05-2141-cv, 05-2326-cv
Khulumani v. Barclay National Bank, Ltd., Ntsebeza v. Daimler Chrysler Corp.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2005

(Argued: January 24, 2006                    Decided: October 12, 2007)

Docket Nos. 05-2141-cv, 05-2326-cv

_____

SAKWE BALINTULO KHULUMANI, as personal representative of Saba Balintulo, FANEKAYA DABULA, as personal representative of Lungile Dabula, NOKITSIKAYE VIOLET DAKUSE, as personal representative of Tozi Skweyiya, BERLINA DUDA, as personal representative of Donald Duda, MARK FRANSCH, as personal representative of Anton Fransch, SHERIF MZWANDILE GEKISO, as personal representative of Ntombizodwa Annestina Nyongwana, ELSI GUGA, as personal representative of James Guga, JOYCE HLOPHE, as personal representative of Jeffrey Hlophe, NOMVULA EUNICE KAMA, as personal representative of Mncedisi Dlokova, JOYCE LEDWABA, as personal representative of Samuel Ledwaba, JOHANA LERUTLA, as personal representative of Matthews Lerutla, FRIEDA Z. LUKHULEI, as personal representative of Tokkie Lukhulei, ELIZABETH MAAKE, as personal representative of Jackson Maake, ARCHITON MADONDO, as personal representative of Mandla Madondo, BENJAMIN MAIFADI, TSHEMI MAKEDAMA, as personal representative of Lugile Makedama, MABEL MAKUPE, as personal representative of Andrew Makupe, MABEL MALOBOLA, as personal representative of Malobola Mbuso, EVELYN MATISO, as personal representative of Pitsi Matiso, BETTY MGIDI, as personal representative of Jeffrey Mgidi, ELIZABETH MKHONWANA, as personal representative of Obed Mkhonwana, CATHERINE MLANGENI, as personal representative of Bheki Mlangeni, CECIL MLANJENI, as personal representative of Kele Mlanjeni, SAMUEL MORUDU, as personal representative of Sannah P. Leslie, TSHIDISO MOTASI, as personal representative of John and Penelope Moloke, WILLIE NELANI, as personal representative of Mongezi Nelani, CATHERINE NGQULUNGA, as personal representative of Brian Ngqulunga, CATHERINE PHIRI, as personal representative of Thomas Phiri, ELIZABETH SEFOLO, as personal representative of Harold Sefolo, MARIA SIBAYA, as personal representative of Jeffrey Sibaya, PATRICIAL M. SONGO, as personal representative of Dipulo Songo, MPOLONTSI TYOTE, as personal representative of Boyboy Tyote, NOMKHANGO SKOLWENI DYANTYI, CLIFFORD ZIXELILE FUDUKILE, WINDOVOEL GAAJE, CHARLES HLATSHWAYO, MOSES HLONGWANE, LESIBA KEKANA, SANAKI MAHLATSHI, ROBERT MAKANA, ZAKHARIA FIKILE MAMBA, ELLIOT SITHEMBISO MARENENE, ALFRED MASEMOLA, MAUREEN THANDI MAZIBUKO, MICHAEL MBELE, LAETITIA NOMBAMBO MFECANE, as personal representative of Rubin Mfecane, DENNIS MLANDELI, TEFO MOFOKENG, MOTLALETSATSI MOLATEDI, AZARIEL MOLEBELELI, SIMON MOLOTSI, LINA MOREANE, as personal representative of Albert Xaba, THABISO SAMUEL MOTSIE, SONTO

NDLOVU, MANGINDIVA ROBERT RHENENE, THOBILE SIKANI, BUBELE STEFANE, NOLUTHANDO BILETILE, LESLIE MNCEDISI BOTYA, LEON DUKASCHE, ELSIE GISHI, DORTHIA GOMO-PEFILE, ZAMIKHAYA BISHOP KHALI, JAMES MAGABANA, NOSIPHO MANQUBA, NOTATHU EUGENIA MATOMELA, NOMISA THERSIA MAY, MBONGENI NELSON MBESHU, MZUHLANGENA NAMA, ELIAS NGAMANI, as personal representative of Elizabeth Nagamani, GESHIA NGOXZA, LUCAS NDUKWAYIBUZWA NGWENYANA, WELLINTON MTYUKATO NKOSIPHENDULE, VUYANI NONGCAMA, SINDISWA MIRRIAM NUNU, THULANI NUNU, BONIWE PHALAZA, PATHISWA PRINGANE, as personal representative of Mthozama Theophilus Pringane, MTHUTUZELI SIKANI, NOLUTHANDO SILETILE, THEMBEKA VICTORIA SIPHAHO, JOHANNES TITUS, MPOLONTSI TYOTES, MTHUZIMELE MEFORD YAMILE, NTUNANI WILLIAM ZENANI, THANDIWE SHEZI, ELIAS B. BONENG, DENNIS VINCENT FREDERICK BRUTUS, MORALOKI A. KGOBE, REUBEN MPHELA, LULAMILE RALRALA,

*Plaintiffs-Appellants*,

-v.-

BARCLAY NATIONAL BANK LTD., BRITISH PETROLEUM, PLC, CHEVRONTEXACO CORPORATION, CHEVRONTEXACO GLOBAL ENERGY, INC., CITIGROUP, INC., COMMERZBANK, CREDIT SUISSE GROUP, DAIMLERCHRYSLER AG, DEUTSCHE BANK AG, DRESDNER BANK AG, EXXONMOBIL CORPORATION, FORD MOTOR COMPANY, FUJITSU, LTD., GENERAL MOTORS CORPORATIONS, INTERNATIONAL BUSINESS MACHINES CORP., J.P. MORGAN CHASE, SHELL OIL COMPANY, and UBS AG,

*Defendants-Appellees*,

AEG DAIMLER-BENZ INDUSTRIE, FLUOR CORPORATION, RHEINMETALL GROUP AG, RIO TINTO GROUP, TOTAL-FINA-ELF and DOE CORPORATIONS,

*Defendants*.

_____

LUNGISILE NTSEBEZA,[*] HERMINA DIGWAMAJE, ANDILE MFINGWANA, F.J. DLEVU, LWAZI PUMELELA KUBUKELI, FRANK BROWN, SYLVIA BROWN, NYAMEKA GONIWE, SIGQIBO MPENDULO, DOROTHY MOLEFI, THEMBA MEQUBELA, LOBISA IRENE DIGWAMAJE, KAELO DIGWAMAJE, LINDIWE PETUNIA LEINANA, MATSHIDISO SYLVIA LEINANA, KELEBOGILE PRUDENCE LEINANA, DAVID MOTSUMI, SARAH NKADIMENG, MOEKETSI THEJANE, MOSHOESHOE THEJANE,

---

[*] We direct the Clerk of Court to amend the official caption to reflect this spelling of Ntsebeza's name, which is consistent with the spelling used in his briefs and complaint.

PASCALINAH BOOKIE PHOOFOLO, KHOBOTLE PHOOFOLO, GLADYS MOKGORO, JONGANI HUTCHINGSON, SEFUBA SIDZUMO, GOBUSAMANG LAURENCE LEBOTSO, EDWARD THAPELO TSHIMAKO, RAHABA MOKGOTHU, JONATHAN

MAKHUDU LEDIGA, ANNA LEBESE, SIPHO STANLEY LEBESE, WILLIAM NBOBENI, JOHN LUCAS NGOBENI, CLEMENT HLONGWANE and MASEGALE MONNAPULA,

*Plaintiffs-Appellants*,

SAKWE BALINTULO KHULUMANI, P.J. OLAYI, WELLINGTON BANINZI GAMAGU, Violations of Pass Laws, unlawful detention 1981-1983, torture subjected to discriminatory labor practices 1981 and WILLIAM H. DURHAM,

*Plaintiffs*,

v.

DAIMLER CHRYSLER CORPORATION, NATIONAL WESTMINSTER BANK PLC, COLGATE PALMOLIVE, BARCLAYS BANK PLC, UBS AG, CITIGROUP INC., DEUTSCHE BANK AG, DRESDNER BANK AG, COMMERZBANK AG, FORD MOTOR COMPANY, HOLCIM, INC., EXXON MOBIL CORPORATION, SHELL OIL COMPANY, J.P. MORGAN, MINNESOTA MINING AND MANUFACTURING CO. (3M CO.), GENERAL ELECTRIC COMPANY, BRISTOL-MEYERS SQUIBB CO., E.I. DUPONT DE NEMOURS, XEROX CORPORATION, IBM, GENERAL MOTORS, HONEYWELL INTERNATIONAL, INC., BANK OF AMERICA, N.A., THE DOW CHEMICAL COMPANY, COCA-COLA CO., CREDIT AGRICOLE S.A., HEWLETT-PACKARD COMPANY, EMS-CHEMIE (NORTH AMERICA) INC., CHEVRON TEXACO CORPORATION, AMERICAN ISUZU MOTORS, INC. and NESTLE USA, INC.,

*Defendants-Appellees*,

SULZER AG, SCHINDLER HOLDING AG, ANGLO-AMERICAN CORPORATION, DEBEERS CORPORATION, NOVARTIS AG, BANQUE INDO SUEZ, CREDIT LYONNAIS, and Unknown officers and directors of DANU INTERNATIONAL, STANDARD CHARTERED, P.L.C., CORPORATE DOES, CREDIT SUISSE GROUP, CITIGROUP AG, SECURITIES INC., as successor to Morgan Guaranty, MANUFACTURERS HANNOVER, CHEMICAL BANK & CHASE MANHATTAN BANK, UNISYS CORPORATION, SPERRY CORPORATION, BURROUGHS CORPORATION, ICL, LTD., AMDAHL CORP., Computer Companies, JOHN DOE CORPORATION, HOLCIN, LTD., HENRY BLODGET, JUSTIN BALDAUF, KRISTEN CAMPBELL, VIRGINIA SYER GENEREUX, SOFIA GHACHEM, THOMAS MAZZUCCO, EDWARD McCABE, DEEPAK RAJ, JOHN 1-10 DOE, OERLIKON

CONTRAVES AG, OERLIKON BUHRLE AG, CORPORATE DOES 1-100, ROYAL DUTCH PETROLEUM CO., SHELL TRANSPORT & TRADING COMPANY PLC and SHELL PETROLEUM, INC., MERRILL LYNCH & CO. INC., KENNETH SEYMOUR,

*Defendants*.

_____

BEFORE:  KATZMANN and HALL, *Circuit Judges,* and KORMAN, *District Judge.*[**]

Appeal from a judgment of the United States District Court for the Southern District of New York (Sprizzo, *J.*), dismissing, *inter alia*, plaintiffs-appellants' claims under the Alien Tort Claims Act ("ATCA") and the Torture Victim Protection Act ("TVPA").  We affirm the district court's dismissal of the TVPA claims.  We vacate that portion of the district court's judgment dismissing the plaintiffs' ATCA claims, as well as the district court's denial of the Digwamaje, and Ntsebeza motions to amend, and remand for further proceedings consistent with this opinion. Judge KATZMANN files a separate concurring opinion.  Judge HALL files a separate concurring opinion.  Judge KORMAN files a separate opinion, concurring in part II and dissenting from parts III, IV, and V of the per curiam opinion.

Affirmed in part, vacated in part, and remanded.

> MICHAEL D. HAUSFELD
> Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
> Washington, D.C. for
> *Khulumani Plaintiffs-Appellants*.

> PAUL L. HOFFMAN
> Schonbrun DeSimone Seplow Harris
> & Hoffman LLP
> Venice, California for
> *Ntsebeza & Digwamaje Plaintiffs-Appellants*.

_____

[**] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

FRANCIS P. BARRON
Cravath, Swaine & Moore LLP
New York, New York for
*Defendants-Appellees.*

ROBERT M. LOEB
United States Department of Justice
Washington, D.C. for
*Amicus Curiae United States of America.****

PER CURIAM:

**I**

The plaintiffs in this action bring claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), against approximately fifty corporate defendants and hundreds of "corporate Does." The plaintiffs argue that these defendants actively and willingly collaborated with the government of South Africa in maintaining a repressive, racially based system known as "apartheid," which restricted the majority black African population in all areas of life while providing benefits for the minority white population.

Three groups of plaintiffs filed ten separate actions in multiple federal district courts asserting these apartheid-related claims. *See In re S. African Apartheid Litig.*, 346 F. Supp. 2d 538, 542 (S.D.N.Y. 2004). One group, the Khulumani Plaintiffs, filed a complaint against twenty-three domestic and foreign corporations, charging them with various violations of international law.[1] The other two groups, the Ntsebeza and Digwamaje Plaintiffs, brought class

---

*** A dozen entities participated as *amici*, but only the United States participated in oral argument of the appeal.

[1] The Khulumani Plaintiffs include the Khulumani Support Group, a South African non-governmental organization that "works to assist victims of apartheid-era violence and has 32,700 members who are survivors of such violence," as well as ninety-one individual plaintiffs who are "the

action claims on behalf of the "victims of the apartheid related atrocities, human rights' violations, crimes against humanity and unfair [and] discriminatory forced labor practices." The Digwamaje Plaintiffs also brought claims under the Torture Victim Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note ("TVPA"), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO").

In August 2002, the Ntsebeza Plaintiffs filed a motion with the Judicial Panel on Multidistrict Litigation ("MDL Panel") to transfer all of the actions to the Southern District of New York, and in December 2002, the MDL Panel ordered that transfer for coordinated pre-trial proceedings. *See In re S. African Apartheid Litig.*, 238 F. Supp. 2d 1379, 1380–81 (J.P.M.L. 2002). In July 2003, thirty-one of the fifty-five defendants in the Ntsebeza and Digwamaje actions filed a joint motion to dismiss. Following the transfer of the Khulumani complaint to the Southern District of New York, eighteen of the twenty-three defendants in that action also filed a joint motion to dismiss.[2]

Later that month, Penuell Mpapa Maduna, who was then the Minister of Justice and Constitutional Development for South Africa, submitted an *ex parte* declaration to the district court, stating that the South African government regarded these proceedings as interfering "with

_____

personal representatives of victims of extrajudicial killing, or were themselves tortured, sexually assaulted, indiscriminately shot, or arbitrarily detained by the apartheid regime."

[2] Apparently, not all of the named defendants in the three actions have been served with complaints, and some defendants have indicated that they plan to contest personal jurisdiction. The district court's order granting the motion to dismiss stated that it was "limited to those defendants as to whom the Court's personal jurisdiction is not contested." *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 543 n.3. In addition, eleven of the defendants who joined the motion to dismiss filed separate motions to dismiss on the ground that the plaintiffs' claims were conclusory and failed to meet the pleading standards of Fed. R. Civ. P. 8(a). The district court did not reach those arguments in deciding the motion to dismiss.

a foreign sovereign's efforts to address matters in which it has the predominant interest" and asking that the proceedings be dismissed.[3] After receiving the South African declaration, the district court, *sua sponte*, solicited the views of the United States Department of State.[4] The State Department responded by submitting a "Statement of Interest" asserting that "continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States."

Ruling on the defendants' motions to dismiss, the district court held that the plaintiffs failed to establish subject matter jurisdiction under the ATCA. The district court ruled further that the plaintiffs, having asserted diversity as an alternate basis for jurisdiction, could not establish subject matter jurisdiction on that ground. The district court also held that the plaintiffs failed to state a claim under the TVPA and failed to establish subject matter jurisdiction under RICO. *See In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 554–57. The district court therefore dismissed the plaintiffs' complaints in their entirety. *See id.* at 557. In March 2005, the Ntsebeza and Digwamaje Plaintiffs moved for permission to file an amended consolidated complaint,[5] which the district court denied. *See* Part IV, *infra*. Following the district court's

---

[3] The Ntsebeza and Digwamaje Plaintiffs moved to strike Maduna's declaration and submissions, asserting that the declaration contained "legal argument by a non-party" and "conclusory allegations not supported by any creditable citation to the record," and recited "disputed evidentiary facts." They also argued that international comity could only be raised by a party as an affirmative defense, and even if comity were available, "it would be inappropriate for the Court to dismiss this case without making fact-bound determinations that cannot be made on this record . . . ." The docket sheet indicates that the district court never ruled on this motion.

[4] Specifically, the district court inquired whether "adjudication of these cases would have an adverse impact on the interests of the United States and, if so, the nature and significance of any such impact."

[5] The plaintiffs sought to provide particularized allegations directed at particular defendants, to "meet the new *Sosa* standard," and to clarify for the district court that their ATCA claims were not based

issuance of an amended judgment containing an amended Rule 54(b) certification, the plaintiffs filed timely notices of appeal.[6]

## II

All members of the panel join to affirm the district court's dismissal of the Digwamaje Plaintiffs' TVPA claims. The Digwamaje Plaintiffs asserted a claim under the TVPA, alleging that the defendants "aided and abetted the apartheid regime's subjecting the Plaintiffs to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act . . . under actual or apparent authority, or under color of law." The TVPA provides:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation-
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a). For purposes of the TVPA, an individual "acts under color of law . . . when he acts together with state officials or with significant state aid." *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995). The Digwamaje Plaintiffs, although twice having amended their complaint, failed to link any defendants to state aid or the conduct of state officials.

Further, based on the district court's discussion of the matter of diversity jurisdiction, we affirm the dismissal of the complaints insofar as they seek to assert jurisdiction under 28 U.S.C. § 1332(a)(3).

upon the corporations "merely doing business" in South Africa.

[6] The Digwamaje Plaintiffs have not challenged the dismissal of their RICO claim.

## III

Two members of this panel join to vacate the district court's dismissal of the plaintiffs' ATCA claims because the district court erred in holding that aiding and abetting violations of customary international law cannot provide a basis for ATCA jurisdiction. We hold that in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATCA. The respective rationales of Judges Katzmann and Hall are set forth in separate concurring opinions.

## IV

We further vacate the district court's order denying plaintiffs' motion for leave to amend. In denying this motion, the district court relied, in part, on the erroneous premise that subject matter jurisdiction did not inhere and reasoned that any additional amendments to the pleadings would be futile. Because the denial of the motion rested, in part, on this erroneous premise, we vacate that order. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006) ("The standard for reviewing the denial of a motion to amend a complaint is abuse of discretion . . . ." (internal quotation marks omitted)); *see also Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) ("A district court 'abuses' or 'exceeds' the discretion accorded to it when . . . its decision rests on an error of law (such as application of the wrong legal principle) . . . .").[7] Until

---

[7] Although the district court rested its decision to deny the plaintiffs' motion to replead on several grounds, it is not clear from the district court's order that it would have reached the same result in the absence of its erroneous belief that any amendment would be futile. It seems most respectful of the district court's considerable discretion in this area to allow it to determine in the first instance whether to allow the plaintiffs to replead. In that same vein, we also leave to the district court on remand the first opportunity to consider any motion that may be filed by the Khulumani plaintiffs seeking permission to amend their complaint.

9

the district court has an opportunity to rule on the motion to amend, we cannot be sure that the pleadings in the record before us represent the final version of the plaintiffs' allegations. We therefore decline to determine whether the plaintiffs have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA and remand to the district court to allow it to address the pleadings after amendment as may be permitted has occurred.

# V

Moreover, we decline to affirm the dismissal of plaintiffs' ATCA claims on the basis of the prudential concerns raised by the defendants.[8] In *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), the Supreme Court identified two different respects in which courts should consider prudential concerns in deciding whether to hear claims brought under the ATCA. First,

---

We do not, however, believe it is necessary to vacate the district court's order to the extent that it denied the plaintiffs' motion with respect to their TVPA claims. Given that the plaintiffs had previously amended their complaint twice and did not bring the present motion to amend until after the district court's order dismissing the case, the district court did not abuse its discretion in denying them leave to replead. *See, e.g., Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000) ("A district court has broad discretion in determining whether to grant leave to amend, and we review such determinations for abuse of discretion.").

[8] In his dissent, Judge Korman adamantly asserts that our opinion fails to show deference to the position of the Republic of South Africa, a position that also commands the support of the United States Department of State. Opinion of Judge Korman at 92–100. He presents an analysis of prudential considerations, the strength of which we decline to address, that may well suggest a roadmap for future motion practice before the district court on remand. *Id.* at 73–92. Implicit throughout is the suggestion that by correcting the district court's error and clarifying the applicability of accessorial liability to violations of international law, we have somehow irrevocably, and to the derogation of South Africa's sovereignty, relegated the plaintiffs' claims to the judicial processes of the United States. With all due respect, Judge Korman's position in this regard is overstated and ignores the fact that well before any steps can be taken to address the merits of plaintiffs' claims, the district court may allow for a full airing of prudential concerns and, if it so chooses, engage in an analysis of, and decision regarding, those and other issues, something that has been heretofore lacking.

the Supreme Court held that courts should consider prudential concerns in the context of determining whether to recognize a cause of action under the ATCA. Specifically, the Court explained that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Sosa*, 542 U.S. at 732-33 (internal footnote omitted). Second, the Supreme Court recognized that, in certain cases, other prudential principles might operate to "limit[] the availability of relief in the federal courts for violations of customary international law." *Id.* at 733 n.21.[9]

One such principle specifically identified by the Court was "a policy of case-specific deference to the political branches." *Id.* This policy of "[j]udicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justiciability doctrine known as the 'political question' doctrine." *Whiteman v. Dorotheum GmbH & Co KG*, 431 F.3d 57, 69 (2d Cir. 2005). Another prudential doctrine that the defendants raise in this case is "international comity." *See, e.g.*, *Sosa*, 542 U.S. at 761 (Breyer, J., concurring) (suggesting that courts should consider "whether the exercise of jurisdiction under the [ATCA] is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement"). This doctrine, the application of which "ordinarily lies within the discretion of the district court," asks

---

[9] We reject the proposition endorsed by Judge Korman that the Supreme Court, in a footnote written while deciding a different case, would instruct us on how to decide this case, which was not before it. Opinion of Judge Korman at 73. Instead, we take the Supreme Court's language in footnote 21 of *Sosa* at face value, as simply observing that there is a strong argument that the views of the Executive Branch *on the issue of the case's impact on foreign policy* should be given "serious weight." *Sosa*, 542 U.S. at 733 n. 21. We view summary dismissal at the behest of a footnote as premature. *See Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 363 (2006).

11

whether "adjudication of [the] case by a United States court would offend amicable working relationships with [a foreign country]."[10] *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) (internal quotation marks omitted).

In dismissing the plaintiffs' complaints below, the district court explicitly refrained from addressing the defendants' arguments that the ATCA claim presented a non-justiciable political question.[11] *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 543 n.4 ("Defendants also argue that . . . the matter is a non-justiciable political question. Given the Court's finding that defendants are entitled to relief on other grounds, the Court need not address these remaining grounds for defendants' motion." (internal citation omitted)). Although the district court noted some collateral consequences that might result from the adjudication of these kinds of claims, the consequences it noted were primarily those "that would result from allowing courts in this country to hear civil suits for the aiding and abetting of violations of international norms across the globe." *Id.* at 551. Furthermore, the district court expressly characterized its consideration of the collateral consequences as fulfilling its "duty to engage in 'vigilant doorkeeping.'" *Id.* at 550 (quoting from *Sosa*, 542 U.S. at 729); *see also id.* at 553. As *Sosa* makes clear, this duty is fulfilled in the decision of a federal court to exercise its judicial discretion to recognize a cause of action for a violation of customary international law, an issue distinct from whether the

---

[10] The parties agree that *Sosa*'s reference to "case-specific deference" implicates either the political question or international comity doctrine.

[11] Judge Korman suggests that the content of the Defendant's Joint Motion to Dismiss ("Joint Motion"), cited by the district court, supports the view that the issue of deference to other political branches was addressed below. Opinion of Judge Korman at 93. We fail to see how the content of a motion, the basis for which Judge Korman concedes the district court "declin[ed] to address," *id.*, lends any support to the proposition that the district court reached the issues addressed therein.

12

adjudication of a given suit is barred by political question doctrine. *Sosa*, 542 U.S. at 729. We see no reason to read the district court's citation to this part of *Sosa* as an indication that the court was also (and contrary to its explicit disclaimer) engaged in a consideration of the political question or other prudential doctrines.[12] To the extent that limited portions of the district court's discussion were addressed to the statements of interest submitted by the governments of the United States and South Africa, *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 553–54, these statements were merely illustrative of a general concern with what the court saw as the "far-reaching" consequences of the specific norm it was then discussing (*i.e.,* doing business in South Africa), *id.* at 553. The citation to *Sosa*'s footnote 21 indicates only that the district court considered the views of those governments in assessing "the collateral consequences that would result from finding a new international law violation," *id.*, and does not suffice to demonstrate that the court (again contrary to its stated intentions) adopted *sub rosa* the defendants' political question arguments.

We decline to address these case-specific prudential doctrines now and instead remand to the district court to allow it to engage in the first instance in the careful "case-by-case" analysis that questions of this type require. This approach is particularly appropriate here because the plaintiffs have indicated that, if given the opportunity, they would narrow their claims and clarify

---

[12] It was error for the district court to consider these collateral consequences in the context of deciding preliminarily whether it had jurisdiction to hear this case under the ATCA. However, even if we construed the district court's discussion of the "collateral consequences" as a decision not to recognize a cause of action for plaintiffs' claims, in which context consideration of these consequences would have been appropriate, remand would still be necessary because the district court's decision not to recognize a cause of action might still have rested, in part, on its erroneous view that the ATCA does not allow for claims of aiding and abetting liability. Because we cannot know whether the district court would have declined to recognize the cause of action plaintiffs bring in the absence of that error, we believe it is appropriate to remand, so it can have the opportunity to decide this issue in the first instance.

13

the nature of their allegations against the various defendants, changes that may affect how the district court ultimately decides to resolve these issues.  Oral Argument Tr., Jan. 24, 2006 at 7–8, 14–15; *cf. Zivotofsky v. Sec'y of State*, 444 F.3d 614, 619–20 (D.C. Cir. 2006) (holding that, where the specific relief sought by the plaintiff had changed, remand was appropriate to allow the district court to develop a more complete record as to whether the revised claim presented a nonjusticiable political question).[13]

On remand, the district court will have an opportunity to consider the guidance provided by our prior cases regarding the relevant weight of statements of interest submitted by the United States and other governments.  In *Whiteman*, for example, we addressed "when, and to what extent, . . . the stated foreign policy interests of the United States [should] be accorded deference," and we held that we should be guided in this determination by "our application of the political question doctrine."  431 F.3d at 69, 71.  In that context, we held that "not every case 'touching foreign relations' is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights.  We believe a preferable approach is to weigh carefully the relevant considerations on a case-by-case basis."  *Id.* at 69 (quoting *Kadic*, 70 F.3d at 249).  We have held that "even an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication."[14]  *Kadic*, 70 F.3d at 250.  Likewise, although the views of

---

[13]  While we cannot know how these developments will affect the positions of the United States and South Africa with respect to this litigation, the district court may wish to solicit anew the views of these governments, and thus that fact, too, counsels against us reaching these issues at this time.

[14]  We do not believe the Supreme Court's statement in *Sosa* is to the contrary.  *Sosa*, 542 U.S. at 733 n.21 (noting only that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy").  Indeed, to give dispositive weight

14

foreign nations are an important consideration under the doctrine of "international comity," we have not held them to be dispositive. *See, e.g., Jota v. Texaco Inc.*, 157 F.3d 153, 159–61 (2d Cir. 1998). At this stage in the litigation, we express no view as to what level of deference to their views is appropriate in this particular case. Instead, we remand to the district court so that it may carefully consider whether any of these doctrines require dismissal.

## VI

We therefore AFFIRM the district court's dismissal of the Digwamaje Plaintiffs' TVPA claims. We also AFFIRM the district court's determination that the plaintiffs have failed to satisfy the diversity requirements of 28 U.S.C. § 1332(a)(3). We VACATE the district court's dismissal of the plaintiffs' ATCA claims, as well as the district court's denial of the Digwamaje and Ntsebeza Plaintiffs' motions to amend and REMAND for further proceedings consistent with this opinion.

KATZMANN, *Circuit Judge*, concurring:

This case calls upon us in principal part to determine whether the district court erred in concluding that it does not have jurisdiction over the plaintiffs' claims brought under the Alien Torts Claim Act ("ATCA"), 28 U.S.C. § 1350. I respectfully believe that the district court erred

---

to the Executive Branch's views would likely raise serious separation-of-powers concerns. *Cf., e.g., First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 763 (1972) (Powell, J., concurring) ("I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction. Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with that very doctrine.").

in its analysis of plaintiffs' ATCA claims in two fundamental respects. First, it conflated the jurisdictional and cause of action analyses required by the ATCA. As a result, the district court mistakenly incorporated a discretionary analysis into the determination of whether it has jurisdiction under the ATCA. Second, it erroneously held that aiding and abetting liability does not exist under international law.

## I

The ATCA provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* When we last substantively grappled with the meaning of this statute, we noted that "neither Congress nor the Supreme Court ha[d] definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 247 (2d Cir. 2003). The next year the Supreme Court weighed in on the modern resurgence of the statute in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). While the Court did not definitively resolve all of the complex and controversial questions the ATCA raises, it did clarify to a significant degree how claims brought under the ATCA should be analyzed.

*Sosa* endorsed our Court's prior approach to the ATCA to the extent that we recognized that the Act created jurisdiction for a narrow set of violations of international law, *see id.* at 720 ("Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."); *see also Filartiga v. Pena-Irala*, 630 F.2d 876,

16

887–88 (2d Cir. 1980) (construing the ATCA "as opening the federal courts for adjudication of

. . . well-established, universally recognized norms of international law"), and that a plaintiff's

claim "must be gauged against the current state of international law," *Sosa*, 542 U.S. at 733; *see*

*also Filartiga*, 630 F.2d at 881 ("[I]t is clear that courts must interpret international law not as it

was in 1789, but as it has evolved and exists among the nations of the world today."). The Court

also generally endorsed the cautious approach that we had long applied in determining whether to

hear cases brought under the ATCA. *See, e.g.*, *Sosa*, 542 U.S. at 728–29 (noting that "great

caution" must be exercised in deciding which "norms of today's law of nations may . . . be

recognized legitimately by federal courts"); *see also Flores*, 414 F.3d at 248 ("[I]n determining

what offenses violate customary international law, courts must proceed with extraordinary care

and restraint.").

*Sosa* did, however, deviate from our case law in one crucial respect. We had allowed

cases to proceed under the ATCA on the assumption that when plaintiffs alleged violations of

well-established international law, their "causes of action are statutorily authorized." *Kadic v.*

*Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995); *see also Flores*, 414 F.3d at 245 (discussing the

reception of "*Filartiga*'s holding that the ATCA creates a private right of action for violations of

United States treaties or customary international law"). The Supreme Court flatly rejected this

notion. *See Sosa*, 542 U.S. at 713-14 (citing William R. Casto, *The Federal Courts' Protective*

*Jurisdiction Over Torts Committed in Violation of the Law Of Nations*, 18 Conn. L. Rev. 467,

479, 480 (1986)). *Sosa* construed the statute instead to be of a "strictly jurisdictional nature," in

the sense that it "address[ed] the power of the courts to entertain cases concerned with a certain

subject." 542 U.S. at 713, 714.

This holding led the Court to explore "a new question, this one about the interaction between the [ATCA] at the time of its enactment and the ambient law of the era." *Id.* at 714. The Court rejected the argument that the First Congress passed the ATCA "as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, some day, authorize the creation of causes of action." *Id.* at 719. Rather, the historical materials suggested that "the statute was intended to have practical effect the moment it became law." *Id.* at 724. This practical effect would be achieved through the invocation of causes of action already available at common law. Because some "torts in violation of the law of nations were understood to be within the common law" of 1789, the First Congress would have "understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." *Id.* at 720, 724. No further substantive legislation was required. *Id.* at 724 ("The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.").

Finding that "no development in the two centuries from the enactment of § 1350 to [today] has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law," *id.* at 724–25, the Court held that federal courts retained the ability to "adapt[] the law of nations to private rights" by recognizing "further international norms as judicially enforceable today," *id.* at 728, 729. Most importantly, these norms were enforceable not by virtue of this statutory creation or authorization of a private right of action, as we had previously assumed, but rather through an exercise in "residual common law discretion" to create causes of action under federal common law to remedy the violation of those norms. *Id.*

18

at 738; *see also id.* at 728–31. Thus, *Sosa* makes clear that all ATCA litigation is in fact based on federal common law, rather than a statutory cause of action. But a federal court's power to create these causes of action is not without limits. Indeed, the Court identified a number of "good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind."[1] *Id.* at 725, 728. Its consideration of these factors led the Court to identify a minimum requirement "for accepting a cause of action subject to jurisdiction under § 1350," namely, that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732.

Based on the Supreme Court's holdings in *Sosa* that (1) the ATCA is purely jurisdictional and (2) the common law provides the cause of action for claims brought under that jurisdiction, a federal court faced with a suit alleging a tort in violation of international law must undertake two distinct analytical inquiries. One is whether jurisdiction lies under the ATCA. The other is whether to recognize a common-law cause of action to provide a remedy for the alleged violation of international law. Requiring this analytical separation in ATCA litigation comports with the general principle that whether jurisdiction exists and whether a cause of action exists are two

---

[1] This "series of reasons" comprises (1) a change in the "prevailing conception of the common law" such that there is now "a general understanding that the law is not so much found or discovered as it is either made or created," *Sosa*, 542 U.S. at 725; (2) a "rethinking of the role of the federal courts in making it," *id.* at 726; (3) the recognition that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," *id.* at 727; (4) the fact that "attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences," *id.* at 727–28; and (5) the lack of a "congressional mandate" to engage in judicial lawmaking in this area, *id.* at 728.

distinct inquiries. *See TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002) (noting the Supreme Court's holding that "'the question whether a federal statute creates a claim for relief is not jurisdictional'" (quoting *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 365 (1994)); *cf. Rasul v. Bush*, 542 U.S. 466, 484–85 (2004) (reversing the D.C. Circuit's holding that jurisdiction did not lie under the ATCA without engaging in a cause of action inquiry). Moreover, it reflects the fact that it is Congress, and not the courts, that possesses the power to define the scope of the courts' jurisdiction. *Cf. Whitmore v. Arkansas*, 495 U.S. 149, 155–56, 161 (1990) (noting that "[a] federal court is powerless to create its own jurisdiction" and that a court may not "employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case"). Thus, one might question the extent to which a federal court should exercise its own judgment about the practical consequences of allowing a suit to go forward in the context of its jurisdictional inquiry when, according to the plain language of the ATCA, that inquiry is resolved solely by reference to international law. *Cf. Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 593 (1980) (noting that courts should look to Congress's intent, and not policy considerations, when construing the terms of a jurisdictional statute).[2] By contrast, it is entirely appropriate for courts to consider such concerns in the context of determining whether to recognize a cause of action under federal common law.

---

[2] Federal courts may, of course, decline to accept jurisdiction over a particular case in appropriate circumstances and in accordance with the well-established principles that guide such decisions. I merely suggest that because federal courts "have only the jurisdiction granted to them by Congress," *Carlyle Towers Condo. Ass'n, Inc. v. FDIC*, 170 F.3d 301, 306 (2d Cir. 1999), their exercise of common-law discretion is better viewed as creating a cause of action than jurisdiction. *Cf. Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 974 (5th Cir. 2000) (holding that Congress's grant of authority to the Supreme Court to make rules that affect only the timing of appeals does not constitute an improper delegation of its power to confer jurisdiction).

Having identified the two steps of the inquiry, I now elaborate on what each inquiry requires. Aside from noting that "Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations," *Sosa*, 542 U.S. at 720, the Supreme Court did not discuss the requirements for invoking this jurisdictional grant in a particular case. The ATCA, by its terms, "confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations." *Kadic*, 70 F.3d at 238. In *Flores*, we held that the law of nations, or customary international law,[3] "is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." 414 F.3d at 248; *see also The Paquete Habana*, 175 U.S. 677, 708 (1900) (describing a rule of international law as one reached by "general consent of the civilized nations of the world" and "founded on considerations of . . . the mutual convenience of belligerent states"). In determining whether a given offense meets these requirements, we look to the sources of law identified by the Statute of the International Court of Justice ("ICJ Statute") as the proper sources of international law. *See Flores*, 414 F.3d at 250–51. These include:

a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;

b. international custom, as evidence of a general practice accepted as law;

c. the general principles of law recognized by civilized nations;

---

[3] In *Flores* we noted that the law of nations, as used in the ATCA "refers to the body of law known as customary international law." 414 F.3d at 247.

[and]

d. . . . judicial decisions and the teachings of the most highly qualified publicists

of the various nations, as subsidiary means for the determination of rules of law.

ICJ Statute, art. 38, June 26, 1945, 59 Stat. 1055, 1060.

If jurisdiction is established, the second inquiry is whether a common-law cause of action should be created to provide a remedy for the alleged violation of international law. Recognizing that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind," the Court in *Sosa* "require[d] any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized," namely, "violation of safe conducts, infringement of the rights of ambassadors, and piracy." 542 U.S. at 724–25; *see also id.* at 732 ("[W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."). In setting out this standard, the Court cited with approval our decision in *Filartiga*, noting that "[t]his limit upon judicial recognition is generally consistent with the reasoning of many of the courts and judges who faced the issue before it reached this Court." *Id.*

The Supreme Court instructed that determining whether to recognize a new cause of action "should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732–33. I

22

do not read *Sosa* as requiring that a court individually analyze each of the five reasons it identifies as "argu[ing] for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the . . . statute." *Sosa*, 542 U.S. at 725. These reasons are already captured by the "high bar to new private causes of action" set by the requirement that a claim be accepted by the civilized world and defined with a sufficient degree of specificity. *See id.* at 727–32; *see also id.* at 725 (noting that "there are good reasons for a restrained conception of [a federal court's] discretion" and that "[a]ccordingly . . . courts should require any claim" to meet its standard of acceptance and specificity); David H. Moore, *An Emerging Uniformity for International Law*, 75 Geo. Wash. L. Rev. 1, 40–41 (2006) ("Those concerns, which arise whenever [customary international law] is incorporated as federal common law, are mitigated by the specific definition and mutuality requirements."). I do, however, view the Court's instruction that an element of judgment must be involved in the decision to recognize a cause of action as an invitation to lower courts to consider other prudential concerns consistent with *Sosa*'s approach. As *Sosa* suggests, courts considering the "practical consequences" of recognizing a new cause of action should assess the consequences that might result from making the cause of action generally available to all potential plaintiffs.

In sum, a district court analyzing a claim under the ATCA will normally be required to engage in a two-part analysis. The district court here erred by failing to undertake separately the two parts of this analysis. By conflating these two questions, the district court inappropriately injected a discretionary element into the determination of whether it had jurisdiction under the ATCA. *See In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 551, 553–54. Of greater significance to the district court's ultimate disposition of the plaintiffs' claims, though, was its

23

error in analyzing whether the plaintiffs had alleged a "violation of the law of nations," as is required for plaintiffs to establish both jurisdiction and a cause of action. It is to this analysis that I now turn.

## II

Asking whether "aiding and abetting international law violations . . . [is a] violation[] of the law of nations that [is] 'accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms,'" *Id.* at 549 (quoting *Sosa*, 542 U.S. at 725), the district court concluded that it is not, noting that it found "little [in its review of international law] that would lead [it] to conclude that aiding and abetting international law violations is itself an international law violation that is universally accepted as a legal obligation," *id.* Although I believe the district court was correct to look to international law, I disagree with its analysis.

### A.

The district court's conclusion that its jurisdiction under the ATCA should depend on whether international law specifically recognizes liability for aiding and abetting violations of the law of nations is consistent with our prior case law. We have repeatedly emphasized that the scope of the ATCA's jurisdictional grant should be determined by reference to international law. *See Kadic*, 70 F.3d at 238 (requiring courts to engage in a "searching review" of international law to verify that subject matter jurisdiction lies for a particular action); *see also Flores*, 414 F.3d at 248 (noting that "courts must proceed with extraordinary care and restraint" in "determining

24

what offenses violate customary international law"); *Filartiga*, 630 F.2d at 887 ("The paucity of suits successfully maintained under the section is readily attributable to the statute's requirement of alleging a 'violation of the law of nations' [] at the jurisdictional threshold.").

It is also consistent with the Supreme Court's opinion in *Sosa*. The Court observed in a footnote that "whether a norm is sufficiently definite to support a cause of action" raises a "related consideration [of] whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 542 U.S. at 732 & n.20. While this footnote specifically concerns the liability of non-state actors, its general principle is equally applicable to the question of where to look to determine whether the scope of liability for a violation of international law should extend to aiders and abettors. Furthermore, in *Sosa*, the Supreme Court echoed our prior cases' emphasis on the narrowness of the ATCA's jurisdictional grant. *See id.* at 720 ("Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."); *see also id.* at 712 (describing the statute as a "limited, implicit sanction to entertain the handful of international law *cum* common law claims understood in 1789"). I believe that we most effectively maintain the appropriate scope of this jurisdiction by requiring that the specific conduct allegedly committed by the defendants sued represents a violation of international law.

Most importantly, the district court's approach is consistent with *Sosa*'s broader characterization of the relationship between federal common law and international law. The ATCA's jurisdictional grant "enable[s] federal courts to hear claims in a very limited category *defined by the law of nations*." *Id.* at 712 (emphasis added). Once a court determines that the

25

defendants' alleged conduct falls within one of "the modest number of international law violations with a potential for personal liability" on the defendants' part, it then considers whether "the common law would provide a cause of action" to enable the plaintiffs to bring their claim. *Id.* at 724. The common law thus permits the "independent judicial recognition of actionable international norms," but the courts must, as *Sosa* cautioned, be "vigilant doorkeep[ers]." *Id.* at 729. We recognized this important role for domestic law in *Kadic* when we explained that the "law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations."[4] 70 F.3d at 246. A federal court is free, in the exercise of its common-law discretion, to decline to provide a cause of action for a violation of international law. *See Sosa*, 542 U.S. at 732–33; *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 778 (D.C. Cir. 1984) (Edwards, J., concurring) (explaining that each state may choose whether to impose civil liability for violations of international law). But to assure itself that it has jurisdiction to hear a claim under the ATCA, it should first determine whether the alleged tort was in fact "committed in violation of the law of nations," 28 U.S.C. § 1350, and whether this law would recognize the defendants' responsibility for that violation.

**B.**

I conclude that the recognition of the individual responsibility of a defendant who aids and abets a violation of international law is one of those rules "that States universally abide by, or

---

[4] In *Kadic* we assumed that the ATCA itself created the cause of action, *see* 70 F.3d at 246, but the same principle applies to the common law following *Sosa*.

accede to, out of a sense of legal obligation and mutual concern." *Flores*, 414 F.3d at 248.

Recognized as part of the customary law which authorized and was applied by the war crimes

trials following the Second World War, it has been frequently invoked in international law

instruments as an accepted mode of liability. During the second half of the twentieth century and

into this century, it has been repeatedly recognized in numerous international treaties, most

notably the Rome Statute of the International Criminal Court, and in the statutes creating the

International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International

Criminal Tribunal for Rwanda ("ICTR").[5] Indeed, the United States concedes, and the

defendants do not dispute, that the concept of criminal aiding and abetting liability is "well

---

[5] The district court seems to have dismissed the significance of some of these sources because they imposed criminal and not civil responsibility. *See In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 550. This distinction finds no support in our case law, which has consistently relied on criminal law norms in establishing the content of customary international law for purposes of the ATCA. In *Kadic*, for instance, we held that a defendant could be held liable under the ATCA based on international criminal law norms prohibiting genocide and war crimes. *Kadic*, 70 F.3d at 241–42. In concluding that genocide was actionable under the ATCA, the *Kadic* court relied on a United Nations resolution declaring that genocide is a "crime under international law," G.A. Res. 96(I), at 188–89, U.N. Doc. A/64 (Dec. 11, 1946), the London Charter, Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, E.A.S. 472, and the Genocide Convention, Convention on the Prevention and the Punishment of the Crime of Genocide, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277, which confirms that "genocide, whether committed in a time of peace or in time of war, is a *crime under international law* which [the contracting parties] undertake to prevent and to punish," *id.* at art. I (emphasis added); *see Kadic*, 70 F.3d at 241. *Kadic* also held that jurisdiction existed under the ATCA for "claims of war crimes" because "[t]he liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II," *id.* at 243, notwithstanding that the Nuremberg trials were criminal proceedings and that the proscription of war crimes is self-evidently criminal in nature.

Our past reliance on criminal law norms seems entirely appropriate given that, as Justice Breyer observed in *Sosa*, international law does not maintain the kind of hermetic seal between criminal and civil law that the district court sought to impose. *See Sosa*, 542 U.S. at 762–63 (Breyer, J., concurring). "[T]he criminal courts of many nations combine civil and criminal proceedings, allowing those injured by criminal conduct to be represented, and to recover damages, in the criminal proceeding itself." *Id.* Moreover, the ICTY has recognized the propriety of civil remedies for violations of international criminal law in certain circumstances, noting for example that a torture victim might "bring a civil suit for damage in a foreign court." *Prosecutor v. Furundzija*, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 155 (Dec. 10, 1998).

27

established" in international law.[6]  Brief for the United States as Amicus Curaie, at 21.

The London Charter, which established the International Military Tribunal at Nuremberg, was entered into by the allied powers of World War II, "acting in the interests of all the United Nations," to establish a tribunal to punish violations of international law.  *See* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, pmbl., Aug. 8, 1945, E.A.S. 472 (hereinafter London Charter).  We have previously recognized the London Charter as an authoritative source of customary international law.  *See Flores*, 414 F.3d at 244 n.18; *United States v. Yousef*, 327 F.3d 56, 105 nn.39–40 (2d Cir. 2003) (citing the London Charter for definitions of war crimes and crimes against humanity under international law).  Moreover, other courts, international bodies, and scholars have recognized that the principles set out in the London Charter and applied by the International Military Tribunal are significant not only because they have garnered broad acceptance, but also because they were viewed as reflecting and crystallizing preexisting customary international law.  *See Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) ("The trials for the first time made explicit and unambiguous what was theretofore, as the Tribunal has declared, implicit in

---

[6] The United States also notes that the law governing the initial military commissions established to prosecute acts of international terrorism following the September 11 attacks recognized aiding and abetting as a mode of liability.  *See* Crimes and Elements for Trials by Military Commission, 32 C.F.R. § 11.6(c)(1) (2003). The jurisdiction of the military tribunals was limited to established violations of the law of war or to "offenses that, consistent with that body of law, are triable by military commission."  32 C.F.R. § 11.3(a).  The law of war has long been recognized as a subset of international law. *See Ex parte Quirin*, 317 U.S. 1, 27–28 (1942) ("From the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals.").  While the Supreme Court eventually found that the military commissions lacked the power to proceed, *see Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2759 (2006), nothing in that decision addressed the propriety of including aiding and abetting liability as part of the commissions' jurisdiction.

28

International Law . . . ." (citation, alteration, and internal quotation marks omitted)); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992) ("The legitimacy of the Nuremberg prosecutions rested . . . on the nature of the acts [the defendants] committed: acts that the laws of all civilized nations define as criminal. The universal and fundamental rights of human beings identified by Nuremberg . . . are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*." (citations omitted)); Theodor Meron, *Reflections on the Prosecution of War Crimes by International Tribunals*, 100 Am. J. Int'l L. 551, 559 (2006) ("[T]he Nuremberg and Tokyo Tribunals drew heavily on the 1929 Geneva Prisoner of War Convention and the Fourth Hague Convention of 1907 as establishing the substantive law to be applied—that is, as customary law and general principles of criminal law, and as norms of both state responsibility and individual criminal liability." (footnotes omitted)). Indeed, shortly after the conclusion of the initial war crimes trials, the General Assembly of the United Nations unanimously approved a resolution affirming "the principles of international law recognized by the Charter of the Nürnberg Tribunal and the judgment of the Tribunal." Affirmation of the Principles of International Law Recognized in the Charter of the Nürnberg Tribunal, G.A. Res. 95 (I), at 188, U.N. Doc. A/236 (Dec. 11, 1946) (hereinafter Nuremberg Principles Resolution I).

The London Charter extended individual responsibility for crimes within its jurisdiction not only to "[l]eaders, organizers, [and] instigators" but also to "accomplices participating in the formulation or execution of a common plan or conspiracy to commit" any of the crimes triable by the Tribunal. London Charter art. 6. While the Charter's language taken "literally . . . would seem to imply that the complicity rule did not apply to crimes perpetrated by individual action," as opposed to by common plan, in practice the Tribunal "applied general principles of criminal

29

law regarding complicity." International Law Commission, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, with commentaries, G.A.O.R., 5th session, Supp. No. 12, U.N. Doc. A/1316, ¶¶ 126-27 (1950) ("ILC Principles"). Accordingly, when the International Law Commission ("ILC") formulated the "principles recognized in the Charter . . . and in the judgment of the Tribunal" at the direction of the General Assembly, *see* Nuremberg Principles Resolution I, it omitted any indication of a limitation on accomplice liability. Principle VII provides that "[c]omplicity in the commission of a crime against peace, a war crime, or a crime against humanity . . . is a crime under international law." ILC Principles, Principle VII. The ILC's formulation of the principles is considered to be an authoritative rendering of the formal holdings of the Nuremberg Tribunal and is consulted as an authoritative source of customary international law by the ICTY and ICTR. *See, e.g.*, *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Trial Chamber Judgment, ¶ 526 (Sept. 2, 1998) (citing Principle VII to establish that "participation by complicity in the most serious violations of international humanitarian law was considered a crime as early as Nuremberg"); *see also Prosecutor v. Milosevic*, Case No. IT-02-54, Trial Chamber Decision on Preliminary Motions, ¶¶ 29–30 (Nov. 8, 2001) (finding that "[t]he customary character of [a] rule [of individual responsibility] is further supported by its incorporation in a wide number of other instruments," including, *inter alia*, the ILC Principles).

That the London Charter's use of the term "accomplice" was understood to include those who aid and abet a crime is further confirmed by the law applied in the war crimes trials held in the United States zone of occupation following World War II. War criminals in the United States zone of occupation were tried under Control Council Law No. 10, an act promulgated by

30

the joint allied body that coordinated the governance of post-war Germany. Allied Control

Council Law No. 10 (Dec. 20, 1945) *in Trials of War Criminals Before the Nuernberg Military*

*Tribunals Under Control Council Law No. 10*, at XVIII (William S. Hein & Co., Inc. 1997)

(1949). Control Council Law No. 10 was patterned after the London Charter and enacted under

its authority with the declared purpose to "give [it] effect." *Flick v. Johnson*, 174 F.2d 983,

985–86 (D.C. Cir. 1949). According to Telford Taylor, the Chief of Counsel for War Crimes and

the Chief Prosecutor for the United States under the London Charter, the "underlying principles"

of the London Charter and Law No. 10 "are identical" and the tribunals operating under each

"worked within the same framework" with respect to "the basic principles of international penal

law." Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes*

*Trial Under Control Council Law No. 10*, at 107 (1949), *available at*

http://www.loc.gov/rr/frd/Military_Law/NT_final-report.html. Control Council Law No. 10

imposed criminal liability on anyone who was "an accessory to the commission of any such

crime or ordered *or abetted* the same," Control Council Law No. 10, art. II, sec. 2 (emphasis

added), and tribunals applying Control Council Law No. 10 are viewed by international bodies as

having recognized aiding and abetting liability. *See Prosecutor v. Furundzija*, Case No. IT-95-

17/1, Trial Chamber Judgment, ¶¶ 195–225, 236–40 (Dec. 10, 1998) (reviewing the case law).

We have previously acknowledged the contribution that Control Council Law No. 10 and

the tribunals that applied it have made to customary international law. In *Flores*, to support our

conclusion that "[c]ustomary international law rules proscribing crimes against humanity,

including genocide, and war crimes, have been enforceable against individuals since World War

II," 414 F.3d at 244 n.18, we pointed specifically to Brigadier General Taylor's assessment that

31

"the major legal significance of the Law No. 10 judgments lies . . . in those portions of the judgments dealing with the *area of personal responsibility* for international law crimes," Taylor, *supra*, at 109, *quoted in Flores*, 414 F.3d at 244 n.18. The United States Government, as amicus in this case, similarly acknowledges the role this law has played in establishing the availability of aiding and abetting liability in modern international criminal tribunals. Brief for the United States as Amicus Curaie, at 21 n.11.

Having been accepted as one of the core principles of the post–World War II war crimes trials, the individual criminal responsibility of those who aid and abet violations of international law was repeatedly reflected in international treaties thereafter. These treaties include major agreements addressing fundamental human rights concerns such as torture, apartheid, slavery, and genocide. *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 4, Dec. 10, 1984, 1465 U.N.T.S. 85; International Convention on the Suppression and Punishment of the Crime of Apartheid, art. III(b), Nov. 30, 1973, 1015 U.N.T.S. 243; Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, art. 6, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3; Convention on the Prevention and Punishment of the Crime of Genocide, art III(e), Dec. 9, 1948, 78 U.N.T.S. 277, 280 (hereinafter Genocide Convention). Aiding and abetting liability has also been recognized in treaties addressed to crimes of general international concern such as bribery of foreign officials in international business transactions and drug trafficking.[7]

---

[7] The fact that some of these treaties do not directly criminalize aiding and abetting, but instead require state parties to criminalize it in their domestic law, *see, e.g.*, United Nations Convention Against Transnational Organized Crime, art. 5, G.A. Res. 55/25, at 5-6, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) ("Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences . . . aiding, abetting, facilitating or counselling the commission of serious crime

*See* Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, art. 1 (2), Dec. 17, 1997, *reprinted in* 37 I.L.M. 1 (1998); United Nations Convention on Psychotropic Substances, art. 22 (2)(a)(ii), Feb. 21, 1971, 32 U.S.T. 543, 1019 U.N.T.S. 175. More recently, aiding and abetting has been included in a number of the treaties concerning organized crime and terrorism, which have become prominent concerns of the international community. *See* United Nations Convention Against Transnational Organized Crime, art. 5 (1)(b), G.A. Res. 55/25, at 5–6, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) ; International Convention for the Suppression of the Financing of Terrorism, art. 2 (5)(a), opened for signature Jan. 10, 2000, 39 I.L.M. 270; International Convention for the Suppression of Terrorist Bombings, art. 2 (3)(a), May 23, 2001, 2149 U.N.T.S. 256; *see also* Protocol Against the Smuggling of Migrants by Land, Sea and Air, Supplementing the United Nations Convention Against Transnational Organized Crime, art.5 (1)(b), G.A. Res. 55/25, at 40, U.N. Doc. A/RES/55/25 (Jan. 8, 2001). The United Nations Security Council ("Security Council") also appears to have recognized the importance of accomplice liability in the international response to terrorism, directing states in the wake of the September 11 attacks to "[e]nsure that any person who participates in the financing, planning, preparation or perpetration of terrorists acts or *in supporting* terrorists acts is brought to justice." S.C. Res. 1373, ¶ 2(e), U.N. Doc. S/RES/1373

---

involving an organized criminal group."), does not limit their value as relevant sources of customary international law. Customary international law addresses "those wrongs that are of mutual, and not merely several, concern to States," *Flores*, 414 F.3d at 249 (internal quotation marks and emphases omitted), and where states join a binding agreement to enforce a mode of liability in their domestic law, that decision reflects a matter of mutual, not several, concern and is thus properly considered a subject of customary international law. *See id.* ("Matters of mutual concern between States are those involving States' actions performed towards or with regard to the other . . . . Matters of several concern among States are matters in which States are separately and independently interested." (citation and internal quotation marks omitted)).

(Sept. 28, 2001) (emphasis added).

Aiding and abetting liability continues to be recognized and enforced in international tribunals. The Statutes creating the ICTY and ICTR were adopted by resolutions of the Security Council. In their respective sections on individual criminal responsibility, both statutes impose individual liability on any person "who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution" of a crime. Statute of the International Tribunal for the Former Yugoslavia, art. 7, S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993) (hereinafter ICTY Statute); Statute of the International Criminal Tribunal for Rwanda, art. 6, S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 1994) (hereinafter ICTR Statute).

As with the London Charter, the recognition of aiding and abetting liability in the ICTY Statute is particularly significant because the "Individual Criminal Responsibility" section of that statute was intended to codify existing norms of customary international law. In his report to the Security Council regarding the creation of the ICTY, the Secretary-General explained that "in assigning to the International Tribunal the task of prosecuting persons responsible for serious violations of international humanitarian law, the Security Council would not be creating or purporting to 'legislate' that law. Rather, the International Tribunal would have the task of applying existing international humanitarian law." Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808, ¶ 29, U.N. Doc. S/25704 (May 3, 1993) ("Sec'y-General Report"). Indeed, international law principles "require[d]" that the Tribunal's jurisdiction be limited to "rules of international humanitarian law which are beyond any doubt part of customary [international] law." *Id.* ¶ 34. Accordingly, the provision of aiding and abetting liability in the ICTY statute reflects a determination by both the Secretary-General and

the Security Council, which approved the Secretary-General's report when it enacted the statute, that such liability is firmly established in customary international law. The inclusion of substantively identical language in the statute creating the ICTR presumably reflects a similar determination.[8]

Consistent with its statutory authorization, the ICTY has recognized and applied aiding and abetting liability for violations of international law. *See, e.g.*, *Furundzija*, Trial Chamber Judgment, ¶¶ 249, 275; *Prosecutor v. Tadic*, Case No. IT-94-1-T, Trial Chamber Opinion and Judgment, ¶¶ 689–92, 730, 735, 738 (May 7, 1997). Furthermore, it has done so only after confirming that such liability was part of customary law. As the Tribunal recognized, it was required to determine "the objective basis for such individual responsibility as a matter of customary international law . . . since the International Tribunal is only empowered to apply international humanitarian law that is 'beyond any doubt customary law.'" *Tadic,* Trial Chamber Opinion and Judgment, ¶ 662 (quoting Sec'y General Report ¶ 34). The Tribunal therefore conducted a probing and thoughtful analysis of international law sources in its early decisions to confirm that aiding and abetting liability is recognized in customary international law. *See Furundzija*, Trial Chamber Judgment, ¶¶ 190–249; *Tadic*, Trial Chamber Opinion and Judgment, ¶¶ 661–91.

---

[8] The Security Council did "elect[] to take a more expansive approach to the choice of the applicable law" with respect to punishable violations by providing for liability for violations of Additional Protocol II and common article 3 of the Geneva Convention despite the fact that Additional article II had "not yet been universally recognized as part of customary international law," and violations of common article 3 had never before been criminalized. Report of Secretary-General Pursuant to Paragraph 5 of Security Council Resolution 955, ¶ 12, UN doc. S/1995/134 (Feb. 13, 1995). With respect to individual responsibility, though, the Security Council adhered to customary law by adopting the language used in the ICTY Statute.

More recently, the Rome Statute of the International Criminal Court ("Rome Statute"),

July 17, 1998, 2187 U.N.T.S. 90, provides that a person shall be criminally responsible and liable

for punishment for a crime within the jurisdiction of the ICC if that person:

> (c)      For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission; [or]

> (d)      In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:
>
>> (i)      Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or
>>
>> (ii)      Be made in the knowledge of the intention of the group to commit the crime[.]

*Id.* art. 25 (3)(c), (d). The Rome Statute is particularly significant for the present inquiry because,

unlike other sources of international legislation, it articulates the *mens rea* required for aiding and

abetting liability. The Statute makes clear that, other than assistance rendered to the commission

of a crime by a group of persons acting with a common purpose, a defendant is guilty of aiding

and abetting the commission of a crime only if he does so "[f]or the purpose of facilitating the

commission of such a crime." *Id*. art. 25 (3)(c).

In drawing upon the Rome Statute, I recognize that it has yet to be construed by the

International Criminal Court; its precise contours and the extent to which it may differ from

customary international law thus remain somewhat uncertain. Nevertheless, the Statute has been

signed by 139 countries and ratified by 105, including most of the mature democracies of the

world.[9]  It may therefore be taken "by and large . . . as constituting an authoritative expression of the legal views of a great number of States."  *Furundzija*, Trial Chamber Judgment, ¶ 227.

Furthermore, the Rome Statute's *mens rea* standard is entirely consistent with the application of accomplice liability under the sources of international law discussed above.[10]  For example, in the *Ministries Case* conducted under Control Council Law No. 10, the tribunal declined to impose criminal liability on a bank officer who was alleged to have "made a loan, knowing or having good reason to believe that the borrower w[ould] use the funds in financing enterprises [conducted] in violation of either national or international law," but was not proven to have made the loan with the purpose of facilitating the enterprises' illegal activities.[11]  *United States v. von Weizsaecker* (*The Ministries Case*), *in* 14 *Trials of War Criminals Before the*

---

[9] The United States has not ratified the Rome Treaty for reasons unrelated to any concern over the definition of aiding-and-abetting.  *See* Brief for the United States as Amicus Curaie, at 24 n.14; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 339–40 (S.D.N.Y. 2005) ("[T]he United States feared 'unchecked power in the hands of the prosecutor' that could lead to 'politicized prosecution.'").  Indeed, the Amicus Brief appears to endorse the elements set out in Article 25(3).  Brief for the United States as Amicus Curaie, at 26.

[10] The same standard was also adopted by the United Nations Transitional Administration in East Timor ("UNTAET").  *See* UNTAET Reg. No. 2000/15 § 14.3(c).

[11] There are occasions when this intent could be inferred from such sales.  In *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), the Supreme Court held that the sale of restricted goods with an inherent capacity for harm, such as the opiates involved in that case, combined with other factors, may be sufficient to prove that the seller was engaged in a conspiracy with the buyer.  *Id*. at 711.  Nevertheless, it observed that "not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy."  *Id.* at 712.  For example, the Court held that a conspiracy charge might not lie against a company engaged in a "continuous course of sales, made either with strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase."  *Id.* at 712 n.8.  On the other hand, sales of unlimited quantities stimulated "by all the high-pressure methods, legal if not always appropriate in the sale of free commodities," *id.* at 712, would suffice to support such a charge.  Another example that would suffice is the *Zyklon B* case, *Trial of Bruno Tesch and Two Others*, *in* 1 *Law Reports of War Criminals* 93 (William S. Hein & Co., Inc. 1997) (1946), where the principal defendant not only supplied prussic acid to the S.S. but undertook to train its members how it could be used to kill human beings.  *Id.* at 95.

37

*Nuernberg Military Tribunals Under Control Council Law No. 10* 308, 622 (William S. Hein &

Co., Inc. 1997) (1949). Meanwhile, those who assist in the commission of a crime with the

purpose of facilitating that crime would be subject to aiding and abetting liability under the

statutes governing the ICTY and ICTR.[12] My research has revealed no source of international

law that recognizes liability for aiding and abetting a violation of international law but would not

authorize the imposition of such liability on a party who acts with the purpose of facilitating that

violation (provided, of course, that the *actus reus* requirement is also satisfied).

With respect to the *actus reus* component of the aiding and abetting liability, the

international legislation is less helpful in identifying a specific standard. However, in the course

of its analysis of customary international law, the ICTY concluded that "the *actus reus* of aiding

and abetting in international criminal law requires practical assistance, encouragement, or moral

support which has a *substantial effect* on the perpetration of the crime." *Furundzija*, Trial

Chamber Judgment, ¶ 235 (second emphasis added). My research has uncovered nothing to

indicate that a standard other than "substantial assistance" should apply.

Accordingly, I conclude that a defendant may be held liable under international law for

---

[12] These Tribunals would also extend liability to individuals who merely had "knowledge that [their] acts assist the commission of the specific crime of the principal." *Prosecutor v. Vasiljevic*, Case No. IT-98-32-A, Appeals Chamber Judgment, ¶ 102 (ii) (Feb. 25, 2004). Any individual who acts with the purpose to facilitate the commission of a crime would necessarily act with such knowledge. Thus, I do not view the articulation of a broader definition by the ICTY as detracting from my position that liability in accordance with the purposefulness standard is well-established and universally recognized under international law. The critical question is whether there is a discernable core definition that commands the same level of consensus as the 18th-century crimes identified by the Supreme Court in *Sosa*. *See Sosa*, 542 U.S. at 732. I believe that the standard I adopt is such a definition. *Cf. United States v. Smith,* 18 U.S. (5 Wheat.) 153, 161 (1820) (noting that "whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, animo furandi, is piracy").

aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime. Furthermore, based on this review of international law's treatment of aiding and abetting liability over the past sixty years, I conclude that aiding and abetting liability, so defined, is sufficiently "well-established[] [and] universally recognized" to be considered customary international law for the purposes of the ATCA. *See Kadic*, 70 F.3d at 239 (internal quotation marks omitted). This conclusion comports with the decisions of several other federal courts that have considered the issue.[13] *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 287 (E.D.N.Y. 2007) (noting the "vast body of law finding aiding and abetting liability available under the [ATCA]"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006) ("Aiding and abetting liability is a specifically defined norm of international character that is properly applied as the law of nations for purposes of the [ATCA]."); *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2455752, *3–4 (N.D. Cal. Aug. 22, 2006); *In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 52–54 (E.D.N.Y. 2005).

## C.

While I conclude that, at present, only aiding and abetting liability imposed in accordance with the standard outlined above is sufficiently well-established and universally recognized under

---

[13] In light of this conclusion, I need not address the plaintiffs' argument that a theory of aiding and abetting liability could be supplied by domestic federal common law even if such liability did not exist under international law.

international law to trigger jurisdiction under the ATCA, I appreciate that this definition is not necessarily set in stone. International law, like our domestic law, can change, and the ATCA was intended to change along with it. *See Sosa*, 542 U.S. at 728 (noting Congress's intention in passing the TVPA that the ATCA "'remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law'" (quoting H.R. Rep. No. 102-367, pt. 1, p. 3 (1991)); *see also id.* at 725 (articulating the standard for courts hearing "any claim based on the *present-day* law of nations" (emphasis added)). In this regard, I note that there is some support, principally in tribunal decisions from the ICTY and ICTR, for a definition of aiding and abetting that would lead to liability where an individual provides substantial assistance with "the knowledge that the acts performed by the aider and abettor assist the commission of the specific crime of the principal."[14] *Prosecutor v. Vasiljevic*, Case No. IT-98-32-A, Appeals Chamber Judgment, ¶¶ 102 (i)–(ii) (Feb. 25, 2004); *see also Furundzija*, Trial Chamber Judgment, ¶¶ 249, 275; *Tadic*, Trial Chamber Opinion and Judgment, ¶¶ 689–92, 730, 735, 738.

To be sure, I acknowledge limitations on the extent to which we may rely on the decisions of the ICTY and ICTR for the present purposes.[15] Those decisions arise out of

_____

[14] The Appeals Chamber, which is shared by both the ICTY and the ICTR, has made clear that the same law relating to modes of liability applies in both Tribunals. *See Prosecutor v. Ntakirutimana*, Case Nos. ICTR-96-10-A, ICTR-96-17-A, Appeals Chamber Judgment, ¶ 468 (Dec. 13, 2004) ("Given the fact that both the ICTY and the ICTR have mirror articles identifying the modes of liability by which an individual can incur criminal responsibility, the Appeals Chamber is satisfied that the jurisprudence of the ICTY should be applied to the interpretation of Article 6(1) of the ICTR Statute.").

[15] I note a possible tension in the tribunals' definition aiding and abetting under which the necessary *mens rea* is knowing assistance, *Vasiljevic*, Appeals Chamber Judgment, ¶ 102(ii), yet requires that the act of assistance be "specifically directed to assist . . . the perpetration of a specific crime," *id.* ¶ 102(i). I express no view on how, if at all, this possible tension might be resolved.

40

completely distinct factual contexts and often involve defendants who might have been convicted on alternate theories of liability. Moreover, as a scholar and participant in the ICTY noted, panels of that Tribunal occasionally (and consciously) engaged in discussions "peripheral to the *ratio decidendi* of a case" in order to provide "clarification [that] might have some value for the future development of international criminal law." Antonio Cassese, *The ICTY: A Living and Vital Reality*, 2 J. Int'l Crim. Just. 585, 589–90 (2004). Such clarification through dicta can be useful and is not necessarily without justification. *See id.* at 590 ("[T]he absence of an international law-maker and an international court with compulsory universal jurisdiction entails that many rules are not clear, particularly when they are of customary origin, and are thus open to differing interpretations—hence the need for courts gradually to spell out the contents of those rules, if need be through *obiter dicta*."); *see also* 1 Oppenheim's International Law: Peace 41 (Robert Jennings & Arthur Watts eds., 9th ed. 1992) (noting that "in view of the difficulties surrounding the codification of international law," international tribunals are expected to "fulfil, inconspicuously but efficiently, a large part of the task of developing international law"). But it "may also prove simply academic and sometimes also misleading for future courts pronouncing on the same matters." Cassese, *supra*, at 590.

Nevertheless, the opinions of the ICTY and ICTR provide evidence of the state of customary international law. As a leading treatise explains, "decisions of international tribunals . . . exercise considerable influence as an impartial and considered statement of the law by jurists of authority in light of actual problems which arise before them." 1 Oppenheim's, *supra*, at 41; *see also* Ian Brownlie, Principles of Public International Law at 19 (noting that "the practical significance of the label 'subsidiary means' in Article 38(1)(d) is not to be exaggerated"). The

ICTY has been specifically recognized as having provided "a number of significant findings on issues of law." Brownlie, *supra*, at 23; *see also* Cassese, *supra*, at 591–93 (arguing that the ICTY "clarified the contours of many notions of international criminal law," including "the notion of aiding and abetting"); *cf. Sosa*, 542 U.S. at 734 ("'[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat.'" (quoting *The Paquete Habana*, 175 U.S. at 700) (alteration in original)). While I am unable to find that liability predicated on the definition of aiding and abetting offered in the decisions of the ICTY and ICTR is sufficiently well-established and universally recognized to trigger jurisdiction for a tort suit under the ATCA, particularly in light of the higher standard articulated in the Rome Statute, I am mindful of the conclusions of these tribunals.[16]

---

[16] I note further that other federal courts have consulted decisions of the ICTY and ICTR in determining whether various rules are part of customary international law. *See, e.g., Hamdan*, 126 S.Ct. at 2785 n. 40 (ICTY); *Sosa*, 542 U.S. at 762 (Breyer, J. concurring) (ICTY); *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1290–93 (11th Cir. 2002) (ICTY and ICTR); *Tagaga v. INS*, 228 F.3d 1030, 1035 n.10 (9th Cir. 2000) (ICTY); *Almog*, 471 F. Supp. 2d at 286 (noting that "[s]tandards for imposing liability where a non-primary actor is alleged to be liable for a violation of the law of nations emerge from," in part, the ICTY and ICTR case law); *Presbyterian Church of Sudan*, 453 F. Supp. 2d at 666–68 (analyzing ICTY cases to determine the elements of aiding and abetting liability under international law); *In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d at 54 (same); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1356 (N.D. Ga. 2002).

## D.

## 1.

Judge Korman argues that it is insufficient to inquire whether aiding and abetting is generally recognized under customary international law and that the appropriate inquiry is instead to engage in a "norm-by-norm analysis" to determine whether aiding and abetting liability exists for the violation of a particular rule. Opinion of Judge Korman at 134. Yet this is not how the inquiry is undertaken by international tribunals whose jurisdiction is limited by customary international law.

In *Tadic*, the Appeals Chamber of the ICTY considered whether a defendant could be held criminally responsible under international law on a common purpose or joint criminal enterprise (JCE) theory of liability. *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 185 (July 15, 1999). After concluding that the ICTY Statute permitted such liability, the tribunal turned to customary law.[17] The Appeals Chamber reviewed relevant sources of customary law including case law from post–World War II war crimes cases, international treaties, and the domestic law of many countries. It then concluded that "the notion of common design as a form of accomplice liability is firmly established in customary international law." *Id.* ¶ 220. The Appeals Chamber made no effort, though, to distinguish among the different crimes (or even broad categories of crimes) over which it had jurisdiction or to verify the existence of

---

[17] *See Prosecutor v. Milutinovic*, Case No. IT-99–37-AR72, Appeals Chamber Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction - *Joint Criminal Enterprise*, ¶ 17 (May 21, 2003) (noting that each chamber has a "duty to ascertain that a . . . form of liability charged in the indictment is both provided for under the Statute and that it existed at the relevant time under customary international law.").

JCE liability at customary law for each individual crime. Later panels have confirmed that *Tadic*'s review of "state practice and *opinio juris* . . . was sufficient" to establish that "such a norm existed under customary international law." *Prosecutor v. Milutinovic*, Case No. IT-99–37-AR72, Appeals Chamber Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction - *Joint Criminal Enterprise*, ¶ 29 (May 21, 2003); *see also Prosecutor v. Brdjanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 363 (Apr. 3, 2007).

These tribunals took the same approach with respect to the application of aiding and abetting liability. In *Tadic*, the ICTY trial chamber viewed international treaties and trials following the Second World War as "establish[ing] the basis in customary international law for both individual responsibility and of participation in the various ways provided by Article 7 of the [ICTY] Statute." *Tadic*, Trial Chamber Opinion and Judgment, ¶ 669. In *Furundzija*, the trial chamber consulted post–World War II case law, as well as modern authoritative international instruments, to "establish the content" of aiding and abetting liability under customary international law. *Furundzija,* Trial Chamber Judgment, ¶¶ 191, 195–231. In neither case did the Tribunal engage in the norm-specific inquiry advocated by Judge Korman. Indeed, the *Furundzija* Trial Chamber concluded that "[t]he definitions and propositions concerning aiding and abetting [it] enunciated . . . apply . . . to all crimes," even though it had not purported to identify sources relating to every crime over which it had jurisdiction. *Id.* ¶ 250. Yet these analyses are recognized as authoritative by other chambers of the Tribunals. *See, e.g.*, *Prosecutor v. Aleksovski*, Case No. IT-95-14/1-A, Appeals Chamber Judgment, ¶ 162 (Mar. 24, 2000) (noting that "[t]he liability of a person charged with aiding and abetting another person in the commission of a crime was extensively considered by Trial Chamber II in the *Furundzija*

44

Judgment" and adopting its conclusions); *Prosecutor v. Bagilishema*, Case No. ICTR-95-1A-T, Trial Chamber Judgment, ¶ 32 n.22 (June 7, 2001) (citing *Tadic* for discussion of "the customary nature of the[] principles" of aiding and abetting liability).

The international tribunals' approach is consistent with the understanding that aiding and abetting is a theory of liability for acts committed by a third party. As we have recognized in our domestic criminal law, "aiding and abetting 'does not constitute a discrete criminal offense but only serves as a more particularized way of identifying persons involved'" in the underlying offense. *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999) (quoting *United States v. Oates*, 560 F.2d 45, 54 (2d Cir. 1977) (internal quotation marks omitted)); *see also Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (explaining that "aiding and abetting is a theory for holding the person who aids and abets liable for the tort itself"). International law is consistent with domestic law on this point. *See, e.g.*, *Prosecutor v. Kunarac*, Case Nos. IT-96-23-T & IT-96-23/1-T, Trial Chamber Judgment, ¶ 391 (Feb. 22, 2001) ("As opposed to the 'commission' of a crime, aiding and abetting is a form of accessory liability."); *Akayesu*, Trial Chamber Judgment, ¶ 527 (defining an accomplice as "someone who associates himself in an offence committed by another"); *see also Hamdan*, 126 S. Ct. at 2785 n.40 ("The International Criminal Tribunal for the former Yugoslavia (ICTY), drawing on the Nuremberg precedents, has adopted a 'joint criminal enterprise' theory of liability, but that is a species of liability for the substantive offense (akin to aiding and abetting), not a crime on its own."). Because aiding and abetting is a generally applicable means of identifying who should be held responsible for a particular act, rather than a necessary element of the act itself, it is more reasonable to consider whether the theory is accepted as a general principle of customary international law than to ask whether each

45

substantive norm that proscribes a specific conduct encompasses liability for aiding and abetting. *See, e.g.*, Rome Statute (including the provision on individual criminal responsibility in "Part III: General Principles of Criminal Law" and the definition of the substantive offenses in Part II); ICTR Statute (segregating the article defining individual criminal responsibility from the articles describing the substantive offenses); ICTY Statute (same); Draft Code of Crimes Against the Peace and Security of Mankind, Report of the International Law Commission on the work of its forty-eighth session, U.N. GAOR, 51st Sess., Supp. No. 10, U.N. Doc. A/51/10 (1996) (including the article on individual responsibility in "Part One: General Provisions" and the definitions of crimes in "Part Two: Crimes Against the Peace and Security of Mankind").

## 2.

Viewing aiding and abetting in this way, as a theory of identifying who was involved in an offense committed by another rather than as an offense in itself, also helps to explain why a private actor may be held responsible for aiding and abetting the violation of a norm that requires state action or action under color of law. It is true, as we held in *Kadic*, that "certain forms of conduct" violate the law of nations only when undertaken by state actors or those acting under color of law. *Kadic*, 70 F.3d at 239. But imposing liability on private actors who aid and abet such conduct does not, contrary to Judge Korman's suggestion, detract in any way from this requirement. Indeed, the imposition of aiding and abetting liability under international law requires "a predicate offence committed by someone other than the accomplice," in this case, a state actor or someone acting under color of law. *Akayesu*, Trial Chamber Judgment, ¶ 529. Recognizing the responsibility of private aiders and abettors merely permits private actors who substantially assist state actors to violate international law and do so for the purpose of

46

facilitating the unlawful activity to be held accountable for their actions.

It is of no moment that a private actor could be held liable as an aider and abettor of the violation of a norm requiring state action when that same person could not be held liable as a principal. In our domestic law, it is "well settled that one may be found guilty of aiding and abetting another individual in his violation of a statute that the aider and abettor could not be charged personally with violating." *In re Nofziger*, 956 F.2d 287, 290 (D.C. Cir. 1992); *see also United States v. Tannenbaum*, 934 F.2d 8, 14 (2d Cir. 1991) ("The fact that the accused does not possess the legal capacity to commit the substantive offense does not mean that he cannot be convicted . . . of aiding and abetting the commission of the substantive offense by another. Thus, the inability to commit the substantive offense is immaterial." (citations omitted)). Indeed, "[t]he doctrine is of ancient origin." *Nofziger*, 956 F.2d at 291. International law, too, recognizes that criminality is assessed by reference to the actions of the principal, not the aider and abettor. *See Akayesu,* Trial Chamber Judgment, ¶ 528 ("[I]t should be understood that the physical act which constitutes the act of complicity does not have its own inherent criminality, but rather it borrows the criminality of the act committed by the principal perpetrator of the criminal enterprise. . . . The accomplice has not committed an autonomous crime, but has merely facilitated the criminal enterprise committed by another.").

The defendants and the government argue that the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), precludes us from recognizing aiding and abetting liability for claims brought under the ATCA because "where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred." *See In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 550.

47

The Court's holding in *Central Bank* was primarily premised on a recognition that § 10(b) does not prohibit aiding and abetting, and "the private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)." *Central Bank*, 511 U.S. at 173. Here, however, the ATCA provides jurisdiction for the courts to hear torts "committed in violation of the law of nations." The Supreme Court's instruction in *Central Bank* that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors," 511 U.S. at 182, is thus inapposite. Under the ATCA, the relevant norm is provided not by domestic statute but by the law of nations, and that law extends responsibility for the violations of its norms to aiders and abettors. *See* William R. Casto, *The New Federal Common Law of Tort Remedies for Violations of International Law*, 37 Rutgers L.J. 635, 650 (2006) (noting that "[t]he precise holding in *Central Bank* . . . does not translate easily to [ATCA] litigation," and that "at a fundamental level" *Central Bank* in fact suggests that a theory of aiding and abetting liability may be recognized if "a norm of international law forbids private persons to assist violators"). Thus, I conclude that customary international law recognizes liability for aiding and abetting violations of international law, and that the district court erred when it reached the contrary conclusion.

**3.**

Judge Korman further argues that the defendants cannot be held liable as aiders and abettors because the sources that establish accessorial liability do not extend that liability to corporations. Opinion of Judge Korman at 118. This argument was not raised by the defendants on appeal and therefore the issue was not briefed by the parties. It is perhaps not surprising that

48

neither the defendants nor the United States raised this issue as a bar to liability: We have repeatedly treated the issue of whether corporations may be held liable under the ATCA as indistinguishable from the question of whether private individuals may be. *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447 (2d Cir. 2000) (asking "whether Coca-Cola can have violated 'the law of nations' if it acted solely as a non-governmental entity"); *see also Flores*, 414 F.3d at 244 (making no distinction between private individuals and corporations and noting that "certain activities are of 'universal concern' and therefore constitute violations of customary international law not only when they are committed by state actors, but also when they are committed by private individuals" (citing *Kadic*, 70 F.3d at 239–40)); *cf. Sosa*, 542 U.S. at 732 n.20 (classifying both corporations and individuals as "private actor[s]"). Regardless, because the defendants have not objected to the imposition of liability on this basis, we need not reach the issue at this time.

## E.

The Ntsebeza and Digwamaje Plaintiffs argue that the district court also erred in focusing on whether allegations of accessorial liability would support jurisdiction under the ATCA because they also brought claims of direct liability. To the extent that the court did confront these direct liability claims, it appears to have rejected them either on the ground that the plaintiffs failed to allege state action or on the ground that the treaties upon which the claims were based were not self-executing and therefore could not satisfy the ATCA's jurisdictional prerequisite. Both of these bases appear to rest on misunderstandings of our ATCA

jurisprudence.

First, it appears that the district court did not distinguish between norms of international law that apply only to state actors and those norms that proscribe conduct even when not taken under the color of law. For example, the district court held that the plaintiffs in this case "do not allege actions by the defendants that elevate them to the status of state actors in the commission of torture, genocide, killings, and other serious crimes." *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 548–59. As we squarely held in *Kadic*, however, "the proscription of genocide [by customary international law] has applied equally to state and non-state actors," and "acts of rape, torture, and summary execution . . . are actionable under the [ATCA], without regard to state action, to the extent that they were committed in pursuit of genocide or war crimes." 70 F.3d at 242, 244. It is therefore not relevant whether the plaintiffs sufficiently allege that the defendants acted under color of law in the commission of genocide as long as they sufficiently allege that the defendants committed genocide.

Second, I believe that the district court overstated the weight we have placed on the self-executing status of a treaty in our consideration of its weight as evidence of customary international law. In *Flores*, we explained that "a treaty that is self-executing or that has been executed through an Act of Congress—and therefore gives rise to rights legally enforceable in our courts—provides greater evidence of the customs and practices of the United States than a treaty that has not been executed." 414 F.3d at 257. We did not hold that non-self-executing treaties are without any evidentiary value with regard to the state of current customary international law, much less that "no liability based upon any alleged violation of the[] norms [articulated in such treaties] can form an adequate predicate for jurisdiction under the ATCA."

50

*In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 552.  Indeed, in *Kadic* we relied on the

Genocide Convention to determine the shape of the international proscription of genocide and

made clear that "the legislative decision not to create a new private remedy does not imply that a

private remedy is not already available under the [ATCA]."[18]  *Kadic*, 70 F.3d at 241–42.  The

relevant inquiry for establishing jurisdiction under the ATCA, as our case law makes clear, is

whether the conduct alleged by the plaintiffs violates a norm "that States universally abide by, or

accede[] to, out of a sense of legal obligation and mutual concern."  *Flores*, 414 F.3d at 248.

Whether a treaty that embodies that norm is self-executing is relevant to, but is not determinative

of, that question.


### III

For the foregoing reasons, I join in the per curiam opinion.

---

[18] Apparently recognizing that the Genocide Convention may be used to support the existence of genocide as a violation of the law of nations, Judge Korman nonetheless suggests that the district court should not recognize a cause of action for genocide because "Congress has quite plainly indicated its intention that such a cause of action should not be available" through its passage of the Genocide Convention Implementation Act, 18 U.S.C. § 1091.  Opinion of Judge Korman at 116–17; *see also* 18 U.S.C. § 1092 (providing that nothing in the Act should be "construed as creating any substantive or procedural right enforceable by law by any party in any proceeding").  It is unnecessary to resolve this issue as part of the jurisdictional analysis, and I would leave it to the district court to address in the first instance should it undertake to decide whether to recognize a cause of action.

Hall, *Circuit Judge*, concurring:

As reflected in the per curiam opinion, I agree with Judge Katzmann with respect to the ultimate disposition of this appeal. The district court erred when it ruled that it lacked jurisdiction under the ATCA to determine plaintiffs' claims based on defendants' accessorial liability. In ruling that it lacked subject matter jurisdiction under the ATCA, the district court required that "aiding and abetting international law violations [be] itself an international law violation that is universally accepted as a legal obligation." *In re S. African Apartheid Litig.*, 346 F. Supp. 2d 538, 549 (S.D.N.Y. 2004). In other words, the district court assumed that a federal court must look to international law to divine not only the applicable primary violation of international law cognizable under the ATCA, but also the standard for aiding and abetting liability. The district court went on to conclude that aiding and abetting liability did not exist as a matter of customary international law and thus that federal subject matter jurisdiction did not lie. This conclusion was error. As *Sosa* makes clear, a federal court must turn to international law to divine standards of primary liability under the ATCA. To derive a standard of accessorial liability, however, a federal court should consult the federal common law.

**I**

**A**

We begin with the text. In its entirety, the ATCA provides:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

52

28 U.S.C. § 1350.  The First Congress enacted the statute as part of the Judiciary Act of 1789.  Over the course of the last 200-odd years, the text of the statute has changed only slightly, but "little is known of the framers' intentions in adopting it—the legislative history of the Judiciary Act does not refer to section 1350."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 304 (S.D.N.Y. 2003).  Few parties invoked the ATCA until our decision in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), which heralded the modern era of ATCA litigation.  But from the very beginning, the ATCA's straightforward text belied complex and controversial problems of exegesis and praxis.  Struggling with these problems in the wave of litigation that followed *Filartiga*, we observed that "neither Congress nor the Supreme Court ha[d] definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA."  *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 247 (2d Cir. 2003).

One year later, in an attempt to clarify the problems posed by the ATCA, the Supreme Court issued *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  Principally, *Sosa* resolved that the ATCA was not "a jurisdictional convenience to be placed on the shelf for use by a future Congress . . . that might, someday, authorize the creation of causes of action."  *Id*. at 719.  Instead, the ATCA recognizes "claim[s] based on the present-day law of nations" so long as they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms."  *Id*. at 725.

**B**

In their complaints, the plaintiffs make claims that rest on such norms "defined with a

53

specificity comparable to the features of the 18th-century paradigms." The allegations include genocide, torture, cruel and degrading treatment, systematic racial discrimination, forced removals, and various other avowed crimes against humanity. In essence, the plaintiffs assert that apartheid itself is a crime against humanity,[1] on a par with genocide[2] and slavery, and that the depredations of the apartheid system (such as torture, sexual assault, extrajudicial killing, and forced labor) were perpetrated in the course of genocide and crimes against humanity. In their brief and at oral argument, the corporations did not contest that such allegations reflected violations of customary international law.[3] Though their complaints are not models of precision,

_____

[1] The Charter of the International Military Tribunal (Nuremberg Tribunal) describes crimes against humanity as:

> murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of domestic law of the country where perpetrated.

Charter of the International Military Tribunal, art. 6(c), *in* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, E.A.S. No. 472.

[2] The Genocide Convention defines genocide as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
>> (a) Killing members of the group;
>> (b) Causing serious bodily or mental harm to members of the group;
>> (c) Deliberately inflicting on the group conditions of life calculated to bring
>> about its physical destruction in whole or in part.

Convention on the Prevention and Punishment of the Crime of Genocide, art. 2, Jan. 12, 1951, 78 U.N.T.S. 277.

Notably, the Apartheid Convention echoes the definition of genocide, in that it applies to "murder of members of a racial group or groups," "the infliction upon the members of a racial group or groups of serious bodily or mental harm," and the "[d]eliberate imposition on a racial group or groups of living conditions calculated to cause its or their physical destruction in whole or in part." Convention on Apartheid, art. 2, Nov. 30, 1973, 1015 U.N.T.S. 243.

[3] At oral argument, counsel for the corporations added that he did not accept the premise that the plaintiffs had actually pled those allegations, as the complaints did not allege that particular plaintiffs suffered particular injuries at the hands of specific South African officials whom the corporations aided and abetted in a specific way at a specific time and place. As reflected in the per curiam opinion,

the plaintiffs, if given the opportunity to replead, likely would allege primary violations of international law cognizable under the ATCA.

**C**

In addition to its delineation of the standard by which federal courts derive primary violations of international law, the *Sosa* opinion also contains numerous dicta. In his concurring opinion, Judge Katzmann thoroughly summarizes these dicta. It remains inescapable, however, that *Sosa* at best lends Delphian guidance on the question of whether the federal common law or customary international law represents the proper source from which to derive a standard of aiding and abetting liability under the ATCA. Lacking the benefit of clear guidance, I presume a federal court should resort to its traditional source, the federal common law, when deriving the standard. Because I find that federal common law provides a standard by which to assess aiding and abetting liability, I do not address the alternative argument that such a standard may be derived from international law.[4]

It is a "hornbook principle that international law does not specify the means of its domestic enforcement." Brief for the International Law Scholars as Amici Curiae at 5–6; *see also* Brief for the United States of America as Amicus Curiae at 5 ("[A]lthough the substantive

---

plaintiffs may have an opportunity to replead these violations with greater specificity on remand.

[4] I note that Judge Katzmann, in his concurring opinion, declines to address whether federal common law provides a standard by which to determine aiding and abetting liability in this case. Opinion of Judge Katzmann at 39 n.12. It is thus left to a future panel of this Court to determine whether international or domestic federal common law is the exclusive source from which to derive the applicable standard.

norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law.").  As Judge Edwards has explained, "the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations."  *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 778 (D.C. Cir. 1984) (Edwards, J., concurring); *see also Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) ("The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations."); *Xuncax v. Gramajo*, 886 F. Supp. 162, 180 (D. Mass. 1995) ("While it is demonstrably possible for nations to reach some consensus on a binding set of principles, it is both unnecessary and implausible to suppose that, with their multiplicity of legal systems, these diverse nations should also be expected or required to reach consensus on the types of actions that should be made available in their respective courts to implement those principles."); Restatement (Third) of Foreign Relations Law § 703 cmt. c ("In general, individuals do not have direct international remedies against a state violating their human rights except where such remedies are provided by international agreement.  Whether they have a remedy under the law of a state depends on that state's law." (internal citation omitted)); Beth Stephens, Sosa v. Alvarez-Machain*: "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts*, 70 Brook. L. Rev. 533, 558 (2004) ("*Sosa* does not require that every ancillary rule applied in an AT[CA] case meet the level of international consensus required for the definition of the underlying violation.  As in any case in which the federal courts exercise discretion to recognize federal common law, the courts will fashion rules to fill gaps, borrowing from the most analogous body of law.").

Numerous international law scholars have described this principle. *See* L. Henkin, Foreign Affairs and the Constitution 224 (1972); Oppenheim, 1 International Law 44–46 (8th ed. 1955); L. Henkin, R. Pugh, O. Schachter & H. Smit, International Law 116 (1980); 4 Blackstone's Commentaries 72 (Welsby ed., 1854) (noting that the law of nations recognized certain universal offenses but that accessorial liability is made available "by statute"). As amicus International Law Scholars persuasively argue, these "means of domestic enforcement" encompass at least some theories of accessorial liability, including aiding and abetting. Brief for International Law Scholars as Amici Curiae at 6. I believe our Court should stand by this principle. Moreover, when international law and domestic law speak on the same doctrine, domestic courts should choose the latter. Oppenheim, *supra*, at 44–46. This, too, is a principle our Court should respect. Here, customary international law and the federal common law both include standards of aiding and abetting. In a situation such as this, I opt for the standard articulated by the federal common law.

Supreme Court precedent commands the same result. As Judge Reinhardt noted when concurring in *Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002), the ATCA is silent "as to what body of law applies to ancillary issues that may arise, such as whether a third party may be held liable in tort" for a violation of international norms. *Id.* at 965 (Reinhardt, J., concurring). Typically, federal courts look to the federal common law to fill such an interstice. *Id.* at 966 (citing *United States v. Kimbell Foods*, 440 U.S. 715, 727 (1979)); *see also Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (stating that courts should apply the federal common law "in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or

57

our relations with foreign nations"). Until the Supreme Court provides us more explicit guidance regarding accessorial liability than it has to date, I remain convinced that our federal common law embodies a clearly extant standard of aiding and abetting liability. *See Unocal*, 395 F.3d at 967. It is to this standard that federal courts should resort and to which I now turn.

The Supreme Court has described *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) as "a comprehensive opinion on the subject [of aiding and abetting]." *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 181 (1994). *Halberstam* relied heavily upon the Restatement (Second) of Torts to set the parameters of aiding and abetting liability. Section 876(b) of the Restatement provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Based on the Restatement, *Halberstam* held that aiding and abetting included three elements:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 477. The *Halberstam* Court then adopted and applied the factors enumerated in § 876 to assess whether the defendant's encouragement or assistance was sufficiently substantial to support liability. "The Restatement suggests five factors in making this determination: 'the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind.'" *Id.* at 478 (quoting Restatement (Second) of Torts § 876 cmt. d) (alteration

58

omitted).  In the almost quarter-century since *Halberstam* was decided, many state courts and Circuit Courts, including the Second Circuit, have adopted the Restatement's aiding and abetting standard.  Following the lead of the *Halberstam* Court, I believe that § 876 provides the proper standard under which to assess whether a particular defendant may be held liable for aiding and abetting a primary violation of international law.[5]  I also agree with the *Halberstam* Court that "a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it."  *Id.* at 484.

Under a proper application of § 876 to ATCA civil aiding and abetting claims, liability should be found only where there is evidence that a defendant furthered the violation of a clearly

---

[5]  I agree with Judge Katzmann that *Central Bank*, 511 U.S. at 164, poses no bar to finding aiding and abetting liability under the ATCA, albeit for a different reason.  In *Central Bank*, the Supreme Court held that the Securities Acts of 1933 and 1934 did not encompass aiding and abetting liability.  511 U.S. at 171.  Noting that the Acts provided for some forms of "indirect" liability, the Supreme Court reasoned that "Congress knew how to impose aiding and abetting liability when it chose to do so."  *Id*. at 176.  This same reasoning cannot apply to the ATCA, whose textual brevity and dearth of legislative history leave us with inconclusive evidence of Congress's intent to include or exclude aiding and abetting liability.  It would appear, however, that the Founding Generation nevertheless understood the ATCA encompassed aiding and abetting liability.  For example, in Attorney General Bradford's 1795 opinion, *Breach of Neutrality*, 1 Op. Att'y Gen. 57, 59 (1795), he opined that the ATCA allowed civil suits for damages for those who had "taken part" in violating international law.  *Sosa*, 542 U.S. at 721.  In fact, Bradford's opinion specifically covered those American citizens who "voluntarily joined, conducted, *aided and abetted*" the French fleet in their attack on a British settlement.  *Breach of Neutrality*, 1 Op. Att'y Gen. at 58 (emphasis added).  Attorney General Bradford furthermore referred to an April 1793 Proclamation issued by George Washington which declared that "all those who should render themselves liable to punishment under the laws of nations, by committing, aiding or abetting hostilities" against the merchants of foreign nations at peace with the United States would not receive the protection of the United States.  *Id.* at 59.  Cases from that era, moreover, indicate that secondary liability was recognized as an established part of the federal common law.  *See Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795) (holding a defendant liable for aiding the unlawful capture of a neutral ship and ordering restitution); *Henfield's Case*, 11 F. Cas. 1099, 1103 (C.C.D. Pa. 1793) (Chief Justice John Jay) (charging a grand jury that United States citizens may be held liable under the laws of the United States for "committing, aiding or abetting hostilities" in violation of the law of nations); *see also* Congress's Act of April 30, 1790, which deemed "an accessary [sic] to . . . piracies" anyone who "knowingly and willingly aid[ed]" piracy. 1 Stat. 114 (1790).

established international law norm in one of three ways: (1) by knowingly and substantially assisting a principal tortfeasor, such as a foreign government or its proxy, to commit an act that violates a clearly established international law norm; (2) by encouraging, advising, contracting with, or otherwise soliciting a principal tortfeasor to commit an act while having actual or constructive knowledge that the principal tortfeasor will violate a clearly established customary international law norm in the process of completing that act; or (3) by facilitating the commission of human rights violations by providing the principal tortfeasor with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services will be (or only could be) used in connection with that purpose.

All members of this panel understand that corporations must transact business in a less than perfect world. I do not understand defendants to argue, however, that business imperatives require a license to assist in violations of international law. Rather, I understand defendants to express the concern that the recognition of ATCA aiding and abetting liability could expose corporations to liability for merely doing business in countries with repressive regimes or for participating in activities that, with twenty-twenty hindsight, can be said to have been indirectly linked to human rights abuses. I share Judge Katzmann's understanding, however, that private parties and corporate actors are subject to liability under the ATCA. I therefore concur in Part II.D.2 of Judge Katzmann's opinion to the extent that it recognizes the general legal principle that aiding and abetting liability obtains even where the culpable actor is incapable of violating the relevant legal norm as a principal, and I concur in Part II.D.3 of his opinion in full. Defendants raise important concerns about such liability, but those concerns do not counsel in favor of the per se rejection of corporate liability, private party liability, and aiding and abetting

60

liability under the ATCA.  Instead, they require the narrow and careful extension of such liability to cases in which a defendant played a knowing and substantial role in the violation of a clearly recognized international law norm.  Furthermore, the collateral consequences predicted by defendants and the dissent remain relevant considerations when making these judgments, as the common law nature of the inquiry allows for a limited but meaningful consideration of the practical consequences of extending ATCA liability in the context of each particular case.

Because I intend aiding and abetting liability to attach only in this limited way, I think it helpful to provide examples illustrating the three ways in which I believe a defendant may incur liability for aiding and abetting violations of customary international law.  The first type of aiding and abetting liability is designed to capture the case of a principal tortfeasor who seeks assistance from a defendant to commit an act that violates international law norms, such as the extrajudicial killing of an opposition political figure.  The second is designed to cover circumstances where the alleged aider and abettor is accused of having purchased security services with the knowledge that the security forces would, or were likely to, commit international law violations in fulfilling their mandate.  The allegations raised in the cases of  *Unocal*, 395 F.3d 932, and *Wiwa v. Royal Dutch Petroleum Co.*, No. 96-Civ-8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002), would be reached by this prong.  In *Unocal*, the alleged aider and abettor corporation was accused of having purchased security services from a military government to further develop its oil operations, with the knowledge that the security forces would likely commit international law violations in fulfilling this mandate.  395 F.3d at 938–42.  In *Wiwa*, the plaintiffs alleged that the defendants directed and aided government security forces in violating plaintiffs' rights by providing logistical support, transportation, and weapons to government security forces to ensure

that the corporation's business activities could proceed "as usual." *Wiwa*, No. 96-Civ-8386, 2002 WL 319887, at *2.

The Zyklon B Case provides a clear example of when liability would attach in the third circumstance, when a defendant provides "the tools, instrumentalities, or services to commit [human rights] violations with actual . . . knowledge that those tools, instrumentalities or services will be (or only could be) used in connection with that purpose." *See* Trial of Bruno Tesch and Two Others (The Zyklon B Case), 1 Law Reports of Trials of War Crim. 93 (1947) (British Military Ct., Hamburg, Mar. 1-8, 1946). In that case, Bruno Tesch was the sole owner of a firm that distributed Zyklon B, a highly dangerous poison gas, to Auschwitz and other concentration camps from 1941 to 1945. Zyklon B previously had been used as a disinfectant in public buildings. The evidence showed that Tesch himself proposed using the gas to exterminate human beings, undertook to train the S.S. in this "new method of killing," and was aware that, by June 1942, the gas was being used for such a purpose. *Id.* at 95. The Prosecutor successfully argued that "knowingly to supply a commodity to a branch of the State which was using that commodity for the mass extermination of Allied civilian nationals was a war crime, and that the people who did it were war criminals for putting the means to commit the crime into the hands of those who actually carried it out." *Id.* at 94.

These examples are illustrative rather than exhaustive, and I offer them in an effort to provide greater substantive content for a doctrinal framework that, like most common law rules, is "vague" and abstract in its articulation of legal obligations and culpable conduct. Opinion of Judge Korman at 133 (criticizing Restatement aiding-and-abetting standard as "vague and inappropriate in the present context"). Standards such as "substantial assistance" and "actual or

constructive knowledge" are hardly "newly minted," however, and judicial decisions interpreting the meaning of these standards in the context of individual cases will provide guidance to courts considering accessorial liability under the ATCA. *See, e.g.*, *Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 993 (9th Cir. 2006) (applying California law on the "knowledge" requirement of § 876); *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535–37 (6th Cir. 2000) (applying knowledge and substantial assistance requirements of § 876); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1496 (8th Cir. 1997) (addressing "substantial assistance" requirement in context of products liability litigation); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 886 (3d Cir. 1975) ("It has been held that liability for aiding and abetting may be found on less than actual knowledge of the illegal activity. How much or how little knowledge would seem to vary with the facts of each case." (citation omitted)). Common law decisionmaking proceeds through the incremental, analogical application of broadly-stated principles, and it is therefore not amenable to the formulation of finely detailed rules in the manner of a regulatory code. Contrary to the dissent's suggestions, however, the contextual nature and factual sensitivity of common law judicial rulemaking takes account of the "practical problems" that can result from ill-designed legal rules, and the flexibility of the common law process allows those problems to be addressed and avoided as they arise.

In the case at bar, plaintiffs have alleged, albeit in insufficiently specific terms, that the defendant corporations (a) knowingly and substantially assisted a principal tortfeasor to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the principal tortfeasors with the tools,

instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose. Such allegations, if proven, clearly satisfy the standard for asserting ATCA liability under an aiding and abetting theory.

As to the arguments raised by the Ntsebeza and Digwamaje plaintiffs regarding direct liability claims and the district court's treatment of them, I concur with and join in Part II.E of Judge Katzmann's concurring opinion.

### III

This case has confronted our panel with a number of difficult and unsettled questions in a controversial area of the law. As have other courts, *see, e.g.*, *Tel-Oren*, 726 F.2d at 775, we have struggled with these issues in an effort to find some ground on which a majority of our panel could fully agree. Unfortunately, despite tireless debate, we remain diverse in our perspectives. Though our already lengthy opinions scarcely demand lengthening, I wish to articulate in a bit more detail, one objection to the dissent covered in part in footnote 14 of the per curiam opinion.

The dissent contends that the district court lacked subject matter jurisdiction as a result of certain justiciability doctrines, such as case specific deference, the political question doctrine, and international comity. Respectfully, this contention is in error. In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court distinguished between the two. The existence, *vel non*, of subject matter jurisdiction is simply a question (with few exceptions not relevant here) of whether a claim arises under federal law. *Id.* at 198. If subject matter jurisdiction exists, a court may

64

then—and only then—inquire as to the applicability of any of the various justiciability doctrines:

> The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction or upon . . . "[]justiciability." The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute.

*Id.* (citations omitted). As this quote makes clear, the dissent errs in conflating the anterior question of the existence of subject matter jurisdiction with the posterior question of justiciability. *Cf. Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit . . . ."). The dissent's error is not a minor one. By conflating these questions, the dissent provides itself the opportunity to discuss case specific deference, the political question doctrine, and international comity. This discussion, in turn, contains a number of missteps, at least two of which merit our attention in this context. The dissent suggests a district court—or even an appellate court, sitting in review—must dismiss a case when the executive branch, through a State Department Statement of Interest or other document, deems a case to be a political "irritant." This is not so. Mere executive fiat cannot control the disposition of a case before a federal court. Our principle of separation of powers not only counsels the judiciary to conduct an independent inquiry—it

65

requires us to do so. Regardless of what else *Sosa* holds, it did not doubt that ATCA suits are *law suits* constitutionally entrusted to the judiciary. *Cf. Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 69 (2d Cir. 2005) ("[N]ot every case touching foreign relations is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights." (quoting *Kadic*, 70 F.3d at 249 (internal quotation marks omitted))). Thus a district court must weigh the Statement of Interest, as well as other relevant facts, in applying the *Baker v. Carr* factors and exercising its own discretion before deciding whether to dismiss a complaint.

## IV

For the foregoing reasons, I join in the per curiam opinion.

Korman, District Judge, concurring in part and dissenting in part:

Today, the majority allows three class actions on behalf of all persons who lived in South Africa between 1948 and the present and who suffered damages as a result of apartheid to go forward in a United States court against American, Canadian, and European corporations that sold goods and materials or made loans to the Union of South Africa during the apartheid era. It does so over the vigorous objections of the United States, its allies, and, most notably, the Republic of South Africa, which is justifiably proud of the ability of its legal system to adjudicate legitimate human rights claims. In doing so, the majority also ignores a direct signal from the Supreme Court of the United States regarding the non-viability of these claims. The majority also declines to dismiss the case, even though the legal foundation of the complaints was expressly rejected by a judgment rendered in Nuremberg that "[l]oans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime." *United States v. von Weizsaecker* ("*The Ministries Case*"), 14 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 308, 622 (William S. Hein & Co., Inc. 1997) (1949). Indeed, the defendant in that case was an officer of the Dresdner Bank, which is a named defendant in this case. The theory of liability was that the Dresdner Bank provided loans to businesses knowing that the funds would be used to finance enterprises that employed slave labor. In acquitting the corporate officer of the charges relating to slave labor, the tribunal at Nuremberg observed that:

> The real question is, is it a crime to make a loan, knowing or having
> good reason to believe that the borrower will us[e] the funds in

67

> financing enterprises which are employed in using labor in violation of either national or international law? . . . A bank sells money or credit in the same manner as the merchandiser of any other commodity. It does not become a partner in enterprise and the interest charged is merely the gross profit which the bank realizes from the transaction, out of which it must deduct its business costs, and from which it hopes to realize a net profit. Loans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime. Our duty is to try and punish those guilty of violating international law, and we are not prepared to state that such loans constitute a violation of that law . . .

*Id.* Indeed, the theory of liability rejected by the tribunal is the same as that alleged here against Dresdner Bank. A00211-12. Specifically, along with other banks, it is accused of providing "[f]oreign capital in the form of trade loans, large international bonds and credits, direct loans . . . to South African borrowers, and project financing [that] supported the apartheid regime." A00194.

Instead of deferring to this reasoned judgment, one member of the majority, Judge Hall, eschews any reference to sources of customary international law and applies a principle of aiding-and-abetting in civil cases that the Supreme Court observed "has been at best uncertain in application . . . with the common-law precedents 'largely confined to isolated acts of adolescents in rural society.'" *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181 (1994) (quoting *Halberstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983)). The second member of the majority, Judge Katzmann, concludes that a defendant's liability for aiding-and-abetting a crime against humanity must be determined by reference to customary international law, and he then goes on to articulate the standard for determining such liability. While the standard he enunciates is entirely consistent with the holding in the *Ministries Case*, and also reflects an emerging consensus

68

on the appropriate standard for holding a private party liable for aiding-and-abetting, he joins Judge Hall in voting to vacate the judgment dismissing the case without deciding whether the allegations in the complaints are sufficient to satisfy that standard, and without addressing the objections of the United States and the Republic of South Africa to the exercise of jurisdiction over the complaints.

**Background**

Because the allegations in the complaint go unmentioned in the *per curiam* and concurring opinions, it is necessary to provide an overview of the case beyond describing the procedure by which the case made its way here. Judge Sprizzo's opinion in the district court contains a detailed and accurate description of the hundreds of pages of allegations contained in the three voluminous complaints. *See In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 543-46 (S.D.N.Y. 2004). This enables me to provide the following brief background.

In 1948, the National Party came to power in South Africa. From then until the early 1990s, that ruling party imposed and enforced a set of laws under which the non-white population was the subject of disenfranchisement, state-sponsored discrimination, and repression. These laws, establishing what became known as apartheid, included severe curtailments on the liberty of non-whites with respect to residency, travel, assembly, education, employment, and marriage. Apartheid's restrictions were enforced by members of South Africa's military and police, and the history of apartheid includes many instances of arbitrary detention, torture, and killings by those state actors. The complaints recount many of those instances of wrongful conduct by apartheid government officials, including the Sharpeville Massacre of 1960, the Soweto Massacre of 1976, and the killing of the Craddock Four in 1985.

The allegations are very different with respect to the defendants. The portions of the complaints relating to defendants' alleged conduct focus principally on their trade with South Africa. Thus, car companies are accused of selling cars, computer companies are accused of selling computers, banks are accused of lending money, oil companies are accused of selling oil, and pharmaceutical companies are accused of selling drugs. The theory of the complaints is that in this way defendants facilitated or "aided-and-abetted" apartheid and its associated human rights violations. To support that theory, the complaints allege generally that defendants knew of the racist policies of apartheid; that they nevertheless so engaged in the transactions in and with the Union of South Africa; and that, had they not done so, the apartheid regime would have collapsed, apartheid would have ended sooner, and plaintiffs would not have suffered some or all of their injuries. The causal theory advanced by the Khulumani plaintiffs is even weaker: "Apartheid would not have occurred *in the same way* without the participation of defendants." A00166 (emphasis added). Typical of the allegations are:

- "Apartheid needed the cooperation, financing and supplies from the defendant financial institutions and companies and/or their predecessors or successors to ensure that they had the technology, equipment, systems, infrastructures and weaponry to insure that their system could function." A00304.

- "Without oil, the police and military could not have functioned and the economy of South Africa would have come to a standstill." A00171.

- "More than any other single technological advancement, the computer fostered the concentration of administrative power in the hands of Africa's white elite." A00427.

- "Many computer uses were crucial for the apartheid regimes' [*sic*] keeping track of political activists who were later targeted for assassinations." A00430.

- "[A]ny transfer of capital to South Africa had military implications: loans to the railways and harbors systems assisted in the mobilization of the armed forces; trade financing provided the computers and telecommunications equipment necessary to the efficient functioning of a modern army; financing for housing project perpetuated the segregated housing of apartheid." A00201.

- "The money from defendant German banks directly benefitted and supported the apartheid reign of terror in South Africa." A00440.

- "Limitations on the employment of non-whites in salaried, administrative jobs puts a premium on automating such tasks. In this sense, U.S. computer firms helped to solve the skilled white labor problem." A00428; *see also* A00306-07.

- "Defendant vehicle manufacturers knowingly supplied vehicles, parts, and other equipment to the South African Police (SAP), South African Defense Force (SADF) and South African Army. . . . These vehicles were used to patrol African townships, homelands, and other areas and were used to suppress dissent." A00216; *see also* A00312.

The complaints themselves seek relief on behalf of all persons who lived in South Africa between 1948 and the present who suffered damages as a result of apartheid. Moreover, they seek to hold responsible each of the defendants, whom they characterize as aiders-and-abetters, liable for "all acts comprising the entire system of apartheid – a criminal enterprise." A00255. Nevertheless, they fail to link the conduct of a specific defendant to an injury suffered by a particular plaintiff. On the contrary, the gravamen of the complaints is not that individuals should recover from particular

defendants in tort, but that millions of people who "lived under the apartheid system", A00095, should recover from all the defendants for having been "subject to . . . the overwhelming injustices that characterized apartheid." *Id.* In sum, these are reparations cases, seeking at least $400 billion in reparations, rather than torts cases for damages. They fail to allege a cognizable cause of action.

Moreover, the plaintiffs conceded at oral argument that they are not anxious to amend their complaints to link a particular plaintiff to injuries caused by a particular defendant. Tr. at 64. Indeed, the attorney for the Khulumani plaintiffs acknowledged that he would not necessarily be satisfied with such an amendment, but that he would "accept it because it would be a beginning." Tr. at 80. Nevertheless, he confessed that "[w]hat's at stake here is almost by definition of the crime an inability to make that exact trace or that degree of particularity." Tr. 80-81. This concession alone establishes that the allegations in any amended complaints would be insufficient "to raise a reasonable expectation that discovery will reveal evidence" to support them. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). Instead, these complaints would simply provide a vehicle to coerce a settlement. Nevertheless, the *per curiam* opinion reverses the order dismissing the complaints and orders Judge Sprizzo to rule again on plaintiffs' motions for leave to replead, because plaintiffs have indicated "that, if given the opportunity, they would narrow the claims and clarify the allegations against the various defendants." *Per Curiam* Op. *ante* at 13-14.

I dissent from the holding keeping these claims alive for the reasons alluded to earlier and because (1) the Supreme Court, in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), has instructed us that this is the very sort of case in which jurisdiction should not be exercised; (2) the State Department has filed a persuasive Statement of Interest in this matter urging dismissal because of the adverse effect the continued prosecution of these cases would have on the interests of the United

72

States and our relations with other countries; and (3) the Republic of South Africa, a democratically elected government representative of all South Africans, including the victims of apartheid, has asserted the right to define and finalize issues related to reparations for apartheid-era offenses within its own legal framework – thus making this lawsuit an insult to the post-apartheid, black-majority government of a free people. These grounds, among others, reinforce the compelling policy argument articulated that a decision to hear these cases would "reflect[] the worst sort of 'judicial imperialism' . . . [and] send the message that the United States does not respect the ability of South African society to administer justice by implying that U.S. courts are better placed to judge the pace and degree of South Africa's national reconciliation." Elliot J. Schrage, *Judging Corporate Accountability in the Global Economy*, 42 Colum. J. Transnat'l L. 153, 166 (2003).

## Discussion

**1. Deference to the United States and the Republic of South Africa**

This appeal is unique. Departing from its usual practice, the Supreme Court, in the context of deciding a different case, has already given us guidance as to how this appeal should be decided. In *Sosa*, it held that, in determining whether the Alien Tort Claims Act (the "ATCA") provides a basis for the exercise of jurisdiction over an alleged tort in violation of the law of nations, courts must apply "principle[s] limiting the availability of relief" beyond the requirement that the international law norm whose violation is alleged be sufficiently defined. 542 U.S. at 733 n.21. Specifically, because the decision to permit a case to proceed involves "an element of judgment about the practical consequences of making that cause available to litigants," *id.* at 732-33, the

73

Supreme Court suggested that "case-specific deference to the political branches," *id.* at 733 n.21,

provided one limitation on the exercise of jurisdiction under the ATCA in certain instances.

Among the reasons for such deference is that the recognition of private rights of action for

violations of international law may give rise to "collateral consequences." *Id.* at 727. Specifically,

the Court cautioned that "the potential implications for the foreign relations of the United States of

recognizing such causes should make courts particularly wary of impinging on the discretion of the

Legislative and Executive Branches in managing foreign affairs." *Id.* The Court continued: "Since

many attempts by federal courts to craft remedies for the violation of new norms of international law

would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with

great caution." *Id.* at 727-28. Then, focusing on the case before us on this appeal, the Supreme

Court continued:

> For example, there are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. *See In re South African Apartheid Litigation*, 238 F. Supp. 2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which "deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill." Declaration of Penuell Mpapa Maduna, Minister of Justice and Constitutional Development, Republic of South Africa, reprinted in App. to Brief for Government of Commonwealth of Australia et al. as *Amici Curiae* 7a, ¶ 3.2.1 (emphasis deleted). The United States has agreed. *See* Letter of William H. Taft IV, Legal Adviser, Dept. of State, to Shannen W. Coffin, Deputy Asst. Atty. Gen., Oct. 27, 2003, reprinted in *id.*, at 2a. In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy. *Cf. Republic of Austria v. Altmann*, 541

U.S. 677, 124 S. Ct. 2240, 159 L. Ed. 2d 1 (2004) (discussing the State Department's use of statements of interest in cases involving the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*).

*Id.* at 733 n.21.

The Executive Branch's view of the impact of these cases on foreign policy is set forth at some length in a letter to the district court, dated October 27, 2003, from the Legal Advisor of the Department of State. The letter advises "that continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States." A01090. After outlining the objections of the Republic of South Africa to the continued prosecution of these cases in the United States and noting the "extensive steps" it has taken "to promote reconciliation and redress for apartheid-era injustices," the Legal Advisor observed that the Republic of South Africa "is broadly representative of the victims of the apartheid regime" and "is uniquely charged with a popular mandate to deal with the legacy of apartheid." *Id.* He then concluded his discussion of this aspect of the Executive Branch's concern as follows:

> Support for the South African government's efforts in this area is a cornerstone of U.S. policy towards that country. For that reason, we are sensitive to the view of the South African government that adjudication of the cases will interfere with its policy goals, especially in the areas of reparations and foreign investment, and we can reasonably anticipate that adjudication of these cases will be an irritant in U.S.-South African relations. To the extent that adjudication impedes South Africa's on-going efforts at reconciliation and equitable economic growth, this litigation will also be detrimental to U.S. foreign policy interests in promoting sustained economic growth in South Africa.

*Id.*

The State Department also voiced other concerns. For one thing, the Legal Advisor wrote, "[v]arious other foreign governments, including those of the United Kingdom and Canada, have also approached us via diplomatic channels to express their profound concern that their banks, corporations and other entities have been named as defendants." A01090-91. Because of those governments' "strong belief that the issues raised in the litigation are most appropriately handled through South Africa's domestic processes," the State Department "anticipat[ed] possible, continuing tensions in our relations with these countries over the litigation." A01091.

Moreover, the Legal Advisor expressed concern over the chilling effect that actions of this kind may have on future foreign investment in developing countries:

> The United States relies, in significant part, on economic ties and investment to encourage and promote positive change in the domestic policies of developing countries on issues relevant to U.S. interests, such as respect for human rights and reduction of poverty. However, the prospect of costly litigation and potential liability in U.S. courts for operating in a country whose government implements oppressive policies will discourage the U.S. (and other foreign) corporations from investing in many areas of the developing world, where investment is most needed and can have the most forceful and positive impact on both economic and political conditions. To the extent that the apartheid litigation in U.S. courts deters such investment, it will compromise a valuable foreign policy tool and adversely affect U.S. economic interests as well as economic development in poor countries.

*Id.*

In *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir. 2005) (Cabranes, *J.*), we recognized that "[j]udicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justiciability doctrine known as the 'political question' doctrine . . . ." *Id.* at 69. In deciding what deference to accord the position of the Executive Branch,

76

we referenced the foundational case of *Baker v. Carr*, which identified six independent tests for recognition of a political question. 369 U.S. 186, 217 (1962). In *Whiteman*, we directed the dismissal of the complaint without examining each of the *Baker* tests because it was clear that the case met the fourth test, namely that "'a court's undertaking independent resolution' of this claim is impossible 'without expressing lack of the respect due' the Executive Branch." 431 F.3d at 72 (emphasis deleted) (citations omitted).

We need not examine any of the six independent tests identified in *Baker* because *Sosa* plainly held that the determination of whether to exercise jurisdiction over a cause of action for a violation of the law of nations is subject to "case-specific deference to the political branches." 542 U.S. at 733 n.21. More than that, the Supreme Court advised us that in the *instant* cases "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.* Indeed, one commentator, who has emphasized the need for a "searching review" of the Bush administration's positions in human rights cases, has acknowledged that the present cases are different:

> [These] cases reflect the unique history of South Africa and its transition from apartheid to democracy. The government that replaced the apartheid regime was recognized internationally as representative both of the majority of the nation and, in particular, of the victims of past human rights abuses. The transition included a negotiated process by which abuses would be investigated and perpetrators given the opportunity to testify about their actions in return for amnesty. When the democratically elected, representative government of South Africa objected to the impact of the U.S. litigation on the negotiated transition process, the executive branch asked the courts to defer to this judgment. All of these factors provide support for the Court's suggestion that there is a "strong argument" that executive branch views "in such cases" are entitled to "serious weight."

Beth Stephens, *Sosa v. Alvarez-Machain, "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts*, 70 Brook. L. Rev. 533, 562 (2005). (Professor Stephens and a fellow academic co-authored an *amicus curiae* brief on behalf of international human rights organizations and bar associations in support of the plaintiffs-appellants. While it urges reversal of the judgment of the district court, her *amicus* brief does not address the effect of footnote 21 in *Sosa*.)

In any event, the force of the advice of the State Department is enhanced by the fact that, under the doctrine of international comity, dismissal would be justified solely out of deference to the Republic of South Africa. Comity, a doctrine more easily invoked than defined, may be viewed as either "the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum," *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984), or as "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts." *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996). A court's exercise of discretion to dismiss a suit on comity grounds is independent of its treatment of the views of the Executive Branch. *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir. 2004) (dismissing a claim on the grounds of international comity after declining to defer to the Executive Branch).

The decision whether to dismiss on this basis depends on the degree to which the interests of a foreign sovereign are "legitimately affronted by the conduct of litigation in a United States forum," *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998), steps the foreign sovereign may have taken to address the issues in the litigation, and the extent of our own interest in the underlying

issues.  *See generally Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582 (2d Cir. 1993)

(Newman, *J.*).  Perhaps the most significant factor is whether the foreign sovereign to which we

defer is a democratically elected government with an independent judiciary.  *Id.* at 585-86.

In the present cases, the extent of the affront to the legitimate interests of the Republic of

South Africa, the steps it has taken to address the issue of reparations, and the depth of feeling

underlying its concern are amply reflected in the record.  On April 15, 2003, in response to the

Report of the Truth and Reconciliation Commission ("TRC"), the President of the Republic, Thabo

Mbeki, announced the programs that would be implemented to assist the victims of apartheid:

> [W]ith regard to specific cases of individual victims identified by [the] TRC Act, the government has put in place and will intensify programmes pertaining to medical benefits, educational assistance and provision of housing and so on.  From time to time, Ministers have elaborated and will continue to expatiate on the implementation of these and other related programmes.

> The TRC has reported that about 22,000 individuals or surviving families appeared before the Commission.  Of these, about 19,000 required urgent reparations, and virtually all of them, where the necessary information was available, were attended to as proposed by the TRC with regard to interim reparations.

> With regard to final reparations, government will provide a once-off grant of R30,000 to those individuals or survivors designated by the TRC.  This is over and above other material commitments that we have already mentioned.

> We intend to process these payments as a matter of urgency, during the current financial year.  Combined with community reparations, and assistance through opportunities and services we have referred to earlier, we hope that these disbursements will help acknowledge the suffering that these individuals experienced, and offer some relief.

A00745. President Mbeki then addressed the issue of "civil suits against corporations that benefitted from the apartheid system," specifically this litigation. A00747. After reiterating "that the South African Government is not and will not be a party to such litigation," he continued: "[W]e consider it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country and the observance of the perspective contained in our Constitution of the promotion of national reconciliation." *Id.* While recognizing "the right of citizens to institute legal action," President Mbeki also emphasized that the government's approach is informed by "the desire to involve all South Africans, including corporate citizens, in a co-operative and voluntary partnership to reconstruct and develop South African society." *Id.* Accordingly, he also rejected the once-off wealth tax on corporations suggested by the TRC. *Id.*

Likewise, in an address to Parliament on the same day, Alec Erwin, the Minister of Trade and Industry, emphasized that the government's rationale for its rejection of the once-off wealth tax applied equally to its opposition to the cases at issue:

> It is for all the above reasons that we are opposed to and indeed contemptuous of attempts to use unsound extra-territorial legal precepts in the [United States of America] to seek personal financial gain in South Africa. Whilst individuals have an inviolate right to recourse in law and this is firmly entrenched in South Africa it is an abuse to use the law, unsound law at that, of another land to undermine our sovereign right to settle our past and build our future as we see fit. South Africans involved in this break that indefinable collectivist identity that was the origin of our strength. The government rejects the actions of legal practitioners in the USA to exploit our history and will not allow any judgment made in the USA or elsewhere to be carried out in South Africa.

A00754-55.

Professor Kader Asmal, the Minister of Education, also assailed the prosecution of these cases. He told the Parliament:

> South Africa must settle this issue for themselves and does not need the help of ambulance chasers and contingency fee operators, whether in Switzerland, the Netherlands, or the United States of America. As South Africans, we have effectively dealt with our own historical challenges and we will continue to do so. It is part of our sovereign right.

A00758.

On April 16, 2003, the day after the addresses quoted above, the Cabinet of the Republic of South Africa resolved that "[i]t remains the right of the [G]overnment [of South Africa] to define and finalise issues of reparations, both nationally and internationally." A00803. Against this backdrop, the then-Minister of Justice, Penuell Mpapa Maduna, filed a declaration in the district court which set forth the Republic of South Africa's view of various cases pending in the United States against corporations that did business with and in South Africa during the apartheid period, including the cases at issue here. The statement summarizes the actions undertaken by the Republic of South Africa "to repair the damage caused by the apartheid system through a broad programme of socioeconomic reparations which has at its heart, the betterment of the lives of the previously disadvantaged." A00801. Then, addressing the prosecution of these cases, he argued that the remedies sought – including "the demand for billions of dollars in damages to be distributed by the US courts" – are "inconsistent with South Africa's approach to achieving its long term goals." A00805. Specifically, he continued:

> Permitting this litigation to go forward will, in the government's view, discourage much-needed direct foreign investment in South Africa and thus delay the achievement of our central goals. Indeed,

81

the litigation could have a destabilising effect on the South African economy as investment is not only a driver of growth, but also of employment. One of the structural features of the South African economy, and one of the terrible legacies of apartheid, is its high level of unemployment and its by-product, crime. Foreign direct investment is essential to address both these issues. If this litigation proceeds, far from promoting economic growth and employment and thus advantaging the previously disadvantaged, the litigation, by deterring foreign direct investment and undermining economic stability will do exactly the opposite of what it ostensibly sets out to do.

A00805-06. The last paragraph of Minister Maduna's declaration invoked the doctrine of international comity. He observed

that under United States law, courts may abstain from adjudicating cases in deference to the sovereign rights of foreign countries to legislate, adjudicate and otherwise resolve domestic issues without outside interference, particularly where the relevant government has expressed opposition to the actions proceeding in the United States, and where adjudication in the United States would interfere with the foreign sovereign's efforts to address matters in which it has the predominant interest. The government submits that its interest in addressing its apartheid past presents just such a situation.

A00806.

Most recently, on this appeal, the Republic of South Africa filed an *amicus curiae* brief, which is not addressed in the *per curiam* and concurring opinions and is not specifically listed among the parties filing briefs on this appeal, arguing that these actions "fundamentally interfere with South Africa's independence and sovereignty and intervene in its internal affairs, including its right under international law to address its apartheid past and to develop policies for its future in the manner it deems most appropriate, subject to the support and approval of the democratic electorate." Br. for S. Afr. as *Amicus Curiae* at 1-2. Specifically, it emphasized that the continuation of this litigation

82

would discourage business investment and, thereby, disrupt the growth of the South African economy. *Id.* at 3-4. In a statement appended to the brief, the current South African Minister of Justice, Brigitte Sylvia Mabandla, repeated verbatim the earlier statement of former Minister Maduna, adding that "another country's courts should not determine how ongoing political processes in South Africa should be resolved." *Id.* annex at 1.

In light of the consistent and considered policy of the Republic of South Africa and the programs it has put in place to provide reparations and assistance to the identifiable victims of apartheid, it is difficult to conceive of any policy reason for exercising jurisdiction over these cases. On the contrary, "[m]ost judges would not want, by asserting their own jurisdiction in a doubtful case, to undermine efforts to rebuild national sovereignty, democratic institutions, and self-respecting courts, in countries that have lately suffered from catastrophic events that include international crimes." Michael Kirby, *Universal Jurisdiction and Judicial Reluctance: A New "Fourteen Points",* *in Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes Under International Law* 240, 255 (Stephen Macedo, ed. 2004). Indeed, Professor William R. Casto, whose scholarship was cited repeatedly by the Supreme Court in *Sosa*, has written that the apartheid regime in South Africa may be an example of a situation "in which a nation's prior government has engaged in the most despicable misconduct, but the current government is making an honest, perhaps faltering, but nevertheless real effort to rectify the past misdeeds . . . . If apartheid were determined to be a violation of clearly established international law, a tort remedy for the victims of that evil system might nevertheless be inappropriate." William R. Casto, *The New Federal Common Law of Tort Remedies for Violations of International Law*, 37 Rutgers L.J. 635, 656 (2006).

83

Particularly apposite here is the characteristically thoughtful opinion of Judge Newman in *Bi v. Union Carbide Chemicals & Plastics Co*, 984 F.2d 582. The case arose out of the devastating Bhopal industrial accident, in which deadly gas from a plant operated by Union Carbide India Ltd. ("UCIL") blew into a densely populated part of India. Some 145 class actions were filed in federal district courts across the United States and consolidated in the Southern District of New York. After the case was dismissed on the grounds of *forum non conveniens*, the Indian government, to which its parliament granted the exclusive authority to represent the victims of the disaster in India and elsewhere, filed suit in India on behalf of all claimants. India and Union Carbide ultimately agreed to a court-approved settlement, by which the latter agreed to pay $470 million to the Indian government for the benefit of all victims of the disaster.

After the settlement of the class actions in India, two cases were filed in Texas state courts on behalf of other victims of the Bhopal disaster. The cases were transferred to the Southern District of New York, where Judge Keenan dismissed both actions on the ground of *forum non conveniens*. We affirmed the dismissal, although on different grounds. Judge Newman described the appeal as presenting "an interesting issue of comity among nations in the resolution of claims arising from torts occurring within a foreign country." *Bi*, 984 F.2d at 583. The precise issue he identified

> is whether the federal and state courts of this country should defer to the judgment of a democratic foreign government that disputes arising from a mass tort occurring within its borders can be best resolved by according the foreign government exclusive standing to represent the victims of the disaster in the courts of the world.

*Id.* We declined to permit the plaintiffs to prosecute the class actions in federal or state court, notwithstanding their arguments that settlement of their claims by the Indian government was unfair and improper because, among other things,

84

the Indian Government had an unacceptable conflict of interest as part owner of UCIL, most of the victims oppose the settlement as grossly inadequate, and their due process rights were violated because they received inadequate notice and inadequate representation in the proceedings and because they could not opt out of the settlement.

*Id.* at 584.

After describing in detail the structure of the Indian government, pursuant to a Constitution that "provides for a republican form of parliamentary government and guarantees the fundamental rights of the people, including equal protection and procedural due process," *id.* at 585, Judge Newman observed that India had chosen "to represent exclusively all the victims in a suit against Union Carbide and to use the money it received in settlement of that suit to fund a plan framed . . . to process the claims of all the victims." *Id.* at 586. Under these circumstances, he wrote, "[t]o grant the victims of the Bhopal disaster, most of whom are citizens of India, access to our courts where India has set up what it believes to be the most effective method of dealing with a difficult problem would frustrate India's efforts." *Id.* "[W]ere we to pass judgment on the validity of India's response to a disaster that occurred within its borders," Judge Newman continued, "it would disrupt our relations with that country and frustrate the efforts of the international community to develop methods to deal with problems of this magnitude in the future." *Id.*

Moreover, it was not relevant whether "under our constitutional standards, our Government could pass an act similar to the Bhopal Act" pursuant to which the Indian government settled the claims that the plaintiffs sought to prosecute. *Id.* Instead, he wrote that:

> when a recognized democracy determines that the interests of the victims of a mass tort that occurred within its borders will be best served if the foreign government exclusively represents the victims in courts around the world, we will not pass judgment on that

> determination, and we will permit only the foreign government access to our courts to litigate those claims, subject of course to our own requirements for standing. This conclusion is especially compelling in a case such as this where almost all of the victims are Indian citizens.

*Id.*

The present cases involve a stronger basis for dismissal under the doctrine of international comity. Like India, the Republic of South Africa is a sovereign democratic state whose policies broadly reflect the interests of its people. Moreover, it has adopted policies and programs designed to address the effects of apartheid and compensate its victims. However, unlike the plaintiffs in Bi, whose claims were wiped out under Indian law and who had no alternative forum, the plaintiffs here may have a competent alternative forum in their home country that, by all accounts, is prepared to hear their grievances. Indeed, the plaintiffs have themselves acknowledged that relief would be available in the courts of the Republic of South Africa. *See* Khulumani Reply Br. at 27 ("No relief from civil or criminal liability was enacted for those who did not apply for and obtain amnesty from the TRC, . . . South Africa's approach leaves open the possibility for individual citizens to take up any grievance related to human rights violations with the courts . . . .") (internal quotation marks omitted); Ntsebesa Reply Br. at 28 ("The acts alleged in plaintiffs' complaints are illegal and would subject the defendants to suit in both the United States and South Africa . . . .").

Significantly, President Mbeki has stated, "[the] Government recognizes the right of citizens to institute legal action." A00747. Likewise, in criticizing the prosecution of these cases in the United States, Minister Erwin noted that the plaintiffs "have an inviolate right to recourse in law" – just not in the United States. A00754. Thus, unlike the victims of the Bhopal disaster, there is

86

every indication they may have their day in court, in their home country, before an independent judiciary, in a manner consistent with traditional notions of due process. As Minister Maduna stated in his declaration to the district court:

> Under the Constitution, the judicial authority of the Republic is vested in the courts, which are independent and subject only to the Constitution and the law, which they must apply impartially and without fear, favour or prejudice. No person or organ of state may interfere with the functioning of the courts, while all other organs of the state, through legislative and other measures, must assist and protect the courts to ensure their independence, impartiality, dignity, accessibility and effectiveness. An order or decision of a court binds all persons to whom and organs of state to which it applies. South Africa has a well developed judicial system, with the Constitutional Court at its apex and the Supreme Court of Appeal as the final court of appeal in non-constitutional matters. Judgments of the Constitutional Court and, indeed, the Supreme Court of Appeal, are widely admired for their independence and incisiveness and are frequently referred to in judgments of other final courts of appeal internationally.

A00798-A00799. Similarly, as one scholar of South African law has observed,

> [t]he new constitutional law not only introduced the ethos of a democratic *Rechtsstaat*, but also enacted an extensive array of socioeconomic rights that are designed to change South African society fundamentally. These can be and indeed already have been used to secure, through litigation, the interests of the traditionally marginalised groups and to ensure their place on the political agenda.

François du Bois, *Introduction: History, System and Sources, in Introduction to the Law of South Africa* 1, 3-4 (C.G. van der Merwe & Jacques E. du Plessis eds., 2004).

While I have assumed the availability of a forum in the Republic of South Africa, *Bi* makes clear that such an alternative forum is not always required before the doctrine of comity may be invoked. *See also Jota*, 157 F.3d at 160 ("[C]ases might be imagined where a foreign sovereign's

87

interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum . . . ."). Nevertheless, even if the availability of an alternative forum were an absolute prerequisite to dismissal on the ground of international comity, and one were not available in these cases, deference to South African law would be justified under a traditional choice-of-law analysis. Indeed, although he did not *in haec verba* invoke such analysis, Judge Newman's opinion in *Bi* is entirely consistent with it.

We have previously held that the assumption of subject matter jurisdiction over a cause of action under the ATCA does not preclude a choice-of-law analysis resulting in dismissal of the case. *Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980). This inquiry is separate from the jurisdictional analysis. Indeed, we have read *Filartiga* as "requiring the district court to perform a traditional choice-of-law analysis to determine whether international law, [the] law of forum state, or [the] law of state where events occurred should provide substantive law in such an action." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 105 n.12 (2d Cir. 2000).

I engage in a hypothetical choice-of-law analysis here, because it focuses on the governmental interests of South Africa and the United States and serves to reinforce the argument against exercising jurisdiction over these cases. As we have observed,

> [t]he federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation . . . . The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent.

*In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992). In this case, the Republic of South Africa has the greatest interest, if not the only interest, in the application of its laws. The

conduct alleged took place in South Africa and the victims were its own citizens. The remedies that

its citizens should have as a result of the injuries they suffered at the hands of the apartheid regime

are matters exclusively for its democratically elected post-apartheid government.

Moreover, the tenuous interest of the United States in the issues raised by these cases is also

reflected in the fact that, under customary international law, we could not exercise subject matter

jurisdiction over a cause of action against the primary tortfeasor – the officials of the Union of South

Africa – or the foreign corporate defendants. This is so, because apartheid, however abhorrent it may

have been, has not been regarded as an offense subject to the exercise of universal jurisdiction. This

concept, as its name implies, "recognize[s] that international law permits any state to apply its laws

to punish certain offenses although the state has no links of territory with the offense, or of

nationality with the offender (or even the victim)." *Restatement (Third) of Foreign Relations Law*

§ 404 cmt. a (1987); *see also Matter of Extradition of Demjanjuk*, 612 F. Supp. 544, 555-58 (N.D.

Ohio 1985). Universal jurisdiction is dependent not only on "substantive agreement as to certain

universally condemned behavior," which transforms the behavior into a violation of customary

international law, but also "procedural agreement that universal jurisdiction exists to prosecute a

subset of that behavior." *Sosa*, 542 U.S. at 762 (Breyer, *J.*, concurring in part and concurring in the

judgment).

There is no agreement with respect to the latter issue. Although the *Restatement (Third) of

Foreign Relations Law* cites racial discrimination, "when [ ] practiced systematically as a matter of

state policy, e.g., apartheid," as a violation of customary international law, *id.* § 702 cmt. i (emphasis

deleted), it omits apartheid from the list of offenses subject to universal jurisdiction. Instead, the

Restatement states that universal jurisdiction exists only for "certain offenses recognized by the

community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." *Id.* § 404. Indeed, while the Reporters of the Restatement observed that the International Convention on the Suppression and Punishment of the Crime of Apartheid, *adopted* Nov. 30, 1973, 1015 U.N.T.S. 243 ( the "Apartheid Convention"), provided for universal jurisdiction, they stated that it did so only "[a]mong [the] parties to the Convention." *Restatement (Third) of Foreign Relations Law* § 702 reporters' note 7. *See also* Antonio Cassese, *Crimes Against Humanity*, *in* 1 *The Rome Statute of the International Criminal Court: A Commentary* 353, 376 (Antonio Cassese et al., eds., 2002) (observing that the Rome Statute, enacted in 1998, is broader than customary international law and "expands general international law" insofar as it, *inter alia*, "broadens the classes of conduct amounting to crimes against humanity" to include "the crime of apartheid").[1] Likewise, the European Commission, the executive body of the European Union, has stated explicitly that, while "apartheid[] is widely condemned by states . . . at least at present, it does not give rise to universal jurisdiction because, among other reasons, the [Apartheid Convention] . . . has not been widely ratified." Br. for the European Commission as *Amicus Curiae* Supporting Neither Party, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (No. 03-339), 2004 WL 177036, at *16 n.35. Another reason is that jurisdiction is limited to certain universally condemned crimes which "by their nature occur either outside of a State or

---

[1] The Rome Statute does not apply to "conduct prior to the entry into force of the Statute." Rome Statute of the International Criminal Court art. 24(1), *open for signature* July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002). As one commentator explained, "[t]o be acceptable to the broadest possible majority of countries, many of which had dark experiences in the past and had to resort to amnesties or similar solutions to achieve national reconciliation, criminal responsibility under the Rome Statute could not be made retroactive . . . ." Per Saland, *International Criminal Law Principles, in The International Criminal Court: The Making of the Rome Statute – Issues, Negotiations, Results* 189, 196 (Roy S. Lee ed., 1999). This may explain why the Republic of South Africa, which never ratified the Apartheid Convention, ratified the Rome Statute.

where there is no State capable of punishing, or competent to punish, the crime (as in a time of war)." *United States v. Yousef*, 327 F.3d 56, 105 (2d Cir. 2003). Of course, with respect to the conduct alleged here, there is now a State capable of providing redress in a competent manner.

Under these circumstances, particularly the failure of the United States to sign or ratify the Apartheid Convention, denying a forum for these cases at this point cannot be said to undermine any interest of the United States. To the contrary, as the United States argues in its *amicus* brief, the prosecution of these cases harms significant interests of the United States. Obviously, the congressional interest in making available a forum under the ATCA would be undermined if we denied a forum where the regime, which violated the norm, was the same one that decided that such a cause of action should not be pursued. *See Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 415 (S.D.N.Y. 2002) (declining deference to law of the foreign state in action alleging actionable conduct by a sitting government). But that is not the case here, for as the State Department has observed, the laws of the Republic of South Africa reflect policy judgments made by a government that "is broadly representative of the victims of the apartheid regime" and "uniquely charged with a popular mandate to deal with the legacy of apartheid." A01090. We have no interest in undermining its law or policy.

In sum, to quote again from one learned commentary:

> A court decision to hear an Alien Tort Statute claim over action in South Africa reflects the worst sort of "judicial imperialism." It would send the message that the United States does not respect the ability of South African society to administer justice by implying that U.S. courts are better placed to judge the pace and degree of South Africa's national reconciliation. In contrast, U.S. intervention to block such a suit sends a different signal to South Africa and other countries struggling through difficult political transitions. It would communicate our recognition of the respected position that the justice

91

system holds in South Africa and reinforce the importance of having those claims judged in that country.

Schrage, *supra*, at 166.[2]

--------------------------

The majority declines to address the aspect of *Sosa* directing courts to determine the deference owed to the Executive Branch's view of the case, notwithstanding the facts that both parties and *amici* devote many pages of argument to this issue and that the issue goes directly to whether subject matter jurisdiction should be exercised over the cause of action alleged by the plaintiffs. The principal reason given for this silence is that "the district court explicitly refrained from addressing the defendants' arguments that the ATCA claim presented a non-justiciable political question." *Per Curiam* Op. *ante* at 12 (citing *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 543 n.4) (parenthetical omitted). The footnote in Judge Sprizzo's opinion, from which the *per curiam* opinion quotes an incomplete excerpt, reads as follows:

> Defendants also argue that there is no case or controversy for this Court to hear under Article III of the Constitution because plaintiffs cannot establish that they have standing to bring this action and because the matter is a non-justiciable political question. *See* Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at 3-4. Given the Court's finding that defendants are entitled

---

[2] The Khulumani plaintiffs also argue that, "[t]he ATS aside, there are independent grounds for jurisdiction in federal court", namely, diversity of citizenship pursuant to 28 U.S.C. § 1332. Br. for App. at 56. These causes of action, however, are also subject to dismissal based on deference to the Executive Branch's view of the foreign policy impact of allowing them to proceed, and on the doctrine of international comity. *See Bi.*, 984 F.2d at 586-87; *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 357 (D.C. Cir. 2007) (Kavanaugh *J.*, dissenting from denial of writ of mandamus.) The point of disagreement in *Exxon* , as the majority acknowledged, *id.*, turned on the availability of a writ of mandamus to review the denial of the defendant's motion to dismiss where the Executive Branch did not unequivocally seek such relief.

> to relief on other grounds, the Court need not address these remaining grounds for defendants' motion.

*In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 543 n.4.

Contrary to the *per curiam* opinion, a careful reading of the record shows that Judge Sprizzo did not explicitly refrain from addressing the issue of the deference to be accorded to the position of the State Department under *Sosa*. Indeed, the Memorandum of Law in Support of the Defendants' Joint Motion to Dismiss ("Joint Motion"), which Judge Sprizzo expressly referenced in the part of his opinion declining to address the argument that the ACTA claim presented a non-justiciable political question, argued (in relevant part) that the "adjudication of plaintiffs' claim would require a court to pass on the merits of political questions that were resolved by the executive and legislative branches of the United States government in favor of commerce with South Africa." *Id.* at 3. The defendants did *not* argue that the case should be dismissed in deference to the Statement of Interest filed by the United States, nor did they rely on the advice of the Supreme Court in *Sosa* that the views of the United States *in this case* "certainly deserve[d] great weight." *Sosa,* 542 U.S. at 733 n.21. Indeed, the defendants' motion was filed before the Statement of Interest and a year before the Supreme Court suggested that it be afforded deference.

More significantly, an objective reading of Judge Sprizzo's opinion demonstrates that he did rely on the Supreme Court's advice in *Sosa*. *See In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 547, 551, 553-54. Nevertheless, I am unwilling to burden this opinion any further on this score because, even if Judge Sprizzo did not rely expressly on the Supreme Court's guidance in *Sosa* as a basis for his holding, this would not be an excuse for avoiding the issue. While cases may be found where we declined to reach an issue not addressed by the district court, *see, e.g., Bigio v.*

*Coca-Cola Co.*, 239 F. 3d 440 (2d Cir. 2000), we have held expressly that we are "free to affirm a district court decision . . . even [on] grounds not relied upon by the district court." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 134 (2d Cir. 2007) (quoting *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004)). Thus, in *Bi*, 984 F.2d 582, a mirror image of *Bigio*, the district court had dismissed a complaint on the grounds of *forum non conveniens* – a ground on which the defendant had not moved to dismiss, presumably because of the unavailability of another forum. *See In re Union Carbide Corp. Gas Plant Disaster*, MDL No. 626, 1992 WL 36135 (S.D.N.Y. Feb. 18, 1992). We affirmed the dismissal, applying the principle of international comity, even though that issue had not been addressed by the district court. *Bi*, 984 F.2d at 586. Similarly, in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (Newman, *J.*), the district court dismissed the two related cases before it solely on the ground of lack of subject matter jurisdiction under the ATCA. *See Doe v. Karadzic*, 866 F. Supp. 734, 736 (S.D.N.Y. 1994). On appeal, however, the parties briefed three different grounds for dismissal, even though two of them had not been addressed by the district court, and Judge Newman considered each of them in turn. *Kadic*, 70 F.3d at 238.

There is a good reason to reach the issue here. Prosecution of these cases undermines significant interests of the United States and our relations with the Republic of South Africa, as well as allies of the United States, who have expressed concern over the exercise of jurisdiction over these cases. Under these circumstances, it is an issue that should be resolved at the threshold. Particularly apposite here are the words of the Court of Appeals for the Seventh Circuit addressing a motion to dismiss a Sherman Act claim on the ground that the conduct alleged did not have a substantial effect on commerce within the United States. (The "effect on commerce" requirement was enacted as part

of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA").)  In holding that subject matter jurisdiction was implicated, the Seventh Circuit observed:

> There are good policy reasons for [this conclusion].  The extraterritorial scope of our antitrust laws touches our relations with foreign governments, and so, it seems, it is prudent to tread softly in this area.  If FTAIA sets out an issue on the merits, resolution of the issue could be delayed until late in the case, and the potential for a lawsuit to have an effect on foreign markets would exist while the case remained pending. . . .  Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations.  In short, FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong.  And the power of the courts is precisely what subject matter jurisdiction is about.

*United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 952 (7th Cir. 2003); *see also In re BDC 56 LLC,* 330 F.3d 111, 118 (2d Cir. 2003) (finding that a particular issue was jurisdictional because it implicated "a threshold determination that should be made at the earliest possible stage of the proceedings").

While I rely on these cases simply to demonstrate the force of the policy favoring the exercise of our discretion to decide this issue, they also support the argument that the issue here should be treated as one going to subject matter jurisdiction – which we must resolve – even if it would not necessarily be so treated in other contexts.  This argument derives from the language of the ATCA and the Supreme Court's analysis of the manner in which the threshold jurisdictional question should be resolved.  Specifically, *Sosa* stated that "[a]ll Members of the Court agree that § 1350 is only jurisdictional" and "that the jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority."  542 U.S. at 729.

95

The Supreme Court then observed that "it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms . . . ." *Id.* at 730. *Sosa* went on to discuss "the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350," *id.* at 732, while making it clear that the criteria it was setting forth were not exclusive. One consideration "involve[s] an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732-33. Since subject matter jurisdiction under the ATCA depends on whether the defendants have violated an international law norm *which federal courts are prepared to recognize, accept and make available to litigants*, the application of the criteria for making that determination is one that by definition goes to the issue of subject matter jurisdiction.

The *per curiam* opinion argues that subject matter jurisdiction under the ATCA is established simply by virtue of an allegation that the defendant's conduct violated a norm of international law and that the decision to provide a remedy for the alleged violation simply relates to the issue of "whether a cause of action exists." *Per Curiam* Op. *ante* at 19. The latter issue, this argument continues, does not implicate subject matter jurisdiction. *Id. ante* at 19-20. While this may be so with respect to 28 U.S.C. § 1331, which confers jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States," the *per curiam* opinion ignores the language of the ATCA, which is one of a number of statutes in which "Congress has exercised its prerogative to restrict the subject-matter jurisdiction of federal district courts based on a wide variety of factors, some of them also relevant to the merits of a case." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 n.11 (2006). Where Congress has done so, subject matter jurisdiction turns on whether the complaint states a cause of action. *See id.* at 515-16 ("If the Legislature clearly states that a threshold limitation

on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.").[3]  Indeed, in *Members For a Better Union v. Bevona*, 152 F.3d 58 (2d Cir. 1998), we vacated a judgment entered after trial for failure of the complaint to state a cause of action, *id.* at 61, without regard to the trial record and the assertion of the parties "that the district court had subject matter jurisdiction."  *Id.* at 67 n.1.[4]

More significantly, even before *Sosa* reaffirmed the jurisdiction-conferring nature of the ATCA,  we "distinguish[ed] [the] Alien Tort Claims Act, with its jurisdictional pleading requirement, from general federal question jurisdiction, which is 'not defeated by the possibility that the averments in the complaint may fail to state a cause of action.'"  *Bigio*, 239 F.3d at 447 (citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 887-88 (2d Cir. 1980) (citing *Bell v. Hood* 327 U.S. 678 (1946))).  Indeed, as early as the very "birth of the modern line of cases" construing the ATCA, *Sosa*, 542 U.S. at 724-25, we acknowledged that, because of "the statute's requirement of alleging a '*violation* of the law of nations' . . . at the jurisdictional threshold[,] [c]ourts have . . . engaged in a more searching preliminary review of the merits than is required, for example, under the more

---

[3] The jurisdictional statutes cited by the Supreme Court as examples in which Congress has exercised its prerogative to restrict the subject matter jurisdiction of federal district courts include statutes that contain jurisdiction-conferring language identical to that in 28 U.S.C. § 1350. *See, e.g.,* 28 U.S.C. §§ 1345 & 1348 (cited in *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 n.11 (2006)).  Indeed, in *Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001), in which Judge Katzmann concurred, we said that the "Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, which provides that '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States,' similarly identifies certain substantive law violations as jurisdictional pleading requirements."  *Id.* at 144 n.13.

[4] The statute at issue in *Bevona*, section 102 of the Labor-Management Reporting and Disclosure Act, 28 U.S.C. § 412, did not by its terms restrict the exercise of subject matter jurisdiction. Nevertheless, we held that it had been so construed by the Supreme Court.  *Bevona*, 152 F.3d at 62 (citing *Calhoon v. Harvey*, 379 U.S. 134, 138 (1964)).

flexible 'arising under' formulation." *Filartiga*, 630 F.2d at 887-88 (comparing *O'Reilly de Camara v. Brooke,* 209 U.S. 45, 52 (1907) (question of ATCA jurisdiction disposed of "on the merits") (Holmes, *J.*), with *Bell*, 327 U.S. 678 (general federal question jurisdiction not defeated by the possibility that the averments in the complaint may fail to state a cause of action)) (emphasis in original); *accord Kadic*, 70 F.3d at 238; *Bigio*, 239 F.3d at 447. After *Sosa*, "a more searching preliminary review of the merits" necessarily includes determining whether the plaintiffs have adequately pled a violation of the law of nations over which it is appropriate for the district court to exercise subject matter jurisdiction.

Again, even if I am wrong on this score, we should consider the issue of case-specific deference at this juncture because "the continued adjudication of the . . . matters risks potentially serious adverse consequences for significant interests of the United States,", A01090, threatens our relations with the Republic of South Africa, and poses "continuing tensions in our relations" with the other countries where many of the defendants are incorporated A01091. Just as the Seventh Circuit treated the FTAIA as a jurisdictional statute in order to avoid "offending the economic policies of other nations" during the pendency of the case, *United Phosphorous*, 322 F.3d at 952, we should do so here.

Moreover, the *per curiam* opinion offers no good reason for failing to do so. It suggests that its "approach is particularly appropriate here because plaintiffs have indicated that, if given the opportunity, they would narrow their claims and clarify the nature of their allegations against various defendants, changes that may affect how the district court ultimately decides to resolve these issues." *Per Curiam* Op. *ante* at 13-14 (citing Tr. 7-8, 14-15). The Khulumani plaintiffs, however, did not seek leave to file an amended complaint and Judge Sprizzo has previously granted the Ntsebesa and

98

Digwamaje plaintiffs leave to file a second amended complaint alleging that the defendants aided and abetted the violation of norms of customary international law.[5] Moreover, the *per curium* opinion does not identify a single flaw in the current complaints that would need to be cured by an amended complaint, and the transcript of the oral argument does not reflect any offer by the plaintiffs to amend their complaints in any significant way. Indeed, the plaintiffs expressly argued against the standard that Judge Katzmann adopts in section II.B of his concurring opinion (which I have joined) for imposing liability on the defendants for aiding-and-abetting in violation of the norm of international law.

Nevertheless, relying on the amended complaints that the plaintiffs may be permitted to file, the *per curiam* opinion declines "to determine whether the plaintiffs have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA . . . ." *Per Curiam Op. ante* at 10. The *per curiam* opinion does so in the face of our holding in *Bigio* that the failure to properly plead a violation of the law of nations means that "neither [the district court] nor we may consider the matter further . . . ." 239 F.3d at 447. Instead of upholding its obligation to determine whether subject matter jurisdiction exists, *see In re MTBE*, 488 F.3d at 121-22, the *per curium* opinion offers up an advisory opinion that a plaintiff may allege that a private party aided and abetted a violation of a norm of customary international law without so much as a reference to the factual allegations in the complaint or citation to the specific norm in which the defendants were allegedly complicit.

---

[5] On April 28, 2003, before *Sosa* was decided, Judge Sprizzo permitted the Ntsebeza plaintiffs to file a third amended complaint. *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 544 n.8. While some defendants received a copy of such a complaint on May 19, 2003, Joint Motion at 5 n.2, "[t]hat Complaint was never properly filed." *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 544 n.8. Nevertheless, it was virtually identical to the one previously filed. *Id.*

Under these circumstances, it is difficult to understand the disposition of the appeal, a judgment that "vacate[s] the district court's order denying plaintiffs' motion for leave to amend." *Per Curiam* Op. *ante* at 9. The majority does say that, "[i]n denying this motion, the district court relied, in part, on the erroneous premise that subject mater jurisdiction did not inhere and reasoned that any additional amendments to the pleadings would be futile." *Id.* I pass over the incomplete and inaccurate description of the grounds for the denial of the motion to amend.[6] Nevertheless, I do not understand how the majority can say that Judge Sprizzo denied the motion to amend the complaint on the "erroneous premise" that subject matter jurisdiction was lacking, while declining to rule on the basic jurisdictional issue of whether the plaintiffs "have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA." *Id.* at 10.

I decline to join in this peculiar disposition, by which my colleagues seek desperately to avoid the easiest ground on which to resolve this appeal – that of deference to the judgment of the Republic of South Africa, supported by our State Department, that these cases are none of our business – and go on to grapple unnecessarily with difficult issues relating to the ATCA and customary international law without being able to agree on the rationale for the result they reach. Nevertheless, since the majority has chosen to do so, I address the issue whether the scope of liability for violations of the international law norms at issue here extends to private actors, such as corporations, for aiding-and-abetting. I then turn to the separate opinions of Judges Hall and Katzmann.

---

[6] Judge Sprizzo denied the motion to amend because (1) he had previously provided the plaintiffs leave to replead; (2) the plaintiffs' request came "four months after this Court dismissed these actions and more than three months after plaintiffs noticed their appeal"; (3) allowing them to replead would interfere with "ensuring a speedy appeal"; and (4) the proposed amendments would have been "fruitless" in light of his ruling that aiding-and-abetting is not recognized under the ATCA. A01139.

**2. The Scope of Liability Under the ATCA**

*Sosa* indicates that this inquiry requires consideration of two separate principles. First, the Court held that the ATCA should not be read to create jurisdiction over "violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732. Second, the Court observed that "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Id.* at 732 n.20. To that end, immediately thereafter, the Court contrasted two opinions, one finding no consensus that torture by a private actor violated international law, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791-95 (D.C. Cir. 1984) (Edwards, *J.*, concurring), another finding such a consensus that genocide by a private actor did violate international law, *Kadic*, 70 F.3d at 239-41. Justice Breyer, in a separate opinion, agreed with the Court that the international law norm invoked "must extend liability to the type of perpetrator (*e.g.*, a private actor) the plaintiff seeks to sue." *Sosa*, 542 U.S. at 760 (Breyer, *J.*, concurring in part and concurring in the judgment) (citing *id.* at 732 n.20).

As did the Supreme Court in *Sosa*, we have held that, "[i]n order to determine whether the offenses alleged by the [plaintiffs] in this litigation are violations of the law of nations that may be the subject of Alien Tort Act claims against a private individual, we must make *a particularized examination of these offenses . . . .*" *Kadic*, 70 F.3d at 241 (emphasis added). In that case, Judge Newman then proceeded to engage in such an exercise. *Id.* at 241-44 (discussing independently genocide, war crimes, and torture and summary execution). More recently, in *Wiwa*, we reiterated our holding in *Kadic* that "the ATCA reaches the conduct of private parties provided that their

101

conduct is undertaken under the color of state authority or violates a norm of international law that is recognized as extending to the conduct of private parties." 226 F.3d at 104.

These holdings are consistent with the position of the European Commission, which clearly influenced Justice Souter's majority opinion and Justice Breyer's concurrence in *Sosa*. Specifically, in its *amicus* brief in *Sosa*, the Commission urged the Supreme Court to hold, as it ultimately did, that in determining whether a non-state actor was complicit in a violation of customary international law by a state actor, courts should apply international, rather than domestic, legal standards. 2004 WL 177036, at *4. Significantly, and again consistent with our holding in *Kadic*, the Commission argued that only a subset of norms recognized as customary international law applies to non-state actors and "hence only that subset may form the basis of liability against such actors. For example, non-state actors may be liable for genocide, war crimes, and piracy, while torture, summary execution, and prolonged arbitrary detention do not violate the law of nations unless they are committed by state officials or under color of law." *Id.* at *11 (citations omitted).

Consistent with this analysis, I first address whether the complaint here makes allegations against defendants sufficient to hold them liable as acting under the color of law. I next turn to whether, at the time the alleged crimes were committed, there was a well established and universally recognized international norm providing for liability of private parties who aid and abet apartheid. Finally, while officers and employees of a corporation may be held responsible for using the entity as the vehicle for the commission of crimes against humanity, I address the issue whether the entities themselves may be held responsible.

(a)     **Private Party Liability under Color of Law**

Judge Sprizzo held that the allegations against the defendants were not sufficient to "elevate them to the status of state actors . . . ." *In re S. African Apartheid Litig.*, 346 F. Supp. 2d at 548-49. This aspect of his decision is challenged in the briefing of only one group of appellants. The state action element derives from the principle that violations of international human rights norms, including apartheid, are violations of customary international law only if practiced, encouraged, or condoned by the government of a state as a matter of state policy. *Restatement (Third) of Foreign Relations Law* § 702 & cmt. b (discussed in *Sosa*, 542 U.S. at 737). *See United States v. Josef Altstoetter* ("*The Justice Case*"), 3 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 954, 982 (William S. Hein & Co., Inc. 1997) (1947) (Crimes against humanity committed against German nationals are subject to punishment "only where there is proof of conscious participation in systematic government organized or approved procedures . . . .").[7] Indeed, this explains why *Sosa* specifically held that, before jurisdiction is accepted over an ATCA cause of action against a private actor, it must be determined "whether international law extends the scope of liability for a violation of a given norm to . . . a private actor. . . ." 542 U.S. at 732 n.20. *Cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) (linking the color-of-law element of 42 U.S.C. § 1983 to the underlying state-action requirement of the Fourteenth Amendment, and holding that both exclude from their reach "merely private conduct, no matter how discriminatory or wrongful") (internal quotation marks and citation omitted).

---

[7] The ICTY held recently that "[w]hile this may have been the case during the Second World War . . . the law in relation to crimes against humanity has developed to take into account forces which, although not those of the legitimate government, have de facto control over, or are able to move freely within, defined territory." *Prosecutor v. Tadić*, 36 I.L.M. 908, 945, Case No. IT-94-1-T, Opinion and Judgment ¶ 654 (Trial Chamber May 7, 1997); *see also* Antonio Cassese, *Crimes Against Humanity, in* Cassese et al., *supra*, at 353, 357.

We have held that case law construing 42 U.S.C. § 1983 is "a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act." *Kadic*, 70 F.3d at 245. As Judge Newman observed, "[a] private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Subsequently, the Supreme Court has cautioned that the language from *Lugar*, which Judge Newman paraphrased, "must not be torn from the context out of which it arose," *Sullivan*, 526 U.S. at 58, namely, an *ex parte* application for a writ of attachment. This admonition is a useful reminder that the "under color of law" cases arise in varying contexts. Many, including cases on which plaintiffs rely, have been limited to their facts. *Id.* at 55-59.

Perhaps the largest single category of cases under color of law are those in which the primary offender or tortfeasor is a private party, and the issue turns on whether "seemingly private behavior 'may be fairly treated as that of the state itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Met. Edison Co.*, 419 U.S. 345, 351 (1974)). Because the cases on this appeal do not fit in this category, I am reluctant to discuss them in detail. Nevertheless, because plaintiffs rely on general language from the cases "torn from the context out of which it arose," *Sullivan*, 526 U.S. at 59, I borrow from Professor Schwartz's treatise, first, one significant caveat, and second, his useful synthesis of the Supreme Court's holdings in this area.

The caveat is that, in analyzing the large body of decisional law concerning state action, "it is important to consider the era in which the decision was rendered." 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.12, at 5-85 (4th ed. 2003). Professor Schwartz explains that the Warren Court took an expansive view of state action in its effort to combat racial

104

discrimination in society, but that the subsequent Burger and Rehnquist courts reversed this trend in order to shield private behavior from the reach of the Constitution. *Id.* § 5.12, at 5-85–5-86. This reversal was undertaken not by explicitly overturning any earlier state-action decisions, but through a series of decisions finding no state action despite heavy government involvement in private conduct. *Id.* § 5.12, at 5-86. The unmistakable messages sent by these decisions are that the concept of state action is to be given only limited berth, and that federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law. *Id.*[8]

Professor Schwartz then supplemented this perceptive analysis by stating the principles that have emerged as the Supreme Court has narrowed the scope of its state-action jurisprudence:

> 1. Mere state regulation of private conduct, even if extensive, is insufficient to support a finding of state action.

> 2. State authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, coerce, or significantly encourage the contested activity.

> 3. State assistance to a private party, even if substantial, will not support a finding of state action, whether that assistance is in the form

---

[8] *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which provides the basis for the so-called "symbiotic relationship test" between public and private actors and upon which plaintiffs rely, was one of the Warren Court cases that took an expansive view of state action. The Supreme Court did not employ the "symbiotic relationship" language in *Burton*, though in a subsequent case, it referred to "the symbiotic relationship between lessor and lessee . . . present in *Burton*." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175 (1972). "Although neither *Burton* nor the symbiotic relationship doctrine has been overruled, they have been severely narrowed in scope and diminished as precedent. Supreme Court decisional law has given *Burton* a very narrow interpretation and, with the possible exception of its decision that a civil litigant's exercise of a racially based peremptory challenge constitutes state action [*Edmondson v. Leesville Concrete Co.*, 500 U.S. 614 (1991)], has rejected every attempt to establish state action on the basis of *Burton*." 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.13[A], at 5-90–5-91 (4th ed. 2003); *see also Sullivan*, 526 U.S. at 57-58; Laurence Tribe, *American Constitutional Law* § 18-3, at 1701 n.13 (2d ed. 1988).

of direct financial aid, tax exemptions, monopoly power, government mortgage insurance, or the grant of a license.

4.  The mere importance of the function carried out by the private sector is an insufficient basis upon which to find state action; for state action to be found, the function must be historically, traditionally, and exclusively governmental.

*Id.* § 5.12, at 5-87–5-88 (footnotes omitted).  Professor Schwartz continues,

[t]he Supreme Court in some cases has found no state action, even when all four of these government involvements coalesced in the same case.  Thus, the Court has found on more than one occasion that an entity was not engaged in state action even though it was extensively regulated, obtained governmental approval, received substantial governmental assistance, and performed an important societal function.

*Id.* § 5.12, at 5-88 (citing *San Francisco Arts & Athletics v. United States Olympic Comm.,* 483 U.S. 522 (1987); *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982); *Blum v. Yaretsky*, 457 U.S. 991 (1982); *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974)).

In analyzing the subgroup of state-action cases of which the instant cases are representative – those where the primary offender or tortfeasor is a state actor, and the question is whether a private party who is alleged to be an accessory may be deemed a state actor – it is useful to discuss the facts of the leading Supreme Court cases because they illustrate the kind of showing that must be made before a private party may be deemed a state actor in this context.  The case most directly on point is *Dennis v. Sparks*, 449 U.S. 24 (1980), in which a private party bribed a judge to issue an order enjoining the production of minerals from certain oil leases.  In holding that the private actor was acting "under color of law," the Supreme Court observed that "[p]rivate persons, jointly engaged with state officials in a challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Id.* at 24.  Specifically, "the allegations were that an official act of the defendant judge was

the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability." *Id.* at 28. On the other hand, if the private actor had merely resorted to the courts and prevailed in the lawsuit, he would not have been acting under color of law.

*United States v. Price*, 383 U.S. 787 (1966), which arose out of one of the saddest episodes of the civil rights movement, provides another compelling example of this subgroup. *Price* involved the arrest and subsequent murder of three civil rights workers in Mississippi. The facts are described as follows in the opinion of the Court:

> On June 21, 1964, Cecil Ray Price, the Deputy Sheriff of Neshoba County, Mississippi, detained Michael Henry Schwerner, James Earl Chaney and Andrew Goodman in the Neshoba County jail located in Philadelphia, Mississippi. He released them in the dark of that night. He then proceeded by automobile on Highway 19 to intercept his erstwhile wards. He removed the three men from their automobile, placed them in an official automobile of the Neshoba County Sheriff's office, and transported them to a place on an unpaved road.

> These acts, it is alleged, were part of a plan and conspiracy whereby the three men were intercepted by the 18 defendants, including Deputy Sheriff Price, Sheriff Rainey and Patrolman Willis of the Philadelphia, Mississippi, Police Department. The purpose and intent of the release from custody and the interception, according to the charge, were to "punish" the three men. The defendants, it is alleged, "did wilfully assault, shoot and kill" each of the three. And, the charge continues, the bodies of the three victims were transported by one of the defendants from the rendezvous on the unpaved road to the vicinity of the construction site of an earthen dam approximately five miles southwest of Philadelphia, Mississippi.

*Id.* at 790. The Supreme Court held that private individuals who participated directly with state actors pursuant to a common design were acting under color of law. "In effect, if the allegations are true, they were participants in official lawlessness, acting in willful concert with state officers and hence under color of law." *Id.* at 795. *Price* is a classic example of the rule that private parties act under color of law when they are "engaged in a conspiracy with state officials to violate the Fourteenth Amendment." *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 n.12 (2d Cir. 1985) (Oakes, *J.*); *accord Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272-73 (2d Cir. 1999); *Alexis v. McDonald's Rests. of Mass. Inc.*, 67 F.3d 341, 352 (1st Cir. 1995); *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993); *Annunziato v. The Gan, Inc.*, 744 F.2d 244, 251 (2d Cir. 1984).

There is good reason to require direct participation with a state actor pursuant to a conspiracy or common design before holding a private party, who is not the primary wrongdoer, liable as a state actor. Where the issue is whether a public official can be held liable for the primary wrongdoing of a private actor, the public office he holds suffices to satisfy the state-actor requirement; the only issue is whether his conduct in that capacity constitutes a proximate cause of the plaintiff's injury. Thus, "a state actor may be subject to liability for an action physically undertaken by private actors in violation of the plaintiff's liberty or property rights if the state actor directed or aided and abetted the violation." *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993). On the other hand, where the primary actor is a public official, for a private actor to be deemed a state actor, he must jointly participate in the wrongful conduct, pursuant to a common design or plan. As the Supreme Court explained in *Adickes v. S.H. Kress & Co.*, "[t]he involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth

108

Amendment equal protection rights . . . . Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983." 398 U.S. 144 , 152 (1970).

This holding finds support in the law of agency. "When two persons engage jointly in a partnership for some criminal [or legitimate] objective, the law deems them agents for one another. Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective." *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). Thus, a private party who conspires with a state actor becomes his agent, and his actions in that capacity are sufficient to make him an actor under color of law. Similarly where a private party induces an otherwise innocent public official to commit an offense, he has effectively made that person his or her agent.

> This doctrine is an outgrowth of common law principles of criminal responsibility dating at least as far back as *Regina v. Saunders*, 2 Plowd. 473 (1575); and of principles of civil responsibility established, by force of the maxim *qui facit per alium facit per se* [he who acts thorough another acts for himself], at least as early as the 14th century.

*United States v. Lester*, 363 F.2d 68, 72 (6th Cir. 1966). On the other hand, there is no legal framework or precedent for holding that a private party, merely selling goods or materials to a state actor, is himself acting under color of law.

Consistent with this precedent, we have held that a conspiracy to violate an international law norm is necessary to render a private party liable for conduct in which the state is the primary actor. *Bigio*, 239 F.3d at 447. Indeed, there we rejected a cause of action alleging that Coca-Cola Co. was acting "under color of law" where there was "no allegation in the complaint, let alone any hint of evidence . . . that Coca-Cola had any role as a participant or co-conspirator in the confiscation of the Bigios' property." *Id.* at 449; *cf. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 841 (2d

109

Cir. 1992) (holding that joint participation pursuant to an agreement – express or implied – to commit a tort is necessary to impose liability on those acting in concert); *Restatement (Second) of Torts* § 876(a) (imposing liability on one who "does a tortious act in concert with the other or pursuant to a common design with him").

Neither Judge Katzmann nor Judge Hall takes issue with my analysis of section 1983 cases defining circumstances under which a private party may be deemed to have acted under color of law. Judge Katzmann, however, relying on cases applying the general criminal aiding-and-abetting statute applicable to all federal crimes, 18 U.S.C. § 2, argues that a private person may be liable for aiding-and-abetting a public official in the commission of a crime even though he may be incapable of committing the crime himself and even though his conduct would not satisfy the standard set out in § 1983 for treating him as a state actor. Op. of Judge Katzmann *ante* at 47 (citing *In re Nofziger*, 956 F.2d 287, 290 (D.C. Cir. 1992); *United States v. Tannenbaum*, 934 F.2d 8, 14 (2d Cir. 1992)). The fact that a person may be convicted of aiding-and-abetting an offense of which he could be found guilty as a principal - because Congress has so provided - does not provide a basis for imposing such liability in the present context. Because Congress has not enacted a comparable civil aiding-and-abetting statute, a private party could not be subject to such liability in a civil action under 42 U.S.C. § 1983. *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181-82 (1994).

Significantly, when Congress enacted the Torture Victims Protection Act of 1991 ("TVPA") to comply to with the Torture Convention, it provided for civil causes of action *only* against "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation," undertakes conduct prohibited by the Act. TVPA § 2(a), Pub. L. No. 102-256, 106 Stat. 73 (1992).

110

Moreover, the Senate Report accompanying the legislation provides that "[c]ourts should look to principles of liability under U.S. civil rights laws, in particular section 1983 of title 42 of the United States Code, in construing 'under color of law' as well as interpretations of 'actual or apparent authority' derived from agency theory in order to give the fullest coverage possible." S. Rep. 102-249, at 8 (Nov. 26, 1991). To the extent that the Senate Report speaks to the issue of aiding-and-abetting, it addresses the issue of supervisory liability and makes the point that "a higher [public] official need not have personally ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts [to] anyone with higher authority who authorized, tolerated, or knowingly ignored those acts." *Id.* at 9 (citing *In re Yamashita*, 327 U.S. 1; *Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987)).

Nevertheless, even if 18 U.S.C. § 2 applied in this context, the standard for imposing liability for aiding-and-abetting pursuant to this section is not satisfied by the complaints in this case. Specifically, the Supreme Court has held that, "[i]n order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (internal quotation marks and citation omitted). This element is also essential to a cause of action for aiding-and-abetting. *See, e.g., E. Trading Co. v. Refco*, 229 F.3d 617, 623 (7th Cir. 2000) (Posner, *J.*) (observing "that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud"). Indeed, in *United States v. Blankenship*, Judge Easterbrook, after citing to the Model Penal Code for the proposition that a "supplier [is] culpable only if he has 'the purpose of promoting or

111

facilitating' the crime," observed that a similar approach has been adopted to aiding-and-abetting in civil cases. 970 F.2d 283, 286 (7th Cir. 1992). Moreover, in *Boim v. Quranic Literacy Institute*, the same court held that 18 U.S.C. § 2339A, which created a civil cause of action for those injured by terrorist acts against individuals who provided support to terrorist groups, survived a First Amendment challenge "so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping." 291 F.3d 1000, 1028 (7th Cir. 2002). *Cf. Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983) (holding that "desire to make the venture succeed" is a factor in determining aiding-and-abetting liability).

There is no allegation here that the defendants acted with the intent to make the violation succeed. On the contrary, plaintiffs strenuously argued in their briefs and at oral argument that they were not required to make such a showing. Ntsebesa Reply Br. at 19; Khulumani Reply Br. at 11; Tr. at 13. They argue that a private party who knowingly facilitates the commission of an international law violation by a state actor acts under color of law. I use the term "facilitates" because "[o]ne who merely sells goods to a buyer is not an aider and abettor of crimes that the buyer might commit, even if the seller knows that the buyer is likely to use the goods unlawfully, because the seller does not share the specific intent to further the buyer's venture." *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1027 (W.D. Wash. 2005) (citing *Blankenship*, 970 F.2d at 285-87), *aff'd* on other grounds, *Corrie v. Caterpillar, Inc.*, _F.3d_, 2007 WL 2694701 (9th Cir. Sept. 17, 2007); *see also* N.Y. Penal Code § 115.05 (criminal facilitation). Indeed, such conduct does not violate customary international law. *See The Ministries Case*, 14 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 621-22.

112

Nevertheless, plaintiffs suggest that the relevant inquiry is not whether the relationship between the State and the private actor is of a commercial nature, but rather – much like aiding-and-abetting under the substantial assistance prong of section 876 of the Restatement (Second) of Torts – whether the private actor had sufficient prior knowledge of the government's plans to commit violations of international law and of the ways in which the goods or services procured by the government would aid in those illicit actions that the private actor can be said to have become party to the government's actions. The issue, however, is not whether the private actor has become "a party to the government's actions" – whatever that means. Instead, it is whether by engaging in this conduct he acted "under color of law." *Adickes*, 398 U.S. at 150; *Ginsberg*, 189 F.3d at 273. A holding that he does, in the circumstances described in the complaints, strains both the phrase and the concept to the breaking point.

Indeed, notwithstanding the division on the panel with respect to other issues, the *per curiam* opinion, reflecting the agreement of all members of the panel, holds that the allegations of criminal facilitation alleged in the complaint are insufficient to render the defendants liable under the color of law for violation of the TVPA. Specifically, it rejects the cause of action under the TVPA, alleging that the defendants "aided and abetted the apartheid regime's subjecting the Plaintiffs to torture and extra judicial killing within the meaning of the [TVPA] . . . under actual or apparent authority, or under color of law." A-00505. Applying principles of liability under section 1983, the *per curiam* opinion properly concludes that the complaint "failed to link any defendants to state aid or the conduct of state officials." *Per Curiam* Op. *ante* at 8. The same is true with respect to the other causes of action.

**(b)     Aiding-and-abetting Liability of Private Parties**

113

Ordinarily, the fact that the defendants' conduct is not sufficient to hold them liable for acting under color of law would compel the dismissal of the causes of action alleging various crimes against humanity that were not committed during war or an armed conflict. *See Kadic*, 70 F.3d at 244. Nevertheless, Judge Sprizzo identified two potentially applicable international agreements that contemplated liability for private actors. The first and most obvious source of such liability is the Apartheid Convention, which was expressly drafted to cover all of the conduct of the Union of South Africa that the defendants allegedly aided and abetted. Of this Convention, the Reporters of the Restatement write:

> The Convention [ ] creates obligations beyond those imposed by customary international law. It attaches personal criminal responsibility to all individuals who commit, participate in, incite, abet, encourage or co-operate in the crime. Art. III. The Convention also requires states to suppress, prevent any encouragement of, and punish apartheid. Among parties to the Convention, apartheid is also effectively made a subject of universal jurisdiction. Art. IV.

*Restatement (Third) of Foreign Relations Law* § 702 reporters' note 7. Thus, the Reporters recognize that the Apartheid Convention's imposition of liability on private parties not acting under color of law represented a departure from customary international law.[9] Moreover, while it may be an overstatement to describe the list of countries that have ratified the Convention as a rogues' gallery of human rights violators, the Convention has not been ratified by the United States, most other mature democracies, or other states that play a significant role in international affairs, including three of the five permanent members of the United Nations Security Council – the United States, the

---

[9] The Chief Reporter of the Restatement was Professor Louis Henkin of Columbia University. Associated with Professor Henkin as Reporters were Professors Andreas F. Lowenfeld of New York University, Louis B. Sohn of the University of Georgia, and Detlev F. Vagts of Harvard University.

114

United Kingdom, and France. Indeed, it has not been ratified by the post-apartheid Republic of South Africa. Thus, it is not a persuasive source of customary international law on this point. *See Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 257 (2d Cir. 2003) (Cabranes, *J.*) ("[T]he more States that have ratified a treaty, and the greater the relative influence of those States in international affairs, the greater the treaty's evidentiary value."). Dean Koh made a similar point in an analogous context when he wrote:

> [T]hose who advocate the use of international and foreign sources in U.S. constitutional interpretation [as he does] are not urging U.S. courts to defer automatically to some kind of global "nose count." Instead, they are suggesting that the practices of other mature democracies – not those that lag behind developmentally – constitute the most relevant evidence of . . . the "evolving standards of decency that mark the progress of a maturing society."

Harold Hongju Koh, *International Law as Part of Our Law*, 98 Am. J. Int'l L. 43, 56 (2004). Under these circumstances, for the same reason that the Apartheid Convention is not a source for the exercise of universal jurisdiction, Judge Sprizzo properly rejected it as a source for extending the scope of liability to private actors who aided and abetted apartheid in South Africa.

The other international agreement identified by Judge Sprizzo that expressly recognizes liability for private persons is the Convention on the Prevention and Punishment of the Crime of Genocide, *opened for signature* Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277 ("Genocide Convention"). The near-unanimous adoption of the convention constitutes concrete evidence of a peremptory norm that has become part of customary international law. The problem with the invocation of the Genocide Convention – aside from the issue whether the complaints here sufficiently allege activity constituting genocide – is that when Congress enacted legislation to

implement the agreement, *see* Genocide Convention Implementation Act of 1987, Pub. L. 100-606, Nov. 4, 1988, 102 Stat. 3045, *codified at* 18 U.S.C. § 1091 *et seq.*, it expressly provided that the Act shall not "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." 18 U.S.C. § 1092.

In *Kadic*, which was decided prior to *Sosa*, we held that "the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the Alien Tort Act." 70 F.3d at 242. As Judge Newman explained:

> Nothing in the Genocide Convention Implementation Act or its legislative history reveals an intent by Congress to repeal the Alien Tort Act insofar as it applies to genocide, and the two statutes are surely not repugnant to each other. Under these circumstances, it would be improper to construe the Genocide Convention Implementation Act as repealing the Alien Tort Act by implication.

*Id.*

After *Sosa*, however, the issue for us to decide is not whether the Genocide Convention Implementation Act implicitly repealed the ATCA insofar as it applies to genocide. As Judge Katzmann acknowledges, "*Sosa* . . . deviate[d] from our case law in one crucial respect. We had allowed cases to proceed under the ATCA on the assumption that when plaintiffs alleged violations of well-established international law, their 'causes of action are statutorily authorized.'" Op. of Judge Katzmann *ante* at 17 (quoting *Kadic*, 70 F.3d at 246). *Sosa* "flatly rejected this notion." *Id.* Instead, we are now required to determine "whether to recognize a common-law cause of action to provide a remedy for the alleged violation" of international law. *Id. ante* at 19. Thus, we have to address the threshold question of whether to recognize a civil cause of action under the ATCA for

genocide where Congress has quite plainly indicated its intention that such a cause of action should not be available.

Judge Katzmann appears to acknowledge that, notwithstanding *Kadic*, the issue whether to recognize a cause of action for genocide based on the ATCA must be considered anew in light of *Sosa*. Nevertheless, he would "leave it to the district court to address in the first instance should it undertake to decide whether to recognize a cause of action." Op. of Judge Katzmann *ante* at 51 n.32. While leaving it to Judge Sprizzo to resolve the issue, however, Judge Katzmann goes on to suggest to him that such a cause of action should be recognized. *Id.* Instead of deciding an issue that we should and must resolve, Judge Katzmann's disposition of this issue invites a game of ping-pong with Judge Sprizzo, in which I decline to participate.

The Genocide Convention Implementation Act should shut the door to the recognition of a cause of action under the ATCA for violation of the international law norm that it implements, because it would be an abuse of our discretion to expand the scope of ATCA liability to causes of action that Congress indicated its intent to proscribe. We should not "override a clear indication from the political branches that a 'specific, universal, and obligatory' norm against genocide is *not* to be enforced through a private damages action[.]" *Sosa*, 542 U.S. at 749 (Scalia, *J.*, concurring in part and concurring in the judgment).

### (c)     Liability of Corporations

In *Sosa*, the Supreme Court directed federal courts to determine "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual." *Id.* at 732 n.20. Judge

117

Katzmann, who agrees with me that the issue of the scope of liability is governed by international law, draws no distinction between a corporation and an individual. Nor do our decisions in cases invoking jurisdiction under ACTA. Nevertheless, the specific issue of corporate liability under customary international law was not discussed, nor was it raised by the parties, in any of those cases. *See, e.g., Bigio*, 239 F. 3d 440; *Flores*, 414 F.3d 233. Consequently, they are simply not apposite here, because "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

There is a significant basis for distinguishing between personal and corporate liability. Where the private actor is an individual, he is held liable for acts which he has committed and for which he bears moral responsibility. On the other hand, "legal entities, as legal abstractions can neither think nor act as human beings, and what is legally ascribed to them is the resulting harm produced by individual conduct performed in the name or for the benefit of those participating in them or sharing in their benefits." M. Cherif Bassiouni, *Crimes Against Humanity in International Criminal Law* 378 (2d ed. 1999). Thus, the issue here is whether an artificial entity that is allegedly used as a vehicle for the commission of a crime against humanity may be held vicariously liable.

The sources evidencing the relevant norms of international law at issue plainly do not recognize such liability. While the London Charter, which created the International Military Tribunal (the "IMT") at Nuremberg, does not explicitly limit its jurisdiction to "natural persons," it seems clear from its language and context that it conferred jurisdiction only over the prosecution of individuals. Specifically, the Nuremberg Tribunal was empowered "to try and punish *persons* who, acting in the interests of the European Axis countries, whether as *individuals* or as *members*

118

of organizations," committed any of several enumerated crimes. Charter of the IMT art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279 (the "London Charter" or the "Charter") (emphasis added).[10] Moreover, in rejecting the defense argument that "international law is concerned with the actions of sovereign states, and provides no punishment for individuals," the Nuremberg Tribunal held that "[c]rimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced." *The Nuremberg Trial*, 6 F.R.D. 69, 110 (1946); 1 *Trial of the Major War Criminals* 223 (William S. Hein & Co., Inc. 1995) (1947). *See also* Ernst Schneeberger, *The Responsibility of the Individual under International Law*, 35 Geo. L. J. 481, 489 (1947) ("[I]n the last resort responsibility under international law can only be responsibility of an individual . . . .").

Indeed, the distinction between corporate and individual responsibility is illustrated by *The I.G. Farben Case* in which corporate officers were charged with "acting through the instrumentality of Farben" in committing various crimes against humanity. *United States v. Krauch* ("*The I.G. Farben Case*"), 7 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 14, 39, 50, 59 (1952). Nevertheless, the notorious I.G. Farben was not named as a defendant. *Id.* at 11-14. Nor were any other corporations charged with crimes at Nuremberg. "In fact, in the Nuremberg trials, this point of lack of corporate liability appeared to have been

___

[10] Article 9 of the London Charter provided that "[a]t the trial of any individual member of any group or organization the Tribunal may declare (in connection with any act of which the individual may be convicted) that the group or organization of which the individual was a member was a criminal organization." 1 *Trial of Major War Criminals* 255-57. The consequence of a finding in the main trial that organizations, such as the Schultzstaffeln (more commonly referred to as the S.S.) and the Gestapo, were criminal in nature was that it permitted a finding of guilt against other members of the organization in subsequent trials. *See The Nuremberg Trial*, 6 F.R.D. at 131-33.

explicitly stated." *In re Agent Orange Product Liab. Litig.*, 373 F. Supp. 2d 7, 57 (E.D.N.Y. 2005) (Weinstein, *J.*).

In 1948, the United Nations General Assembly asked the International Law Commission (the "ILC"), a United Nations body, to study the possibility of creating an international judicial tribunal, which ultimately emerged in the form of the International Criminal Court (the "ICC"), to prosecute genocide and other crimes. Under the auspices of the ILC, the Committee on International Legal Jurisdiction began to study the issue in 1951, and it released its report in 1953. *See* U.N. GAOR, 9th Sess., Supp. No. 12, U.N. Doc. A/2645 (1954). The Committee considered a proposal by Australia to grant the international court jurisdiction over corporations. *Id.* ¶ 85. The proposal was soundly defeated because "it was undesirable to include so novel a principle as corporate criminal responsibility in the draft statute." *Id.*

More than forty years later, during negotiations for the Rome Statute, pursuant to which the ICC was created, France proposed bringing corporations and other juridical persons (though not States) within the jurisdiction of the ICC. That proposal was again rejected, for three principal reasons: (1) "from a pragmatic point of view it was feared that the ICC would be faced with tremendous evidentiary problems when prosecuting legal entities"; (2) "from a more normative-political point of view it was emphasized that the criminal liability of corporations is still rejected in many national legal orders, and international disparity which could not be brought in concord with the principle of complementarity"; and (3) "it was felt morally obtuse for States to insist on the criminal responsibility of all entities other than themselves." Albin Eser, *Individual Criminal Responsibility*, *in* 1 Antonio Cassese et al., *The Rome Statute of the International Criminal Court: A Commentary* 767, 778-79 (2002) (footnotes omitted). Thus, the Rome Statute provides for

120

jurisdiction over only "natural persons." The Rome Statute of the ICC art. 25(1), *opened for signature* July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002) ("The Rome Statute").

Similarly, Article III of the Apartheid Convention provides that "[i]nternational criminal responsibility shall apply, irrespective of the motive involved, to individuals, members of organizations and institutions and representatives of the State . . . ." Article 4 of the Genocide Convention is to the same effect. Specifically, it provides that "[p]ersons committing genocide or any of the other acts enumerated in [a]rticle 3 shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals." The statutes for the International Criminal Tribunal for the former Yugoslavia ("ICTY") and International Criminal Tribunal for Rwanda ("ICTR") also confer jurisdiction only over "natural persons." *See* Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991 art. 25(1), *adopted* May 25, 1993, S.C. Res. 827, U.N. Doc. S/RES/827 (the "ICTY Statute"); Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for the Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States Between 1 January 1994 and 31 December 1994 art. 5, *adopted* Nov. 8, 1994, S.C. Res. 955, U.N. Doc. S/RES/955 (the "ICTR Statute").

Likewise, the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Torture Convention"), contemplates violations by "persons," which in the agreement's textual context can only mean natural persons. *See* Torture Convention arts. 4(1), 6(1), 6(3), *adopted* Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027. The language of the TVPA,

which executed in part the Torture Convention, *Flores*, 414 F.3d at 247 n.20, provides further support for the fact that customary international law has not recognized corporate liability. Under the TVPA, the term "individual" describes both those who can violate its proscriptions against torture, as well as those who can be victims of torture. Specifically, the TVPA provides that "[a]n *individual* who . . . subjects an *individual* to torture shall . . . be liable for damages to that *individual*," and it defines "torture" as "any act, directed against an *individual* . . . by which severe pain or suffering . . . is intentionally inflicted on that *individual*." *Id.* §§ 2(a)(1), 3(b)(1) (emphasis added). As Judge Weinstein recently wrote:

> [b]oth from context and common sense only natural persons can be the "individual" victims of acts that inflict "severe pain and suffering." *See* [TVPA § 3(b)1]. Because the TVPA uses the same term "individual" to identify offenders, the definition of "individual" within the statute appears to refer to a human being, suggesting that only natural persons can violate the Act. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (noting that "[a]bsent some congressional indication to the contrary, [courts] decline to give the same term in the same Act a different meaning depending on whether the rights of the plaintiff or the defendant are at issue"); *see also Beanal v. Freeport-McMoRan, Inc.*, 969 F.Supp. 362, 381-82 (E.D. La. 1997) ("[T]he plain meaning of the term 'individual' does not ordinarily include a corporation."), *aff'd by* 197 F.3d 161 (5th Cir. 1999).

*In re Agent Orange Product Liab. Litig.*, 373 F. Supp. 2d at 56.

The same is true with respect to the statute making torture committed outside the United States a federal offense. 18 U.S.C. § 2340 *et seq.* Section 2340 provides that, "[a]s used in this chapter . . . 'torture' means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering . . . upon another person within his custody or physical control . . . ." *Id.* § 2340(1). Because here, as in the TVPA, the context

indicates that the word "person" refers to natural persons, the general rule that the word "person" when used in any Act of Congress includes corporations, unless the context indicates otherwise, 1 U.S.C. §1, is not applicable here. *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993) ("'Context' here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts . . . .").

These sources are not undermined by Professor Henkin's suggestion that, "[a]t this juncture[,] the Universal Declaration [of Human Rights (G.A. Res. 217A (III), U.N. Doc. A/180 (1948)] may also address multinational companies." Louis Henkin, *The Universal Declaration at 50 and the Challenge of Global Markets,* 25 Brook. J. Int'l L. 17, 24 (1999). Relying on the Preamble to the Declaration, Professor Henkin argued that it "is 'a common standard for all people and all nations.' It means that 'every individual and every organ of society shall strive – by progressive measures . . . to secure their universal and effective recognition and observance among the people of member states.' Every individual includes juridical persons." *Id.* at 24-25. The Supreme Court, however, has held that the Declaration "does not of its own force impose obligations as a matter of international law." *Sosa*, 542 U.S. at 734. Moreover,

> it is [also] important to keep in mind what exactly the Preamble expects of such individuals and organs: that they "promote" respect for the rights set forth in the Declaration by 'teaching and education' and by supporting "progressive national and international measures." The language is thus consistent with the idea that legal obligations bind corporations only to the extent that further "national and international measures" are taken.

Carlos M. Vázquez, *Direct vs. Indirect Obligations of Corporations Under International Law*, 43 Colum. J. Transnat'l L. 927, 942 (2005).

Nor are the sources rejecting corporate liability undermined by two international conventions and a Security Council resolution, all of which post-date the dismantling of apartheid. *See* The United Nations Convention Against Transnational Organized Crime art. 5(1)(b), Jan. 8, 2001, U.N. GAOR, 55th sess., Supp. No. 49, U.N. Doc. A/45/49; Convention on Combating Bribery of Foreign Public Officials in International Business Transactions arts. 1(2) & 2, Dec. 18, 1997, 37 I.L.M. 1 (1998); S.C. Res. 1566, U.N. Doc. S/RES/1566 (Oct. 8, 2004); Mandatory Action to Fight Terrorism, S.C. Res. 1373 ¶ 1(d), U.N. Doc. S/RES/1373 (Sept. 28, 2001); International Convention for the Suppression of the Financing of Terrorism, *adopted* Dec. 9, 1999, G.A. Res. 109, U.N. GAOR 54th Sess., 76th plen. mtg., U.N. Doc. A/RES/54/109, 39 I.L.M. 270 (2000). While each of these sources call upon parties to enact measures to impose some kind of liability on legal persons in accordance with their own domestic legal principles, none of them directly impose any liability on corporations. Without an analysis of the laws enacted by the various signatories, it is impossible to draw any conclusions regarding the practice of states with regard to the issue of the degree of corporate liability for violation of international law norms.[11]  Indeed, as Professor Bassiouni has observed, although "contemporary international efforts to deal with organized crime, corruption, and drug trafficking" are moving in the direction of corporate liability "these new concepts of corporate criminal responsibility have not yet found their way into [customary international law]."  Bassiouni, *supra*, at 377 (internal quotation marks and footnotes omitted).  *See also* Steven R. Ratner & Jason S. Abrams, *Accountability for Human Rights Atrocities in International Law: Beyond the Nuremberg*

---

[11]  As a general rule, treaties, like contracts, "are legally binding on States that become parties to them by consenting to be bound", and may constitute evidence of a norm of customary international law only if "an overwhelming majority of States have ratified the treaty *and* those States uniformly and consistently act in accordance with its principles." *Flores*, 414 F.3d at 256.

*Legacy* 16 (2d ed. 2001) ("It remains unclear [ ] whether international law generally imposes criminal responsibility on groups and organizations.").

In sum, the issue here is not whether policy considerations favor (or disfavor) corporate responsibility for violations of international law. *Cf.* Carlos M. Vásquez, *Direct v. Indirect Obligations of Corporations Under International Law,* 43 Colum. J. Transnat'l L. 927, 932-959 (2005) (acknowledging that very few norms apply directly to corporations under "international law as it exists today" and outlining arguments for why "international law should move in the direction of generally extending human rights obligations of states to private corporations"). Instead, it involves a determination of what the law was during the relevant period. Indeed, the Supreme Court has held that the retroactive application of statutes enacting civil liability is presumptively inappropriate even where the conduct giving rise to liability was already proscribed and the newly enacted legislation simply increased the scope of liability for damages. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281-86 (1994).

"[T]he presumption against retroactive legislation is [not only] deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic," *id.* at 265, but is also reflected in customary international law. As one scholar has noted, "[a] further traditional corollary of the *nullum crimen sine lege* principle – namely, the notion of non-retroactivity – views the principle of legality from a temporal perspective: conduct may be punished only on the basis of a norm that came into force *prior* to when the conduct occurred." Susan Lamb, *Nullum Crimen, Nulla Poena Sine Lege in International Criminal Law*, *in* Cassese et al., *supra*, at 733, 751 (emphasis in the original). Indeed, "[t]he applicability of the *nullum crimen* principle to serious breaches of international humanitarian law was by 1998 sufficiently well-accepted that its inclusion

125

within the Rome Statute was seen as necessary . . . ." *Id.* at 755. *See also Prosecutor v. Tadić*, 36 I.L.M. 908, 945, Case No. IT-94-1-T, Opinion and Judgment ¶ 654 (Trial Chamber May 7, 1997) (the International Tribunal "must apply customary international law as it stood at the time of the offences").

Although the precise date on which the heart of the apartheid regime stopped beating may be difficult to pinpoint, the executive order by President George H.W. Bush on July 10, 1991, terminating United States sanctions against the country, provides one guidepost. Exec. Order No. 12,769, 56 Fed. Reg. 31855 (July 10, 1991), *reprinted in* 22 U.S.C. § 5061 (2004). By that order, the President concluded as of that date that the Government of South Africa had: (1) released all persons persecuted for their political beliefs or detained unduly without trial and Nelson Mandela from prison; (2) repealed the state of emergency in effect on the date of enactment of [the "Comprehensive Anti-Apartheid Act of 1986"] and released all detainees held under such state of emergency; (3) unbanned democratic political parties and permitted the free exercise by South Africans of all races of the right to form political parties, express political opinions, and otherwise participate in the political process; (4) repealed the Group Areas Act and the Population Registration Act and instituted no other measures with the same purposes; and (5) agreed to enter into good faith negotiations with truly representative members of the black majority without preconditions. *See* Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99-440 § 311(a) (1986). Because the only sources of customary international law that suggest some movement toward the recognition of corporate liability post-date the collapse of the apartheid regime, and because the established norm during the apartheid era was that corporations were not responsible legally for violations of norms

proscribing crimes against humanity, the complaints are subject to dismissal on this ground alone.

3.      **The Concurring Opinions**

(a)      **Judge Hall's Concurring Opinion**

Judge Hall flatly ignores the holding of the Supreme Court that the second consideration in deciding whether to accept jurisdiction over a cause of action alleging a violation of the law of nations "is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 542 U.S. at 732 n.20. Instead of undertaking an analysis of a given norm of international law to determine the scope of liability of a private actor, Judge Hall concludes that international law is irrelevant and that once a violation of a given norm is alleged, ATCA subjects a private party to liability if he aided-and-abetted that violation.

Judge Hall's concurring opinion is premised on the assumption that, even though the ATCA does not by its terms encompass aiding-and-abetting liability, it should be construed as if it contains such language. This aspect of Judge Hall's opinion not only contradicts *Sosa* and *Kadic*, it does disservice to the holding of the leading Supreme Court case addressing the issue of accessorial liability for violations of statutes that create civil causes of action, *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994). In that case, the Supreme Court observed that:

> Congress has not enacted a general civil aiding and abetting statute –
> either for suits by the Government (when the Government sues for
> civil penalties or injunctive relief) or for suits by private parties.
> Thus, when Congress enacts a statute under which a person may sue
> and recover damages from a private defendant for the defendant's
> violation of some statutory norm, there is no general presumption that
> the plaintiff may also sue aiders and abettors.

*Id.* at 182. *Central Bank*, to be sure, only stands for the proposition that when Congress enacts a law creating a private right of action for violation of a statute, "there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* That decision, however, does not preclude civil liability for aiding-and-abetting in cases "where Congress' intent is clear from the language and structure of the statute itself as well as from the legislative history." *Boim*, 291 F.3d at 1019.

*Boim*, upon which Judge Hall relies, concerns the issue of liability for aiding-and-abetting international terrorism in violation of 18 U.S.C. § 2333(a). While the statute, creating the civil cause of action, 18 U.S.C. § 2339A, did not *in haec verba* provide for aiding-and-abetting liability, accomplice liability was implicit in the definition of international terrorism. Thus, in distinguishing *Central Bank*, the Seventh Circuit held that:

> Unlike section 10(b) [the statute at issue in *Central Bank*], Congress also expressed an intent in section 2333 to make civil liability at least as extensive as criminal liability. The statute defining "international terrorism" includes activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1). This language, embracing activities that "involve" violent acts, taken at face value would certainly cover aiding and abetting violent acts. Remember, too, the criminal laws include 18 U.S.C. § 2, which creates liability for aiding and abetting violations of any other criminal provisions. By incorporating violations of any criminal laws that involve violent acts or acts dangerous to human life, Congress was expressly including aiding and abetting to the extent that aiding and abetting "involves" violence.

*Id.* at 1020.

The language of the ATCA, like the language of the statute at issue in *Boim*, can support the recognition of a cause of action for aiding-and-abetting. Nevertheless, it does so only if the plaintiff

128

invokes an international law norm that provides for such liability. Nothing in the language of the ATCA supports the broad holding that Congress intended to provide a forum to adjudicate causes of action for aiding-and-abetting the violation of a norm when such conduct did not fall within the scope of the norm. Indeed, the same Congress that enacted the ATCA, without reference to aiding-and-abetting liability, explicitly made it a crime to aid-and-abet acts of piracy, a violation of the law of nations. *See* Act of April 30, 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790). This shows that, despite Judge Hall's suggestion to the contrary, Op. of Judge Hall *ante* at 59 n.37, the First Congress "knew how to impose aiding and abetting liability when it chose to do so," *id.* (quoting *Central Bank*, 511 U.S. at 174), with respect to violations of the law of nations.

In the absence of either statutory language or legislative history to support his interpretation of the ATCA, Judge Hall's opinion argues that "the Founding Generation nevertheless understood that ATCA encompassed aiding and abetting liability." Op. of Judge Hall *ante* at 59 n.37. This contention is beside the point, for the reasons discussed above, and it is also wrong. In *Central Bank*, the plaintiff argued that "Congress legislated with an understanding of general principles of tort law and that aiding and abetting liability was 'well established in both civil and criminal actions by 1934,'" the year the statute at issue was adopted. 511 U.S. at 181 (citation omitted). The Court's opinion suggested that the plaintiff there relied on the principle derived from the Restatement (Second) of Torts (1979), which provides that a person is liable for another's torts if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. . . ." *Id.* § 876(b); *see Central Bank*, 511 U.S. at 181. The principle of "substantial assistance," which Judge Hall adopts, initially appeared in the Restatement (First) of Torts in 1939, of which Prosser wrote:

129

The form of the Restatement is perhaps unfortunate, in that it seeks to reduce the law to a definite set of black-letter rules or principles, ignoring all contrary authority – since the law of torts in its present stage of development does not lend itself at all readily to such treatment. There is room for suspicion that the courts have tended to cite the Restatement when they are already in agreement with it, and to ignore it when they are not, so that the impressive list of references to it in the cases may be somewhat misleading; and there are those who have disagreed with many of its conclusions, and even denounced the whole project.

William L. Prosser, *Law of Torts* § 4, at 20-21 (4th ed. 1971).[12] Perhaps for this reason, the Supreme Court could write fifty-five years after the publication of the first Restatement that the doctrine of aiding-and-abetting in civil cases "has been at best uncertain in application . . . with the common-law precedents 'largely confined to isolated acts of adolescents in rural society.'" *Central Bank*, 511 U.S. at 181 (quoting *Halberstam*, 705 F.2d at 489). If there was no general understanding that civil aiding-and-abetting liability was "well established in . . . civil . . . actions by 1934," *id.* at 181 (citation omitted), it is difficult to understand how it can be asserted that such an understanding was present in 1789 when Congress enacted the ATCA.

The historical support for the proposition that "[t]he Founding Generation nevertheless understood that civil liability for aiding and abetting international law violations was contemplated under the ATCA," Op. of Judge Hall *ante* at 59 n.37, is ambiguous at best. The lynchpin for this

---

[12] Judge Learned Hand shared Prosser's concern. Hand "repeatedly . . . urged that the Restatements confine themselves to articulating the law 'as it is,' not as it should be; repeatedly, he insisted that the ALI's task was to 'restate, not legislate' . . . ." Gerald Gunther, *Learned Hand: The Man and the Judge* 411 (1994) (internal citations omitted). Indeed, although Hand was a founding member of the ALI and held major positions in it for the rest of his life, he rarely cited the Restatements. *Id.* at 413. The most that he was willing to say about them was that he found them to be useful " 'on questions which were not controversial and [otherwise took] a long time to look up.' " *Id.* (internal citations omitted).

130

argument is Attorney General William Bradford's 1795 opinion, *Breach of Neutrality*, 1 Op. Atty. Gen. 57 (1795). In his opinion, Bradford specifically addressed whether American citizens who "voluntarily joined, conducted, aided, and abetted a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast" could be subject to criminal prosecution in the United States. *Id.* at 58. Bradford expressed some doubt about a criminal prosecution, but he stated that

> there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the law of nations, or a treaty of the United States . . . .

*Id.* at 59.

Because Bradford did not distinguish between primary and secondary liability, it is not possible to discern that, when he said a cause of action would lie for "these acts of hostility," he was focusing on aiding-and-abetting as opposed to direct participation in the conduct that violated a treaty of the United States. Indeed, because the conduct involved direct participation by American citizens, who acted with the intent to make the attack succeed, it seems likely that Bradford recognized all of the perpetrators as joint tortfeasors, as that term was understood at the time. As the D.C. Circuit explained in *Halberstam*:

> Prosser notes that "[t]he original meaning of 'joint tort' was that of vicarious liability for concerted action. All persons who acted in concert to commit a trespass, in pursuance of a common design, were held liable for the entire result." W. Prosser, *Law of Torts* § 46, at 291 (4th ed. 1971). His illustration portrays a standard situation that involved this "joint tort": combined action by tortfeasors on the scene together – "one might have battered the plaintiff, while another imprisoned him, and a third stole his silver buttons." *Id.* (footnote omitted). Each was responsible for the others' actions.

131

705 F.2d at 476-77. Moreover, Prosser goes on to explain that the essential element of a joint tort was "the pursuance of a common plan or design to commit a tortious act." Prosser, *supra*, at 292.

Two early cases cited in Judge Hall's opinion, *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795), and *Henfield's Case*, 11 F. Cas. 1099 (C.C.D. Pa. 1793), neither of which involved the ATCA, bear out Prosser's analysis. Both cases arose from the seizure of a vessel not by pirates, but by privateers, "armed vessels that are owned, equipped and officered by one or more private persons, but sailing under a commission, usually called letters of marque, from a belligerent state, which empowers the person or persons to whom it is granted to attack and seize, at sea, vessels or other property of its enemy." 3 James Fairbanks Conley, *Privateering, in Cyclopædia of Political Science, Political Economy, and the Political History of the United States* 361 (John J. Lalor ed., 1899). The use of privateers in this way was recognized under international law. *Id.* Nevertheless, Talbot's and Henfield's legal problems in these cases derived from the fact that they were United States citizens engaged in acts of war against nations with which the United States was at peace.

*Talbot* was an admiralty case. Talbot himself was the captain of a privateer commissioned by the Republic of France. *Henfield's Case* was a criminal prosecution, and a most unusual one at that, of the prize-master of a privateer also commissioned by France. Henfield was not charged with conduct proscribed by an act of Congress. The undelivered grand jury charge of Chief Justice Jay, upon which Judge Hall relies, Op. of Judge Hall *ante* at 59 n.37, appears to reflect the practice of most of the early justices "to create crimes by judicial fiat[, which] was particularly infuriating to the vast majority of citizens who believed the Constitution had established a government of limited powers." Jean Edward Smith, *John Marshall: Definer of a Nation* 284 (1996). The Supreme Court

132

repudiated the practice in *United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812). Under these circumstances, it is not surprising that Henfield, who was not charged with aiding-and-abetting, was acquitted because "he was ignorant of the unlawfulness of his undertaking." *Henfield's Case*, 11 F. Cas. at 1122 n.7. Nor is it surprising, given Henfield's role as a principal (or as a joint tortfeasor in the civil context), that Jay's grand jury charge, which was written to apply "to the class of offenders, of whom Henfield was one," *id.* at 1105 n.2, did not define aiding-and-abetting, and that the judge who actually charged the Henfield grand jury did not allude to the concept altogether. *Id.* at 1105-09.

In sum, Bradford's opinion and the cases cited by Judge Hall do not support the extraordinary proposition that Congress intended the ATCA to permit jurisdiction to be exercised over claims of aiding-and-abetting without regard to whether the conduct at issue violated an international law norm. Moreover, Judge Hall compounds his flawed discussion of this issue by adopting a standard for aiding-and-abetting that is vague and inappropriate in the present context. As if the language of section 876(b) of the Restatement (Second) of Torts imposing liability for "substantial assistance" was not vague enough, he endorses a five-factor test, first suggested by the Restatement and then adopted in *Halberstam*, to "assess whether the defendant's encouragement or assistance was sufficiently substantial to support liability." Op. of Judge Hall *ante* at 58. These factors are "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind." *Id.*

The "state of mind" factor, as applied in *Halberstam*, includes a "desire to make the venture succeed." 705 F.2d at 488. Nevertheless, despite his reliance on *Halberstam*, Judge Hall's opinion fails to even allude to this critical state-of-mind element. Moreover, even under *Halberstam*'s formulation, it is only one factor among five for determining whether "substantial assistance" was

133

provided. Such a five-prong test for determining whether assistance was substantial hardly provides the clear guidance necessary to those engaging in commercial transactions.

By incorporating a vague "substantial assistance" standard, this newly minted theory of aiding-and-abetting liability will create many practical problems harmful to the political and economic interests of the United States. As the United States observes in its *amicus* brief, the decision to embrace this broader scope of liability under the ATCA will generate tremendous uncertainty for private corporations, who will be reluctant to operate in countries with poor human rights records for fear of incurring legal liability for those regimes' bad acts. Br. for the U.S.A. as *Amicus Curiae* at 13. This uncertainty, in turn, will undermine efforts by the United States to encourage reform in those countries through active economic engagement, *id.*, and will deter the free flow of trade and investment more generally. *Id.* at 18.

### (b) Judge Katzmann's Concurring Opinion

Unlike Judge Hall, Judge Katzmann looks to international law to resolve the issue of whether a private party or a corporation (he draws no distinction between the two) can be held liable for aiding-and-abetting a violation of international law otherwise applicable to state actors or to private parties acting under color of law. While Judge Katzmann properly looks to international law, he disregards the holding in *Sosa* and our own holdings in *Kadic* and *Wiwa*, which I have already discussed at some length, *ante* at 101-02, that require a norm-by-norm analysis to determine whether "international law extends the scope of liability for a violation of a *given* norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 542 U.S. at 732 n.20 (emphasis added). Judge Katzmann declines to undertake this analysis because that "is

not how the inquiry is undertaken by international tribunals whose jurisdiction is limited by customary international law." Op. of Judge Katzmann *ante* at 43.

Contrary to Judge Katzmann's suggestion, the jurisdiction of the international tribunals – he relies principally on the ICTY – are conferred by the Security Council resolutions creating them – or in the case of the ICC by the Treaty of Rome. Indeed, in one significant respect the statute creating the ICTY is inconsistent with the evolving standards of customary international law. *Post* at 140. *C.f.* Rome Statute art. 25(3)(e) (expanding the liability for genocide beyond that provided for other crimes against humanity). More significantly, in the cases on which Judge Katzmann relies – those of the ICTY – the tribunal was not required to make any inquiry regarding the issue of whether "international law extends the scope of liability for a given norm to the perpetrator being sued if the defendant is a private actor such as a corporation." *Sosa*, 542 U.S. at 732 n.20.

The Statute of the ICTY, article 5, followed the London Charter, the Judgment of the Nuremberg Tribunal, construing it, and the tribunals empaneled pursuant to CCL 10, all of which required a connection between crimes against humanity and war crimes.[13] Because private parties are individually responsible for crimes committed in the course of a war, this connection made it unnecessary for the CCL 10 tribunals to address the scope of liability of private actors as aiders-and-abetters. *See Kadic*, 70 F.3d at 239-41; *see also id.* at 242-43 ("Plaintiffs also contend that the acts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities,

---

[13] *See The Nuremberg Trial*, 6 F.R.D. 69, 131, 1 *Trial of the Major War Criminals* 253-54, Brigadier General Telford Taylor, *Final Report to the Secretary of the Army on the Nuerenberg War Crimes Trials under Control Council Law No. 10,* app. B at 224, 228 (William S. Hein & Co., Inc. 1997) (1949). A useful discussion of art. 6(c) of the London Charter, which provided the basis for these holdings, may be found in Bassiouni, *supra*, 19-30.

violate the law of war. Atrocities of the types alleged here have long been recognized in international law as violations of the law of war . . . . The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II."). Thus, ICTY cases provide no support for failing to follow the instruction of the Supreme Court, one that is consistent with our own holding in *Kadic* and *Wiwa*, which requires an analysis of the particular norm the defendant is accused of violating to determine whether a private party may be held responsible as an aider-and-abettor.[14]

While Judge Katzmann erroneously concludes that there was – during the period when the crimes alleged here took place – an independent norm of customary international law, making private actors legally responsible as aiders-and-abetters without regard to whether the particular norm they allegedly violated imposed such liability, he correctly rejects the "substantial assistance with knowledge" standard for this newly minted norm that Judge Hall finds in section 876(b) of the Restatement (Second) of Torts. Instead, he "conclude[s] that a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." Op. of Judge Katzmann *ante* at 38-39. The basis for this formulation is article 25 of the Rome Statute. Rome Statute of the ICC, *opened for signature* July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002).

---

[14] Another reason the ICTY cases are silent on this score is that, while the defendants in these cases may not have been officials of formally recognized states, they were state actors. As we have held, "the state action concept . . . requires merely the semblance of official authority. The inquiry, after all, is whether a person purporting to wield official power has exceeded internationally recognized standards of civilized conduct, not whether statehood in all its formal aspects exists." *Kadic*, 70 F.3d at 245.

Specifically, article 25 of the Rome Statute provides that a person shall be criminally responsible and liable for punishment for specified crimes against humanity if that person:

> (c)  For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission;

> (d)  In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

>> (i)  Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or

>> (ii)  Be made in the knowledge of the intention of the group to commit the crime;

*Id.* art. 25(3)(c), (d).

This article is significant because it makes clear that, other than assistance rendered to the commission of a crime by a group of persons acting with a common purpose, a defendant is guilty of aiding-and-abetting the commission of a crime *only* if he does so "[f]or the purpose of facilitating the commission of such a crime . . . including providing the means for its commission." *Id.* The same standard was adopted by the United Nations Transitional Administration in East Timor ("UNTAEAT"). *See* UNTAET, June 6, 2000, Reg. No. 2000/15 § 14.3(c). As one commentator has observed:

> With regard to *facilitating* the commission of a crime, the aider and abettor must act with '*purpose.*' . . . This means more than the mere knowledge that the accomplice aids the commission of the offence,

137

as would suffice for complicity according to the ICTR and ICTY Statutes, rather he must know as well as wish that his assistance shall facilitate the commission of the crime.

Albin Eser, *Individual Criminal Responsibility*, *in* 1 *The Rome Statute of the International Criminal Court* 767, 801 (Antonio Cassese et al., eds. 2002) (emphasis in original).

The Rome Statute has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world. I agree that it reflects an international consensus on the issue of the appropriate standard for determining liability for aiding-and-abetting, it is consistent with our own domestic law, *see ante* at 111-12, and addresses the concern over the adoption of a "substantial assistance with knowledge" standard raised in the *amicus* brief filed by the United States. Br. for the U.S.A. as *Amicus Curiae* at 13. Indeed, the *amicus* brief appears to endorse the elements set out in article 25(3). *Id.* at 26 (arguing that "the standard the plaintiffs propose differs materially from the most recent formulations adopted in international practice") (citing article 25(3) of the Rome Statute). Perhaps more significantly, the standard in article 25(3)(c) of the Rome Statute is consistent with the *Ministries Case*, discussed at the outset, that holds that the conduct which the defendants allegedly engaged in here was not a violation of customary international law. *The Ministries Case*, 14 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 622. These considerations also obviate any concern regarding the failure of the United States to ratify the Treaty of Rome for reasons unrelated to the definition of aiding-and-abetting. *See Yousef*, 327 F.3d at 92 n.25.

My point of disagreement with Judge Katzmann relates to the narrow issue of whether there was *any* "'well established[] [and] universally recognized'" definition of aiding-and-abetting sufficient to be considered customary international law for the purposes of the ATCA during the

apartheid era when the defendants allegedly violated customary international law. Op. of Judge

Katzmann *ante* at 39 (quoting *Kadic*, 70 F.3d at 239). Nevertheless, I concur in section II.B of his

opinion that articulates the customary international law standard for aiding-and-abetting based on

the Rome Statute. I do so because it provides a clear standard, adopted by a majority of the panel,

for Judge Sprizzo to apply, in deciding whether to grant the plaintiffs' motion to file amended

complaints.[15] Moreover, as applied to the facts in this case, the standard Judge Katzmann adopts is

consistent with the *Ministries Case* – the validity of which has never been questioned.

Judge Katzmann's opinion, however, does not end with section II.B. Thus, while he does

not rely on post-apartheid decisions of the ICTY or the ICTR to support the standard that he

enunciates for determining aiding-and-abetting liability, he does rely on those cases to suggest that

the "substantial assistance with knowledge" standard for aiding-and-abetting may provide a

foundation for future development of the law in this area. I discuss the cases on which he relies to

demonstrate why, contrary to Judge Katzmann's gratuitous suggestion, they do not provide a reliable

basis for a broader definition than the one proscribed in the Rome Statute.

**(a)** **The ICTY**

By way of background, the ICTY was created by United Nations Security Council Resolution

827, which was passed on May 25, 1993, to prosecute individuals responsible for serious violations

of international humanitarian law committed in the former Yugoslavia beginning on January 1, 1991.

Under the ICTY Statute, the tribunal has jurisdiction over four clusters of crimes: grave breaches of

---

[15] In deciding this motion, Judge Sprizzo should also consider applying the pleading standard enunciated in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). The standard seems particularly appropriate to the class actions in this case, which are intended to coerce a settlement rather than provide the framework for a trial which we all know will never take place.

the 1949 Geneva Conventions, violations of the laws or customs of war, genocide, and crimes against humanity. *See* ICTY Statute arts. 2-5. Significantly, as previously noted, the ICTY criminalizes crimes against humanity only "when committed in armed conflict." While this connection with armed conflict is consistent with the London Charter and the Judgement of the Nuremberg Tribunal, *ante* at 135, the ICTY Statute undermines "subsequent developments de-coupling 'crimes against humanity' from the initiation and waging of an aggressive war . . . ." *Bassiouni*, *supra*, at 194. Indeed, if we applied this retrograde statute here, it would require the dismissal of the complaints.

Against this backdrop and my earlier discussion of the ICTY statute, I turn to the specific ICTY decisions relied upon by Judge Katzmann. The gruesome facts in the *Furundzija* case, the principal case which Judge Katzmann cites, are illustrative of the circumstances under which the ICTY chose to address aiding-and-abetting liability. There, two victims, identified as A and D, were apprehended and were brutally interrogated. The ICTY made the following finding with respect to the defendant and his co-defendant, who it identified as Accused B: "There is no doubt that the accused and Accused B, as commanders, divided the process of interrogation by performing different functions. The role of the accused was to question, while Accused B's role was to assault and threaten in order to elicit the required information from Witness A and Witness D." *Prosecutor v. Furundzija*, 38 I.L.M. 317, 363, Case No. IT-95-17/1-T, Judgment ¶ 130 (Trial Chamber Dec. 10, 1998). While this was an open-and-shut case of joint participation in a violation of international law by members of an armed group in an international conflict, the ICTY panel entered into a confused and rambling discussion of aiding-and-abetting.

This theme animates the other ICTY cases cited by Judge Katzmann. In *Tadić*, the Trial Chamber found that the defendant, as part of a group proclaiming the creation of an independent Bosnian Serb republic, played an active role in the attack on a majority Muslim town in a predominantly Serb region by, *inter alia*, beating civilians and forcibly transferring them to concentration camps. *E.g.*, *id.*, Judgement ¶¶ 397, 455, 461. He was also among a group of men who beat, stabbed, and/or killed a number of individuals at such concentration camps in the context of the armed conflict. *E.g.*, *id.* ¶¶ 235-36, 261, 303, 316, 435, 448. Again, this is a classic case of joint participation in criminal conduct by state actors in an armed conflict who provided direct and substantial assistance to the "common purpose" of effecting a violation of an international law norm. *Id.* ¶¶ 730, 735, 738. Indeed, *Tadić* was expressly cited in *Furundzija*, as holding that "the accused 'intentionally assisted directly and substantially in the common purpose of the group' to commit the offence." *Id.* Judgment ¶ 226 (internal citations omitted). *See also Prosecutor v. Vasiljević*, Case No. IT-98-32-A, Judgment ¶ 134 (App. Chamber Feb. 25, 2004) (The evidence showed that "Appellant knew that the seven Muslim men were to be killed; that he walked armed with the group from the place where they had parked the cars to the Drina River; that he pointed his gun at the seven Muslim men; and that he stood behind the Muslim men with his gun together with the other three offenders shortly before the shooting started.").

Similarly, in *Prosecutor v. Kvočka*, Case No. IT-98-30/1-T, Judgment (Trial Chamber Nov. 2, 2001), the defendants were employees of a camp created by Serb Forces in Bosnia Herzegovina, where non-Serbs were detained, killed, and otherwise gravely mistreated. The administrative aide to the commander of the camp was found to have participated in the joint criminal enterprise because his "administrative duties constituted one of many integral cogs in the wheel of a system of gross

141

mistreatment." *Id.* Judgment ¶ 460. The other two defendants held individually responsible were both guard shift leaders at the camp. One defendant was convicted on the basis of "substantial evidence presented that the guards on [his] shift beat detainees, sometimes in his presence, and he not only failed to object, but participated on occasion." *Id.* ¶ 497. The other guard leader also permitted serious crimes to be committed by those under his command and he personally "perpetrated a number of serious crimes, particularly sexual violence." *Id.* ¶ 566. This case is the mirror image of the Dachau Concentration Camp case in which

> there was in the camp a general system of cruelties and murders of the inmates (most of whom were allied nationals) and that this system was practiced with knowledge of the accused, who were members of the staff, and with their active participation. Such a course of conduct, then, was held by the court in this case to constitute "acting in pursuance of a common design to violate the laws and usages of war." Everybody who took any part in such common design was held guilty of a war crime, though the nature and extent of the participation may vary.

*Trial of Martin Gottfried Weiss and thirty-nine others*, 11 *Law Reports of Trials of War Criminals* 5, 14 (William S. Hein & Co., Inc. 1997) (1945).[16]

These cases hardly provide a foundation upon which a norm of international law, of the kind Judge Katzmann suggests, can be constructed. Nor do the opinions of the ICTR, to which I now turn.

---

[16] The citation is to the United Nations War Crimes Commission summary of the case based on the indictment, the evidence and arguments of counsel. *See Foreword* 1 *Law Reports of Trials of War Criminals*, at x. The General Military Government Court of the United States Zone itself reached a guilty verdict without any opinion.

**(b) The ICTR**

The ICTR was created on November 8, 1994, by the United Nations Security Council Resolution 995 in order to judge those individuals responsible for serious violations of international law in Rwanda and nearby states, between January 1 and December 31, 1994. Specifically, the defendants there were accused of genocide, crimes against humanity, and violations of Article 3 common to the Geneva Conventions and of Additional Protocol II. The ICTR Statute did not require a connection between a crime against humanity and an armed conflict. While the ICTR and ICTY are separate tribunals they shared the same Appeals Chamber, Op. of Judge Katzmann *ante* at 40 n.28. Not surprisingly, as Judge Katzmann observes, there was little to distinguish judgments of one from the other. *Id.* These judgments, as I proceed to show, are equally useless precedent on the issue of liability of private parties for violations of customary international law.

In *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgement (Trial Chamber Sept. 2, 1998), the defendant, serving as the local "bourgmestre," was charged with executing the laws adopted by the communal legislature, had control over the appointment and removal of communal employees, and had ultimate authority over the communal police and any gendarmes put at the communes disposal. Judgement ¶¶ 61-71. Bourgmestres also had significant *de facto* powers over their constituents, like those of a tribal chief. *Id.* ¶¶ 72-74. Indeed, the indictment only charges Akayesu with violations performed during his time as a public official. Given the widespread use of public employees and facilities in this conduct, it is clear that Akayesu was a state actor and a joint participant with other state actors.

143

Similarly, in *Prosecutor v. Bagilishema*, Case No. ICTR-95-1A-T (Trial Chamber June 7, 2001), and *Prosecutor v. Musema*, Case No. ICTR-96-13-T (Trial Chamber Jan. 27, 2000), the defendants were not only charged with acts of direct criminal participation in crimes in which they were joint participants, they were significant public officials. Bagilishema, the Mayor of a Rwandan commune, was accused of, *inter alia*, arming individuals and directing them to attack, personally attacking and killing persons, as well as other official acts encouraging mass killings. *See Bagilishema*, Judgment annex A. Musema was the director of a state-owned tea factory, under the authority of the Rwandan Ministry of Agriculture, who led and participated in attacks on non-Hutus using factory employees and equipment, personally shot at refugees, ordered the rape of one Tutsi woman, and personally raped another woman. *See Musema*, Judgment § 5.

Finally, in *Prosecutor v. Ntakirutimana*, Case No. ICTR 96-10-A, ICTR-96-17 (App. Chamber Dec. 13, 2004), the Appeals Chamber summarized the Trial Chamber's findings of facts, in part, as follows:

> The Trial Chamber found 1) in relation to the Mugonero Indictment that, in addition to killing Charles Ukobizaba and shooting at Tutsi refugees at the Complex, Gérard Ntakirutimana's participation in the attacks included procuring ammunition and gendarmes for the attack on the Complex and participation in the attack on Witness SS; and 2) in relation to the Bisesero Indictment that, in addition to killing Esdras and the wife of Nzamwita, pursing and shooting at the refugees, he transported attackers at Kidashya, headed a group of armed attackers at Muyira Hill in June 1994, was at Mutiti Hill in June 1994 with *Interahamwe* where they shot at refugees in a forest by a church, and participated in attacks in Bisesero during the period April to June 1994.

*Id.* ¶ 491. This is a classic example of joint participation of persons acting pursuant to a common design. Moreover, the defendants were also direct participants in the offenses for which they were convicted.

Judge Katzmann concedes that the defendants in the ICTY and ICTR cases he cites involved joint participants in violations of international law. Indeed, virtually all of the defendants in these cases were state actors. They hold, at most, that "substantial assistance with knowledge" satisfies the participation necessary for the imposition of liability on joint participants sharing the common purpose of violating a norm of customary international law. This is entirely consistent with the Rome Statute.

Moreover, to the extent that any language in these opinions suggest more than that, it rises only to the level of *dicta*, of which peremptory norms of international law are not made. Indeed, the leading treatise Judge Katzmann cites explains that "decisions of international tribunals . . . exercise considerable influence as an impartial and considered statement of the law by jurists of authority *in light of actual problems which arise before them*." 1 *Oppenheim's International Law: Peace* 31 (Robert Y. Jennings & Arthur Watts eds. 9th ed. 1962) (emphasis added). *Dicta* unrelated to the actual problems which arise before them do not warrant such deference. This is all the more so where *dicta* are inserted by judges who are using their positions to make law with respect to matters with which they have preconceived views. Yet, a leading jurist and commentator has observed that the practice of "deal[ing] through *obiter dicta* with legal issues that were incidental, as it were, to the main questions," was a regular practice of ICTY panels. Antonio Cassese, *The ICTY: A Living and Vital Reality*, 2 J. Int'l Crim. Just. 585, 589 (2004). The excuse given for this practice is that it provided "clarification [that] might have some value for the future development of international

145

criminal law[.]" *Id.* As Antonio Cassese, the President of the ICTY and Presiding Judge of the

ICTY Trial Chamber, who was one of the judges on the ICTY panel in *Furundzija*, goes on to

explain:

> In this connection, one may find much merit in the witty remark reportedly made by a senior member of the ICTY Office of the Prosecutor in 1995, after the Appeals Chamber handed down its lengthy judgment in [*Prosecutor v. Tadi*ć, Case No. IT-94-1 (App. Chambers Oct. 2, 1995) (Cassese, Presiding J.)]: 'We had gone for a steak,' he said, 'and have got a whole cow.' However, international courts operate in a legal system that is notably lacking in many respects. Among other things, the absence of an international law-maker and an international court with compulsory universal jurisdiction entails that many rules are not clear, particularly when they are of customary origin, and are thus open to differing interpretations-hence the need for courts gradually to spell out the contents of those rules, if need be through *obiter dicta*.

*Id.* at 590.

Nevertheless, Judge Cassese cautioned that "one should not be oblivious of the possible flaws

or abuses. Courts may indulge in legal discussions that not only are peripheral to the *ratio decidendi*,

but may also prove simply academic and sometimes also misleading for future courts pronouncing

on the same matters." *Id.* This accurately describes the aiding-and-abetting *dicta* in the ICTY

opinions. They do not constitute a foundation strong enough to provide a future basis for rejecting

the international consensus achieved by the Rome Statute on the elements of aiding-and-abetting.

## Conclusion

I dissent from judgment reversing the dismissal of the complaint for the reasons I have elaborated above. Nevertheless, I concur in section II.A of Judge Katzmann's opinion that rejects Judge Hall's argument that the scope of liability for the violation of the norm of international law must be decided by reference to our own domestic law. I concur as well in section II.B of Judge Katzmann's opinion that articulates the elements of aiding-and-abetting liability as defined in article 25(b) & (c) of the Rome Statute. These elements are consistent with, if not mandated by, customary international law. I also concur in section II of the *per curiam* opinion dismissing the TVPA cause of action for the reasons stated in the *per curium* opinion and for the additional reason that only natural persons are subject to liability under it.